On September 5, 2007, after much protest actions from CUTNER and the Tenant

Advisory Board of 319 West 94th street,  The Lantern Group agreed to have a service of

extermination performed on a monthly basis. (See copy of September 5, 2007 Tenant

Meeting Agenda as Exhibit 18).

The "Interim Case Management Services" described in the document remitted by the

Lantern Group on September 5,2007 reveled itself to be a total joke. Unknown

individuals calling themselves "CASE MANAGER"

assaulted  tenants "in case of  special need" in the bathroom or in their rooms without

being invited and started to question them!

How many tenants in need of "special assistance"  desperately helpless and hopeless

people who cannot or do not seek judicial recourse because they are too afraid will fall

prey to "bureaucratic carnivores" hired by the Lantern Group under the cover of "Interim

Case Management Services"?

President Ronald Reagan once famously quipped: "The nine most terrifying words in the

English language are:

"I'm from the government and I'm here to help"


Cases of the unfortunate tenants with "special need" in the building known as The Saint

Louis Hall" confirm the wisdom of that adage.

The Lantern Group claimed that:


"The initial contact with the tenant will involve an informal conversation with the tenant

to ascertain whether the tenant is in need of assistance...."

The truth of the matter is that the Lantern Group threw "bureaucratic carnivores" on the old, fable, and devastated tenants to rush them to move

To another building or else....??????

Others tenants received unsolicited visit from so-called "social worker" who came "to talk to tenants "in special need" to persuade them to leave the premises.

**78. Discrimination regarding Package delivery and pick up:**

After a fierce battle from August 15, 2007 until September 10, 2007 between members of the Tenant Advisory Board, among them CUTNER, and the management of The Lantern Group, The Lantern Group accepted reluctantly to modify the harsh policy enacted on August 15, 2007.

The Interim Package Handling Policy dated September 10, 2007, stated that:

"The reception desk will accept personal deliveries (i.e. laundry, dry cleaning) to accommodate **only** tenants with physical disabilities. "

However, The Lantern Group at the bottom of the page surreptitiously added:

**"This policy is currently applicable and management reserves the right to revise or change in as appropriate, upon further review"**

(See copy of Interim Package Handling Policy as Exhibit 19)

CUTNER expresses absolutely no confidence regarding The Lantern Group's promises because in the 19 months The Lantern Group has managed 319 West 94th street, The Lantern Group has repeatedly broken their promises to tenants and representatives of elected officials, both individually and collectively.

CUTNER expresses her overriding concern that The Lantern Group will again break the policy as it has done in the past repeatedly and this sentence[1] printed at the bottom of the page is indicating it willingness to put the tenants "On Notice" that indeed it will break the promises.

Then The Lantern Group will only state: "I put you on notice that it was subjected to revise or change".

## 79. ELIMINATION OF BASIC SERVICES OF DOORMEN AVAILABLE BEFORE THE LANTERN GROUP TOOK OVER THE MANAGEMENT OF THE BUILDING.

Since March 2006, The Lantern Group eliminated the service of a doorman and replaced the position of doorman by a company providing security guards for the building.

This decision has been and still is a total disaster.

On May 15, 2006 CUTNER by her letter dated the same day notified The Lantern Group that a man either drink or in a deep coma was asleep against her door, leaning half against the door and half laying on the stairs leading to the 4th floor. The stranger could not be waken or moved.

CUTNER had to step over his body to go downstairs to alert the security guard about this intruder.(See copy of Cutner's letter written to The Lantern Group after the incident as Exhibit 20 )

The Lantern Group did absolutely nothing.

---

[1] **This policy is currently applicable and management reserves the right to revise or change in as appropriate, upon further review"**

In the months after the Lantern Group took over the building CUTNER became increasingly suspicious that strange individuals were roaming the premises. The security guards were behaving very badly toward the Permanent tenants, and because CUTNER was struggling to make contact with some one at the Lantern Group management who never answered the phone, she again wrote a letter to complain, but to no avail. (See Cutner's letter dated June 13, 2006 herein as Exhibit 21). The Lantern Group did absolutely nothing.

**80.** On January 22, 2007 CUTNER alerted in writing The Lantern Group about the experience of two female residents living on the 6th floor being frightened because during the night the homeless people living next door, in the building located at 315 West 94th street and run by the City of New York like a New York City Homeless Center, were crossing the roof and coming from their roof to the 319 West premises. They were going to the basement where they were gathering and carrying all night. (See copy of CUTNER's letter dated January 22, 2007 herein as Exhibit 22) The Lantern Group denied that the incident took place.

During the week on or around January15 thru January 22, 07 the lock of the front door of the building was broken. The broken lock was wrapped in tape There was a large sign glued to the door : "Please enter the Building"

Nobody repaired the door for one full week. And again The Lantern Group did not bother to answer CUTNER's letter.

**81.** On or about September 5, 07 at 7:00 A.M. a Permanent Tenant, a lady, went outside the building .

She had to go out quickly. She threw a shawl over her nightgown and went out.

When she wanted to go back into the building, she found the door locked. The night security guard had left early without waiting for the morning guard to arrive at 8 .00 A.M. The main entrance of the building was locked.

This lady-tenant had to wait one hour outside the door in her nightgown because the security guard had left early in a total disregard to his duty.

This is the perfect example of a blameless Permanent Tenant being treated like an animal. The decision of The Lantern Group to suppress the services of doormen and to replace said services by security guards who treat people like cattle is a total disregard of basic tenant rights.

Permanent Tenants should have the basic tenant right of services of doormen or in the alternative, Tenants should have the right to receive individual keys of the main entrance of the building issued to each Permanent Tenant.

This is a perfect example of subtle harassment designed to treat Permanent Tenants including CUTNER, as cattle or jailed inmates and not like free and responsible tenants with the right to go, leave out or enter their building as they pleased.

**82.** On or about September 5, 2007 at 6.30 A.M. CUTNER, as she was making her bed, let her pillow fall thru her window outside her room located on the third floor in the back of the building.

She quickly went down and requested the help of the security guard to retrieve her pillow which had landed on the inside pavement in the inner yard, three floors below.

The security guard, a young fellow, was flabbergasted and lost. He did not know what to do. CUTNER suggested that he accompanied her down below to the inner yard to retrieve her pillow. The young security guard rushed down the stairs and was faced with a solid wall. He did not know that the inner yard was not accessible thru the stairs.

In the alternative he rushed into the elevator to find out to his dismay that the elevator was locked. He could not access the basement and the inner yard thru the elevator either.

He was very young, getting frantic all red in his face and about to cry.

He tried to call the management special phone line without success. Nobody answered.

CUTNER ask him what he would have done if she would have felt thru the third floor window instead of her pillow?  Supposed she would have fainted and fell thru the third floor window?  What was he supposed to do?

He recognized that he did not know what was he supposed to do if a terrible accident would had have happened except call 911.

The police would have come and would have been unable to access the inner yard! The security guard acknowledged that he did not have the keys to operate the elevators nor that he knew where to locate said keys.

CUTNER perceived clearly that the security guard knew nothing regarding the security of this building.

CUTNER asked him whether the security company had trained him for this particular building before sending him on his watch on this premises and he said that he could not remember whether he had any training regarding this particular building.

28

He said to CUTNER that the security company never trained him about any particular

building and that he was totally ignorant of the exit and ingress of the stairways and

elevators of this specific building.

The ostensibly blameless security guard, young and inexperienced, was rather an

unwarranted burden on CUTNER and the remaining Permanent tenants.

**83.** CUTNER concluded that the replacement of the building doormen by this security

company was a mistake.

CUTNER understood that her own initial faith in The Lantern Group as an able entity to

safeguard the health and well-being of those who need guidance the most: vulnerable, old

people, was an illusion.

CUTNER called her own initial faith in those security guards " the myth of rights".

Nobody was safe because the security guards were not trained to know and understand

this specific building.

 It is clear that The Lantern Group is partially to blame as well as the security company

for the event in issue.

Questioned by CUTNER about this issue The Lantern Group Management said to

CUTNER that she should have waited 8 .00 A.M. when the management arrives to

answer her call. Unfortunately accident does not wait until 8. A.M. to happen!

CUTNER explained that she was working downtown in the financial district and that she

hade to leave at 7:00 A.M. to reach her office on time.

## LIABILITY OF THE LANTERN GROUP REGARDING SAFETY OF THE BUILDING

In any event, The Lantern Group itself claimed that "they cannot be responsible for the security or condition of packages that are being delivered at the building. They claimed that they "Interim Package Handling Policy" was dictated because of "risk of theft, loss, or spoilage".

What is the use to have security guards and retain the services of a security corporation if there is a higher risk of incompetence and theft, loss and spoilage because of the presence of the security personnel?

## TOTAL FAILURE OF THE LANTERN GROUP TO MAINTAIN A CLEAR, SAFE AND INFESTATION FREE BUILDING

**84.** On February 7, CUTNER and 21 other tenants met with members of the Health and Human Services Committee on the premises 319 west 94th street and request that The Lantern Group in good faith works with the tenants to address the issues. Unfortunately The Lantern Group nor the Committee on Health and Human Services were able to address the issues exposed by CUTNER and the tenants.

**85.** On June 11, CUTNER and 14 other tenants meet with Representatives of Elected Officials to point out these issues to attention of Officials but to no avail.

**86.** On August 20, 2007 a Walk-thru at 319 West 94th street, well advertised in advance to give time to The Lantern Group to get organized took place where Council person Gale A. Brewer, Assembly person Linda Rosenthal, Michael Meade, New York State Senator Office and other State and New York City officials, were appraised of the terrible state of the building.

**87.** Michael Meade saw five instances of "C" building code violations that included : falling down ceilings, open hole at the entrance to a bathroom. Rotten floorboards

throughout and clear evidence of gas leaks in kitchen. All of these violations have been brought to the attention of The Lantern Group management and are in the back of the building where tenants are expected to be relocated to during the construction period.

**88**. Michael Meade also  saw two areas in which the vast majority of tenants living there would easily be described as untreated severely mentally ill.

**89.** In one instance the tenant who resides in room #637 had moved into the common area bathroom. Another tenant a lady, living next door to this tenant has been so terrorized by this individual when she saw him coming around the corner she immediately became openly afraid and attempted to flee the area.

**90.** These two sections on the sixth floor front south east side of the building and third floor front south west side of the building have been known "dumping grounds" for many of the Permanent tenants with "special Needs" who reside in the building. Additionally there was a noticeable smell of body odor and other scents in these areas and it was quite clear that many tenants had no left their rooms in years. (See report from Christopher Santee, a Permanent Tenant in room# 106 written on August 20, 2007 [ herein as Exhibit 23(a) ]

(See also report and notification sent by Christopher Santee a Permanent Tenant  residing in room #106 to Jessica Katz about the complete utter failure from the Lantern group to operate the building in an acceptable manner, dated August 20, 2007. [Herein as Exhibit 23 (b) ]

**91.** On May 15, 2007 CUTNER  wrote to The Lantern Group to complain about "C" violation in the community bathroom  in her area  on the third floor. CUTNER following the procedure told the front desk about the incredible dirtiness of the community

bathroom next to her room #341. She fills out a form. Nothing happened. For three days

the bathroom was plugged up and dirty water stands at the bottom of the tube. The water

closet was very filthy and the tile floor very soiled. The young mother with her two little

children, daughter of Permanent tenant Monica Sandoval and next door tenant of

CUTNER approached her and told her that she was worried for the health of her two little

kids. She said she could not continue to suffer like that. She said that on several occasions

she begged the management to give her brushes and cleaning fluids and that she would be

more than happy to clean the bathroom for her children, for her, for CUTNER, for

everybody living on the third floor in that section in the building, she cried to the

management.... Nothing happened... This young woman was on tears and told

CUTNER that she was willing to help if the Management would at least pay for the

cleaning fluid, cleaning powder , cleaning brushes.... Nothing happened...CUTNER

HAD THE STRONG FEELING THAT NOT ONLY SHE WAS HARASSED BUT

THAT OTHER TENANTS

WERE HARASSED TOO and that The Lantern Group harassed tenants in "low-ranking

position" in the group of Permanent tenants, because they were dependent upon the

approval and goodwill of The Lantern Group management to continue to live in the

building, The Lantern Group was depriving this young woman with her very young

children of material security and independence, and the discrimination toward her

followed the same distressing but familiar pattern of the harassment that CUTNER had to

suffer for months and months. CUTNER understood that rats, mice , and bugs will

continue to freely enter the building and that The Lantern Group would do nothing in the

hope that the tenants would leave. Again, CUTNER witnessed discrimination against this

young Spanish speaking woman as she had suffered discrimination against herself for months and months.

(See Cutner 's letter to management dated May 15, 2007 herein as Exhibit 24).

Furthermore, CUTNER understood that in terms of discrimination and harassment, "anything goes" in the building as long as there was no physical contact with the tenants. The infestation of bedbugs, mice, rats, the unknown individual sleeping in the stairway, the total failure to maintain a clean, safe and infestation free building, the verbal assaults to the young Spanish woman, the rhetorical onslaught against vulnerable minors seeking redress, the barrage of questions ( "did you fill out **the form** for repair and cleaning?"- "did you take a photocopy of the form?" –" Did you place it in the box?") and "a lecture on how the Lantern Group was doing the utmost possible to solve the issues" that was anything but subtle from The Lantern Group Management, were a type of clever, shrewd and refined harassment, nevertheless offensive or intimidating to CUTNER and to other Permanent tenants, and designed to make CUTNER and the Permanent tenants leave the premises for good.

## THE ECONOMIC INFEASIBILITY DEFENSE

## OF THE LANTERN GROUP

**92.** On or about May 2007 CUTNER confronted Rafal Markwat, and Felix De Jesus, Property Managers of the Lantern Group regarding cleanness of the common area and "c" violation in the third floor where she lives.

"Ah! We don't have any money!" cried the two Property Managers. "If you, Tenants, **were paying your rent**, we would not be in the state where we are!"

That type of remarks made to CUTNER who paid her rent regularly was offensive.

33

Further more that remark had a demoralizing effect on everyone tenant within the range of it! This type of harassment had a cumulative, demoralizing effect that discourage CUTNER from asserting herself within the building community, even though that she paid her rent regularly[ $3,000 every six months!] While among others tenants who heard the remarks it reinforces stereotypes of certain Permanent Tenants, being losers, worthless, and unable to pay their rent.

Severe and pervasive harassment by the Lantern Group managers and personal, and by the security guards, created a hostile or intimidating environment that causes tenants to feel worthless, to push them to leave the premises for good, and look elsewhere for lodging.

The life of CUTNER was disrupted by that type of subtle harassment event if CUTNER being a tenant in good standing was not directly involved and did not feel attacked by the verbal assaults from the Lantern Group Management on other tenants.

The offensive conduct of the managers of the Lantern Group led to a victimization of the Permanent tenants as, in a different field, the U.S. Equal Employment Opportunities Commission (EEOC) recognized this effect on the morale of human being in its statement:


"The victim does not have to be the person harassed but could be anyone affected by the offensive conduct."


**93.** The Lantern Group told CUTNER that to enforce building code where compliance would cause severe economic distress, raised the so-called "economic infeasibility"

defense ! Rafal Markwat stated that the cost of correcting the cited code violations was likely to exceed any revenue The Lantern Group could obtain from the tenants after making the required repairs.

The shocking and pathetic response of Rafal Markwat, Property Manager of The Lantern Group to CUTNER's simple question: i.e

"Why don't you repair at least the "C" violations in my bathroom in #341?"

Triggered from CUTNER the most spontaneous response: She told Rafal Markwat, and Felix de Jesus, Property Managers of The Lantern Group that she was going to sue the Group if an amelioration of the state of the building were not done soon.

94. During the course of the conversation, CUTNER said that the sorry looking state of the building was a far cry from the marvelously simple and efficient state of the building when said building was run like an illegal hotel by the Margules Family with a set of Haitian doormen, porter and cleaning ladies, who, in 1994, were doing their job: clean rooms, although modest looking, but spotless. CUTNER asked for a full cash flow analysis, including rent roll, profit and loss statements, and a thorough engineering analysis of the building but to no avail. Both Rafal Markat and Felix de Jesus said that CUTNER perceived disparities between the management of the Margules Family and the management of the Lantern Group in the wrong way because the Lantern Group were running the building impartially, ethically and efficiently although Permanent Tenants were not paying their rents.

95. Since she had paid $6,000 dollars for rent from December 2006 until December 2007 and since, among her two checks of $3,000 each, only one (the last one) was cashed by

The Lantern Group, CUTNER made it clear to The Lantern Group that she did not believe in its "economic infeasibility " defense.

CUTNER told both managers that some of the "C" violations would leads the management of the Lantern Group to jail if nothing was done.

CUTNER told The Lantern Group that this defense did not exempt The Lantern Group from rent-regulated tenant's right and SRO tenants to remain in the premises.

CUTNER told The Lantern Group that "it would remain liable for whatever damages that she, as Permanent tenant, may claim and, of course an abatement of the rent. Further more, even if the economic infeasibility defense was a viable defense for The Lantern Group, this defense did not mean that The Lantern Group was automatically granted the right to evict the tenants who were living there!"

Further more, CUTNER told The Lantern Group that the alleged economic hardship The Lantern Group now was facing in not making the repairs required by tenants and more particularly by CUTNER was self-inflicted.

On August 20, 07, the day of the "tour", CUTNER told both managers that she did not believe that:

> "The cost of the repairs that she would like to see carried on the building, including both materials and labor, and cost of repairs associated with the removal of the "c" violations would establish an economic infeasibility as a defense for The Lantern Group."

> CUTNER added that it was well known that the alleged economic hardship The Lantern Group now was facing was self-inflicted by its failure to properly maintain the building.

36

CUTNER told The Lantern Group that she knew as a fact that the Lantern Group was withholding illegal basic services to force tenants to leave the premises. The Lantern Group knew that the option of going to court was not a viable option since most of the tenants lack funding, were not able to secure a private attorney, and could not obtain a court appointed counsel. To most of the tenants it was the equivalent of a slammed door.

The Permanent tenants including CUTNER, were kept "in jailed" inside their rooms with gaping holes in interior walls that vermin find inviting, leaky ceilings, and filthy corridors leading to plugged up bath tube and dirty washbowls.

## IN ADDITION CUTNER IS DEVELOPING IN HER COMPLAINT
## TWO COMMON LAW CAUSES OF ACTION

**96.** CUTNER, complaining of The Lantern Groups, respectfully alleges two common law causes of action, namely:

    (1) Fraud,

    (2) Negligent misrepresentation..

## FACTUAL ALLEGATIONS OF FRAUDULENT INTENT

**97.** On or about March 2006, on information and believe the Lantern Group entered into a Net Leasing Agreement with the current owner 319 West 94th Street a.k.a The Margules Family. The current owner defendant No. 7 conspired with the Lantern Group to select the shape and form of a non-for- profit corporation because such a legal corporation was exempted to obtain a Certificate of No Harassment from the Commissioner of the Department of Housing Preservation and Development (HPD) certifying that no lawful SRO residents has been harassed to move out in the thirty-six-

month period prior to the application date, as a condition precedent to the Commissioner of Buildings approving plans for building alterations and issuing work permit.

## THE FRAUDULENT STRUCTURE OF A NON-FOR-PROFIT ORGANIZATION SUBSTANTIALLY BENEFIT THE LANTERN GROUP

**98. The Lantern Group substantially profited from the transaction i.e. acquiring the SRO under a NET LEASE agreement under the fraudulent legal structure of a Not-For-Profit corporation in order to benefit from the waiver of the obligation to obtain and to deliver to the City of New York a Certificate of Non Harassment. As a result of this scheme, the contract of NET LEASE became profitable to The Lantern Groups.**

**99.** The Lantern Groups are contemplating gaining from the City of New York a zoning variance, allowing them all, to bulk up mid-block, tearing down pre war structure, demolishing SRO, building poorly conceived city –funded supported housing projects, and getting rid of CUTNER and other Permanent Tenants, meanwhile causing direct economic injury to CUTNER and other Permanent Tenants.

## HISTORICAL BACKGROUND

**100.** On or about March 2006, The Lantern Groups intended to carry out construction to alter, rehabilitate and renovate the former SRO Hotel St. Louis a/k/a St. Louis Hall over

an extended period which will change the overall room count in the premises know as "
The St. Louis Hall".

**101.** The St Louis Hall, an SRO hotel, fell prey to a common predatory investment
scheme where by The Defendant No. 1 thru The Defendant No.7 (collectively referred to
as "The Lantern Group" ) purchased the subject property located at 319 West 94th street,
New York, NY 10025, under a NET LEASE
Arrangement with the Owner 319 WEST LLC and managing company A.R.M.
CAPITAL RESOURCES CORP., at a deep discount, conducted minimal repair work,
and, in conjunction with some unknown investors, caused the property to be converted
into a so-called "permanent affordable housing" with so-called "provided on-site social
services to tenants".

**102.** Defendants No. 1 to No. 7 (collectively referred to as "The Lantern Group")
fraudulently under the cover of a Not-for-Profit corporation to enjoy the waiver of the
obligation to present to the City of New York a Certificate of Non-Harassment, regarding
the Permanent Tenants, substantially profited from the transaction.

 (a) The Lantern Group enjoys the waiver of the Certificate of Non harassment when
  in a matter of fact it harasses old, disabled and poor permanent Tenants ,

 (b) On information and belief, its chief executive receives excessive compensation
  paid by the not-for-profit corporation (collectively referred to as "The Lantern
  Group")

 (c) In addition The Lantern Groups has made it clear that they will no longer
  operate the St. Louis Hall as an SRO, instead they will house displaced residents
  of their various construction projects to the St. Louis Hall.

(d) Upon completion of these projects the Permanent Tenants will meet the same fate as those who resided in the Marion a/k/a the Hunters Moon Hall located at 2612 Broadway (Broadway and 98th and 99th street) which was recently purchased by The Lantern Group.

## HARASSMENT OF THE ILLEGAL IMMIGRANT RESIDENTS OF THE MARION

**103.** The Lantern Group is the owner of "The Marion" a/k/a the Hunter Moon Hall, located at 2612 Broadway (Broadway and 98th and 99th street

**104.** On March 4, 2006, residents of the "Marion" most of whom were hard-working Mexican natives, were informed by the "onsite management" of The Lantern Group that they would immediately be evicted and that under the Immigration Act of 1990, and under the illegal immigration reform and immigrant responsibility act of 1996, and under the USA PATRIOT ACT and the HOMELAND SECURITY ACT under the revision and reorganization of the grounds for exclusion and deportation the tightening of deportation procedures for all aliens and the institution of even tougher procedures for criminal aliens than already existed, these unfortunate frighten illegal immigrants, would be immediately deported and barred from returning to the United States for ten years.

**105.** On or about March 4, 2006, The Lantern Groups frightened these residents and told them that they would call the inspectors of the Immigration and Naturalization Services and the inspectors of the Department of Homeland Security and that they would be immediately deported if they did not accept to be transferred to the St. Louis Hall.

## DISPLACEMENT OF PERMANENT TENANTS AGAINST THEIR WILL

**106.** Upon information and belief, The Lantern Group engaged in a pattern and practice of  displacing Permanent Tenants from their various construction projects, changing  the configuration of the room on every floor, and adding two and half floors to the building, and specifically targeting SRO, fraudulently DISPLACING Permanent Tenants, not operating any longer the St. Louis Hall as an SRO, but under the myth of "Affordable Housing in Manhattan" realizing building conversion to high  cost rental studios that many individuals cannot afford  any more.

## FACTUAL ALLEGATIONS OF FRAUDULENT INTENT

**107.** Because 57 persons were living in the building as  a SINGLE ROOM OCCUPENCY  building "SRO"  or as a rent controlled or permanent rent stabilized Tenants at the St.Louis pursuant to the Rent Control Law (NYC Adminin. Code  26-401 – 26-415) and /or  a  the Rent Stabilization Law and Code (NYC Admin. Code  26-501- 26-520, 9NYCRR 2520 et seq.  or had rights equal to those under stabilization law or had rights equal to those of rent controlled tenants or being subsidized by the City of New York and living in a SRO building,  The Lantern Group  and the previous Owner 319 West LLC and its operator A.R.M. CAPITAL RESOURCES CORP., conspired to select a form of Non-for-profit organization to complete the transfer and conduct the operation because they could not afford to go thru the procedure of obtaining a Certificate of Non-harassment from  HPD  in New York. (Local Law 19 of 1983-SRO anti-harassment statute.)          **THE FRAUDULENT SCHEME**

**108.** For a period of  five years, the Landlord, 319 West LLC, Owner of the building 319 west 94th street, was developing a business named The Riverside Inn, at the premises,

providing rooms, services and related support to transient persons, mostly foreigners in transit.

**109.** On or about January 2006, this activity was declared an illegally renting to short term tourists name "The Riverside Inn" a/k/a the St. Louis Residence Hotel and was operated by A.R.M. CAPITAL RESOURCES CORP, with offices at 20 Ocean Court, Brooklyn, N.Y.

**110.** On Information and believe, at this time the Landlord, 319 West LLC itself was suffering extensive losses and it allegedly was seeking to avoid additional losses by selling off the building.

**111.** On or about March 4, 2006, the Owner, 319 West LLC began to assess whether it was viable to divest itself of the building because it was suffering increase pressure from the street activists complaining of "illegal hotels" run for profit, a deteriorating market for foreigners in transit, an increasing financial drain on the Owner due to a large amount of failure in the maintenance of the building, plus a serious cashflow problem.

**112.** At that time, the SRO St. Louis Hall was described as 149 SRO units averaging 89 sq.ft; 26 units per floor sharing 6 bathrooms and 4 kitchens, and housing 54 Permanent Tenants, 11 Temporary Tenants and 85 vacancies.

**113.** Because no buyer would purchase the building in the state of disarray in which the building was if they possessed the same information as "The Lantern Group Owner", "The Lantern Group Owner" and the "Lantern Group-would-be-purchasers of the building" embarked on an elaborate fraudulent scheme to dupe the Permanent Tenants .

**114.** The basis of this scheme was as follows:

(a). The Owner, 319 West LLC, would direct the Would-be Purchaser, The Lantern Group, to select the shape and form of a Non-For-Profit corporation because such a legal corporation was exempted to obtain a Certificate of Non Harassment .

(b). On or about March 4, 2006, Upon completion of the transfer, the former Riverside Inn began to turn away tourist, despite the fact that they had fully paid reservations, with confirmation in hand from Hotels.com, The disheartened tourists were told that the Morningside Inn, 235 West 107 th. St., also operated by A.R.M. Capital Resources, would honor their reservation but no accommodation was made for the transfer to the other hotel.

## FRAUDULENT INTENT

**115.** The following acts alleged within raise a sufficiently strong inference of fraudulent intent.

On Information and belief, The Lantern Group selected the form of Non-for-profit incorporation because it was told by the attorneys of the former Owner that they would be exempted from obtaining a Certification of no harassment.

**116. EVEN IF THE SELECTION OF THE FORM OF NON-FOR-PROFIT ORGANISATION do no raise a sufficiently strong inference of fraudulent intent because it violates no law and The Lantern Group, was under no duty to select another legal structure to operated its business, CUTNER alleges sufficient facts to establish that there exist sufficient set of facts which would show that The Lantern Group was aware that all current occupants listed as tenants in the building and other occupants identified from other source as living in the basement of the building, would refuse to leave the buildings**

**and that opposition to leave said building would conduct The Lantern Group to harass said tenants to make them leave.**

As an initial matter CUTNER alleges that different fraudulent statements and fraudulent representations were made by The Lantern Group to the Permanent Tenants and among them to CUTNER.

The Lantern Group knew it had to harass tenants and that it would be doubtful or impossible to obtain a Certificate of No Harassment from the Commissioner of the Department of Housing Preservation and development (HPD) to the City of New York, such Certificate of Non-harassment certifying that no lawful SRO residents has been harassed to move out in the thirty-six-month period prior to the application date. The Lantern Group knew that

This was a condition precedent to the Commissioner of Building approving plans for building alterations and issuing work permit.

The Lantern Group knew it was impossible to obtain.

So The Lantern Group had to select the legal form of Non-for-profit organization to benefit such exemption.

## HARASSMENT OF THE PERMANENT TENANTS AND OF NEW INDIVIDUALS BROUGHT INTO THE BUILDING.

117. On March 4, 2006, when the Riverside Inn began to turn away tourists, despite the fact that they had fully paid reservations, with a confirmation in hand from Hotels.com, starting the same morning, U-Haul trailers arrived at the Riverside Inn and workers began to bring in old heavily worn bunk bed frames, mattresses and bedding materials.

a) Within hours of the arrival of the bedding passenger vans pulled up to the front of the building and young Mexicans, male and female, disembarked , caring their belongings in hefty trash bags.

b) Some additional furniture, old model TV's . stereos, messenger bikes, etc. but for the most part their belongings were the clothing on their back and what they carried in the plastic bags. Thos continued well into the night -- the final load was at 1:30 A.M. Sunday morning-

c) The vans would empty their passengers, leave and return within the hour with new load of passengers.

d) It is estimated that at least 50+ individuals took up residence at the Riverside Inn a/k/a St. Louis Hall in a 12 hour period

e) While communication with the new arrivals has been difficult, long term resident of the Riverside Inn (now designated as the Permanent Tenants) have learned that their new neighbors came from the Marion a/k/a HunterMoon Hall, 2612 Broadway at Broadway and 98th/99th street) which was recently purchased by The Lantern Group

f) **Residence of the Marion, were informed by the onsite management that they would immediately be evicted and that immigration would be called if they did not accept the transfer to the Riverside Inn a/k/a the St. Louis Hall**

g) As the months went by The Lantern Group continued to harass illegally the Permanent Tenants :

45

h) Permanent Tenants noted a major deterioration of services and cleanliness in the common areas of the building especially bathroom and kitchens. It has also been noted that in some instances the rooms are being occupied by more that the legal number of occupants.

i) **The Lantern Group has made in clear that they will no longer operate the Riverside Inn a/k/a St.Louis Hall as an SRO, instead they will house displaced residence of their various construction projects at the Riverside Inn a/k/a the St. Louis Hall**

j) **Upon the completion of these projects the residents of the Riverside Inna/k/a the St.Louis Hall will meet the same fate as those who resided in the Marion.**

118. On or about June 2007, CUTNER on learning of The Lantern Group's variance request for the development of the St. Louis Hall a/k/a SRO St. Louis (formely The Riverside Inn) accepted to become involved in the "Tenant Advisory Committee", individually and on behalf of the other Permanent Tenants in the St Louis premises to discuss in good faith the development plans for the St.Louis Hall because said plan would directly effect her and the other residents of the building.

119. Unfortunately, The Lantern Group refused to discuss the development plans for the St.Louis Hall and has been for the last 18 months harassing CUTNER and frightening; and pushing around the Permanent Tenants, residents in the building to make them leave voluntarily the premises.

120. Since 1994, CUTNER has been living at 319 West 94th street and

46

121. After March 4, 2006, CUTNER has been harassed, assaulted verbally, and maltreated, by the management of The Lantern Group.

122. Most of the 57 Permanent Tenants in the 6 story building have been living in the building for many years. Several of the residents of 319 West 94th street have serious health issues.

123. CUTNER and the majority of the residents are going to be directly impacted by the demolition, construction, and so-called renovation of part of the building.

124. Nothing is done by The Lantern Group to protect CUTNER and other Permanent Tenants and The Lantern Group has refused to discuss their environmental health, physical safety, or the structural integrity of the building.

125. No one among the various defendant (collectively " The Lantern Groups") takes responsibility. Nobody among the various The Lantern Groups addresses these issues.

126. CUTNER complained and what she hears exacerbated her concerns:

127. There is great risk of serious problems occurring during the structural redevelopment of the St Louis Hall as an existing building because said building is very old and poorly maintained.

128. No one with competency monitor The Lantern Group.

129. No one is known to be responsible within the Lantern Group's organization.

130. No one seemed in charge of such a major renovation, in charge of the contractors, and of the workers and laborers.

131. No one seemed to know how laborers and workers will be paid, will they receive the prevailing wages, how they will be trained and by whom?

47