

Page 1

```
1                    1
2   UNITED STATES DISTRICT COURT
3   SOUTHERN DISTRICT OF NEW YORK
4   - - - - - - - - - - - - - - - - - - - x
5   ROLANDE CUTNER,
6                Plaintiff,
7       -against-
8   THE LANTERN GROUP, ST. LOUIS HALL, L.P.,
    SRO HOTEL THE ST. LOUIS a/k/a
9   THE ST. LOUIS HALL, 319 REALTY SERVICES, LLP
    and 319 WEST LLC, and XYZ CORPORATION,
10  (Said name being fictitious; it being the
    intention of CUTNER to designate any
11  corporation having a legal interest in the
    SRO HOTEL THE ST. LOUIS,
12
                Defendants.
13
    - - - - - - - - - - - - - - - - - - - x
14
15            450 Seventh Avenue
              New York, New York
16
              July 10, 2008
17            10:06 a.m.
18
19       EXAMINATION BEFORE TRIAL of ROLANDE
20  CUTNER, the Plaintiff in the above-entitled
21  action, held at the above date, time and
22  place, pursuant to Order, taken before
23  Mary E. Santiago, a shorthand reporter and
24  Notary Public of the State of New York.
25
```

Page 2

```
1                    2
2   A P P E A R A N C E S:
3
4   ROLANDE CUTNER, ESQ.
       Pro Se
5      60 Broad Street
       Suite 3502
6      New York, New York 10004
7
8
9   MIRANDA SOKOLOFF SAMBURSKY SLONE
    VERVENIOTIS, LLP.
10     Attorneys for Defendants
       The Esposito Building
11     240 Mineola Boulevard
       Mineola, New York 11501
12  BY: MELISSA HOLTZER, ESQ.
13
14
15  ALSO PRESENT:
16     David A. Cutner, Esq.
17
18
19
20
21
22
23
24
25
```

Page 3

```
1                    3
2
3            S T I P U L A T I O N S
4
5       IT IS HEREBY STIPULATED AND AGREED
6   by and between the attorneys for the
7   respective parties herein, that filing,
8   sealing and certification be and the
9   same are hereby waived.
10
11      IT IS FURTHER STIPULATED AND AGREED
12  that all objections, except as to the
13  form of the question shall be reserved
14  to the time of the trial.
15
16      IT IS FURTHER STIPULATED AND AGREED
17  that the within deposition may be signed
18  and sworn to before any officer authorized
19  to administer an oath, with the same force
20  and effect as if signed and sworn to before
21  the Court.
22
23
24
25
```

Page 4

```
1                    4
2   R O L A N D E    C U T N E R,
3           the witness herein, having first
4           been duly sworn by a Notary Public
5           of the State of New York, was
6           examined and testified as follows:
7   EXAMINATION BY
8   MS. HOLTZER:
9       Q.  State your name for the record,
10  please.
11      A.  Rolande Cutner.
12      Q.  State your address for the record,
13  please.
14      A.  60 Broad Street, 35th floor,
15  Number 3502, New York, New York 10004.
16          MR. CUTNER:  May I make a
17      brief statement.  I'm David Cutner.
18      I'm appearing here not as counsel
19      for the witness, Rolande Cutner.
20      She filed this action pro se.  She
21      is a plaintiff pro se.
22          I have not been involved in
23      this case prior to the deposition
24      and I have no intention to be
25      involved in the case after the
```

Page 5

```
1                Rolande Cutner       5
2       deposition.
3           I'm only here today pursuant
4       to a court order that permitted the
5       witness to have a representation
6       for the deposition.  I'm not filing
7       an appearance in the case and I'm
8       not appearing in the case.
9       Q.  Ms. Cutner, my name is Melissa
10  Holtzer.  I'm an attorney with the law firm
11  Miranda, Sokoloff, Sambursky, Slone and
12  Verveniotis and we represent the Lantern
13  Group, The St. Louis Hall, in the case that
14  you have brought against them.
15          Have you ever had your deposition
16  taken before?
17      A.  No, this is the first time.
18      Q.  I'm just going to go through a few
19  ground rules with you.  First of all, as you
20  can see, the court reporter is taking down
21  everything that you say so I just ask that
22  any response that you give to my questions be
23  a verbal response because the court reporter
24  can't take down nods of the head, or uh-huh
25  or anything like that.
```

Page 6

```
1                Rolande Cutner       6
2       A.  I understand.
3       Q.  If you want to the take a break at
4   any time, that's fine, just let me know.  And
5   all I ask is that if there's a question
6   pending, is that you answer the question
7   before we break.
8       A.  I understand.
9       Q.  If you need clarification, if you
10  don't understand one of my questions, just
11  let me know and I'll rephrase.  Otherwise, if
12  you answer one of my questions, I'm going to
13  assume that you understood it.
14      A.  I understand.
15      Q.  Have you ever filed a lawsuit
16  before?
17      A.  No.
18      Q.  Have you ever been a defendant in a
19  lawsuit before?
20      A.  Let me rectify because in November
21  I was approached by the neighbor of this
22  building and they were fighting a lawsuit
23  against the Lantern Group and because I live
24  in the building, they approached me and they
25  say, "Would you agree to be a plaintiff in
```

Page 7

```
1                Rolande Cutner       7
2   our action," so I should say yes.  I am
3   involved in this particular action being a
4   plaintiff as a permanent resident in this
5   building so yes, I participate in this
6   lawsuit which is now pending and continuing,
7   yes.
8       Q.  Who are the other plaintiffs in
9   this lawsuit?
10      A.  The neighbor, about 25 neighbors so
11  I don't know the names but they all live in
12  the adjacent building.  Let me show it to
13  you:
14          You have the building, 319 West
15  94th Street, you have one building on the
16  left and one building on the right.  Those
17  people are owner of the apartments, it's
18  co-op or condominium.  They are very much
19  concerned about the fact that the Lantern
20  Group is going to demolish 80 percent of the
21  building so based on that concern, this
22  started the lawsuit and they ask me, because
23  I am living in the building, to be a
24  plaintiff with them.  So there are maybe 45
25  people all total.
```

Page 8

```
1                Rolande Cutner       8
2       Q.  Is the purpose of that lawsuit to
3   try and stop the Lantern Group from
4   renovating the building?
5       A.  Yes.
6       Q.  Is there anything else that the
7   plaintiffs are seeking from that lawsuit?
8       A.  Stop the Lantern Group from
9   renovating the building, that I know.  They
10  attack not only the Lantern Group but the
11  New York City Department, home department, I
12  think HPD.  They tax them probably for fraud
13  and misrepresentation but I am not sure but I
14  don't have the complaint in front of my eyes
15  but they go into the details.
16      Q.  Other than the Lantern Group and
17  HPD, do you know of any other defendants in
18  this lawsuit?
19      A.  When I say quote/unquote, "The
20  Lantern Group," there is an LLP, there is a
21  real estate, 319 Realty Services.  You are
22  aware that Lantern Group, that is inside a
23  lot of corporations and LLC so all those
24  corporations and LLCs are defendants in this
25  lawsuit.
```

Rolande Cutner                9

1
2    Q.   Where is this lawsuit pending?
3    A.   It's in Civil Court and in 111
4    Centre Street.  The judge, I'm not sure of
5    the name of the judge but not an Article 78
6    proceeding, and then there are the lawsuits
7    of the Board of Estimate, which is located at
8    40 Rector Street on that Board of Estimate
9    which act, you know, badly, and they attack
10   the Board of Estimate, New York City.  The
11   Board of Estimate, Lantern Group is also a
12   corporation inside of that.  That's what I
13   understood.
14   Q.   Is it correct this action is still
15   pending?
16   A.   Yes.  I understand that they have
17   to go back to court by the end of July.  I
18   understand they are going to be a proceeding
19   in front of the Board of Estimate at
20   40 Rector Street by the end of July, yes.
21   Q.   Other than this other action
22   against the Lantern Group, have you ever been
23   a party in any other litigation?
24   A.   No, but I have been a witness.
25   Q.   Under what circumstances were you a

Rolande Cutner                10

1
2    witness?
3    A.   Two tenants in my building,
4    permanent tenant like me.  I am -- it's very
5    important, permanent tenant.  It's a very
6    legal term, important, so two tenants,
7    permanent tenants as myself had litigation
8    with another group, Lantern Group and they
9    asked me to be witness in those two
10   proceedings, which I did.
11   I went on to civil court,
12   landlord/tenant court at 141 Livingston
13   Street and I was witness in those two
14   different lawsuits, yes.
15   Q.   Did the two tenants have a suit,
16   were they plaintiffs or defendants?
17   A.   Defendants.
18   Q.   So the Lantern Group has brought a
19   proceeding against them; is that correct?
20   A.   That's correct.
21   Q.   Were they both involved in the same
22   proceeding or was this two separate
23   proceedings?
24   A.   Two separate proceedings.
25   Q.   Who is the first permanent tenant

Rolande Cutner                11

1
2    that you testified for?
3    A.   Chris Santee, S-A-N-T-E-E.
4    Q.   Why had the Lantern Group brought a
5    case against Mr. Santee?
6    MR. CUTNER:  I object to the
7    form of the question.
8    A.   I don't know.
9    Q.   Why were you asked to testify?
10   A.   I was asked to testify regarding
11   the terrible condition of the building
12   because I live in the building since
13   September '94, and I was able to testify on
14   my knowledge of the terrible condition of the
15   building.
16   Q.   Did you testify in court or at a
17   deposition like this?
18   A.   No, in court, open court; landlord
19   and tenant court.
20   Q.   Who is the other tenant that you
21   testified on behalf of?
22   A.   Chris -- Nicolas Legrand;
23   N-I-C-O-L-A-S, L-E-G-R-A-N-D.
24   Q.   Do you know why the Lantern Group
25   had brought a proceeding against Mr. Legrand?

Rolande Cutner                12

1
2    A.   Probably because he was, he asked
3    me to be a witness but only a witness.
4    Q.   What did he ask you to testify for?
5    A.   About terrible condition of the
6    building and also it was accuse, it was
7    charged disrupting the life of the tenant and
8    he ask me to be a witness because it happened
9    that his bedroom is on the third floor and I
10   am on the third floor so, of course, I am
11   there every day and I testify to that, to the
12   fact that I live on the third floor, he lives
13   in the third floor and I was a witness of
14   what's happening on the third floor.
15   Q.   Other than what you've already
16   testified to, have you ever been involved in
17   any other litigation?
18   A.   Not that I recall.
19   Q.   Where were you born?
20   A.   Paris.
21   Q.   When did you move to the United
22   States?
23   A.   The last, last time, because I move
24   several times, but the last time was
25   September '94, yes.

Page 13

Rolande Cutner    13

1    Q.  Are you a United States citizen?
2    A.  Yes, I am.
3    Q.  When did you become a citizen?
4    A.  April 21, 1970.
5    Q.  What is your profession?
6    A.  I am an attorney.
7    Q.  When did you get your law degree?
8    A.  I got the law degree in France but
9  because my university was so unknown, I
10  request a Court of Appeal to present myself
11  at the bar exam without having four years of
12  college and the court of appeal hand an Order
13  that I could, yes, present myself and I did
14  on February, the February session, and I win,
15  and I was in September '78, I was sworn in as
16  a lawyer in New York.  And also after I
17  applied for federal court and in December '78
18  I was received as a lawyer in federal court
19  and then in the Court of Appeals and '78 and
20  then in the Supreme Court of the United
21  States in Washington, DC, which I am very
22  proud.
23    Q.  Congratulations.
24    A.  Yes.
25

Page 14

Rolande Cutner    14

1    Q.  And you've been licensed to
2  practice law in the United States since
3  September of '78?
4    A.  Yes.
5    Q.  Where is your law practice located?
6    A.  Difficult question to answer
7  because, as I said, where I sit and I do on
8  the phone, there is where my law practice is,
9  you know, developing.
10    Right now I have an office, if you
11  ask me for the address, it's 60 Broad Street,
12  B-R-O-A-D, Suite 3502, 35th floor, New York,
13  New York 10004.
14    Q.  Do you practice with any other
15  attorneys or are you a solo practitioner?
16    A.  I'm solo practitioner.
17    Q.  What kind of law do you practice?
18    A.  There is two large activity.  One
19  will be consult, to advise.  Let me give you
20  an example, it's more easy for me to give you
21  an example.
22    French person come to the, come
23  from France and need advice how to create a
24  corporation in LLC, how to create licensing
25

Page 15

Rolande Cutner    15

1  equipment, so that part of my activity will
2  be to advise and the coming to this country,
3  how to establish a legal presence in this
4  country, that's part.
5    Second part is to litigate in
6  federal court.  Why, because of the diversity
7  of the citizenship because it's $75,000,
8  whatever they ask for, because the French
9  make terrible mistake because they need a
10  lawyer, because they are petrified with
11  American lawyers and generally, they say, "If
12  you know of a French lawyer speaking French
13  so please, please."
14    So I have this type of activity
15  where I go to federal court and most of the
16  time you want to smile.  I ask for dismissal
17  of action and then the judge is happy to give
18  me and he is going back to France so that's a
19  little bit of litigation part of my activity,
20  I would say.  There's two activities.
21    Q.  Which court -- I know that you
22  mentioned that you could do litigation; which
23  courts do you usually practice in?
24    A.  New York County Supreme Court,
25

Page 16

Rolande Cutner    16

1  60 Centre Street, Civil Court, Part 111, and
2  I am also a lot at 80 Centre Street, the
3  section of the Supreme Court at 80 Centre
4  Street because I am a special master for
5  Judge Brown and generally, those judges, I'm
6  talking about the building 80 Centre Street,
7  they request special master and this judge
8  requested a special master and I was there
9  Tuesday and I do special master helping the
10  judge to go into resolution, so I do that.
11    Q.  What is your current address?
12    A.  319 West 94th Street, Room 341,
13  New York, New York 10025.  That's my home
14  address.
15    Q.  How long have you lived at this
16  address?
17    A.  September '94.
18    Q.  From September 1994 to the present
19  day, did there come a time when the ownership
20  of the building changed?
21    A.  Yes.
22    Q.  Who owned the building when you
23  first began living at 319 West 94th Street?
24    A.  I believe, because I never met the
25

Page 17

Rolande Cutner    17

1  landlord, I believe it was a family in
2  Brooklyn, I think it's Margolis. I think
3  it's this family in Brooklyn that owns the
4  building until March 2006 where we were
5  pushing for a meeting to the lobby and we
6  were told the Lantern Group took net lease of
7  the building. That was probably March or
8  April 2006.
9  Q.  Prior to this meeting in March
10 2006, have you ever heard of the Lantern
11 Group before?
12 A.  No, never.
13 Q.  Who called everyone down to the
14 lobby for this meeting?
15 A.  At that time I did not know but now
16 that I remember, I think it was Rafal Markwat
17 and Eric Galloway. I think they were both at
18 the meeting but I am not sure they directed
19 the tenants. I am not sure but I think they
20 were at the meeting.
21 Q.  Other than the fact that the
22 Lantern Group had taken a net lease, what
23 else was said at this meeting?
24 A.  The building was going to be

Page 18

Rolande Cutner    18

1  renovated, 80 percent were going to be
2  demolished. The people who live in front of
3  the building would be moved into the back of
4  the building so I was not too much concerned
5  because my room, 341 is on the back and very
6  quiet. So at the beginning they say, "We
7  move everybody in the back, don't worry." So
8  I was not worried.
9  Q.  Was anything else discussed at this
10 meeting?
11 A.  They say that they are going to
12 welcome NY3 population, which we did not know
13 what it was. They just mention that.
14 Q.  Was anything else mentioned?
15 A.  New management. I think the lady
16 Harriet Cohen was present at that meeting,
17 probably March or April 2006. I think this
18 lady was present.
19 Q.  Did anyone say anything about what
20 the Lantern Group does or what kind of
21 company the Lantern Group is?
22 A.  I don't recall. I don't think it
23 was a lot of discussion about that. I think
24 they just introduce themselves and that I

Page 19

Rolande Cutner    19

1  remember vividly because they say we are
2  going to move everything in the back of the
3  building, "don't worry," reassuring the
4  people. We are concerned, you know, because
5  my room is on the back.
6  I must say I was not very much
7  concerned at that time or upset. I just
8  listened.
9  MS. HOLTZER: Please mark.
10 (Complaint was marked
11 Defendants' Exhibit A, for
12 identification, as of this
13 date.)
14 Q.  Ms. Cutner, I'm going to show you
15 what's been marked as Exhibit A (handing).
16 Do you recognize this document?
17 A.  Yes. This is my complaint. Yes,
18 this is mine.
19 Q.  I'm going to direct you to
20 Paragraph 13 of your complaint.
21 A.  It says 13.
22 MR. CUTNER: I notice this
23 document is unsigned; is this the
24 original complaint as filed?

Page 20

Rolande Cutner    20

1  MS. HOLTZER: This is the
2  one we have.
3  A.  I signed it because I was helped by
4  a lawyer on the pro se department.
5  MR. CUTNER: I'm just asking
6  about this document, whether it's
7  the original complaint. This
8  document is not signed.
9  MS. HOLTZER: I'm not even
10 sure if we have a signed copy. We
11 don't have the signed copy of it.
12 A.  I verify that this is all the
13 numbers because since I wrote it, if some
14 number would be missing, I would be able to
15 tell you it's missing. Yes, I recognize my
16 complaint. It look to me like the correct,
17 that's a correct complaint that I filed.
18 Q.  So I'm going to direct you back to
19 Paragraph 13 now. In the first sentence of
20 Paragraph 13 you use the term "permanent
21 tenant." Do you see where I'm referring to?
22 A.  Permanent tenant, yes.
23 Q.  And what do you understand a
24 permanent tenant to mean?

Rolande Cutner          21

1
2    A.  I understand it's a tenant which
3    has been living in a SRO building, in a SRO
4    building.
5    Q.  Does a tenant have to be living in
6    an SRO building for a certain amount of time
7    to become a permanent tenant or is it
8    automatic?
9    A.  I understand because the building
10   is called by New York City SRO building, when
11   you live in this building, I understand you
12   are a permanent tenant.  This is what I
13   understood but, of course, I am not a real
14   estate lawyer.
15   Q.  Does permanent tenant status confer
16   any kind of benefits or rights upon a person?
17        MR. CUTNER:  Are you asking
18        for legal advice?  I'm not sure
19        what the question is.
20   Q.  I'm asking what is your
21   understanding of legal rights or benefits
22   that a person has from that permanent tenant
23   status.
24   A.  I understood because me and other
25   people were living in the SRO building and

Rolande Cutner          22

1
2    the rules and regulations of New York apply
3    to us.
4    Q.  A few sentences down you say that
5    you are a tenant in good standing.
6        What does it mean to be a tenant in
7    good standing?
8    A.  I understand it's a tenant that
9    pays regularly its rent.
10   Q.  You also reference the tenant
11   advisory board.
12        What is a tenant advisory board?
13   A.  I understand that it was a body --
14   let me explain that.  I was approached to be
15   a member of this board and, of course, when
16   you are approached, the question you ask is
17   what for and they say because you should
18   negotiate with the Lantern Group and because
19   a tenant -- I would not say no education,
20   it's not that -- after with legal term "we
21   wish that you -- because you are familiar
22   with legal term, we wish you could be a
23   member of this board," and this board was
24   designed to negotiate with the Lantern Group
25   in good faith.  This is what I understand.

Rolande Cutner          23

1
2    Q.  What did being a member of the
3    advisory board entail, such as meetings?
4    A.  Meeting.
5    Q.  How often did you have meetings?
6    A.  At the beginning?
7    Q.  Yes.
8    A.  We had probably one in August or
9    September.  I am not sure about the months
10   but in 2006 and then one in January 2007 and
11   then one in probably October 2007 and it
12   stopped there.
13   Q.  Are there any other activities that
14   you participated in your capacity as a member
15   of the tenant advisory board?
16   A.  Yes.  We were invited to
17   participate on, one day we had a visit from
18   the elected official from New York City,
19   elected official, so a lady by the name of
20   Gail Brewer (phonetic) came and that was the
21   visit at the building.  I believe it was
22   August 2007.  I'm not sure about the month
23   but it was in 2007.
24   Q.  Why were the elected officials
25   coming to the building?

Rolande Cutner          24

1
2    A.  Because the building was
3    deteriorating at high speed and it seemed
4    that the elected official did not know or
5    they pretended they did not know, so a visit
6    or two was organized to make them aware of
7    the terrible condition of the building.
8    Q.  Who organized the visit?
9    A.  I believe that another permanent
10   tenant but I'm not sure because Chris Santee
11   was also on the board, Nicolas Legrand were
12   also on the board and I believe that in
13   connection with Shaffak Islam (phonetic),
14   which is the lawyer for the SRO project, I
15   believe, because I was not there.  They
16   notify the elected official Ms. Gail Brewer
17   to come and look at the terrible condition of
18   the building.  I believe they organized, they
19   asked me and Ms. Brewer to come.
20   Q.  Were any other elected officials
21   there or representatives?
22   A.  Yes.  I think Cal Meade, M-E-A-D-E.
23   I think he's, he was there with Gail.  Gail I
24   remember well, vividly.  I talk to her so I
25   remember her more.  Michael Watts (phonetic)

Page 25

Rolande Cutner    25

1    probably there and maybe also people from the
2    New York City Department of Housing because
3    if my memory is correct, I remember all this
4    group of people but specifically, talk to
5    Gail Brewer.
6        Q.   What did you talk to Gail Brewer
7    about?
8        A.   The terrible condition on the third
9    floor because this is the floor where I live.
10       Q.   What was the terrible condition on
11   the third floor?
12       A.   Bed bugs, mice, mold on the corner
13   of the ceiling.  Bathroom clog up with human
14   waste on the bowl, WC bathroom pipe totally
15   clogged up.  In the kitchen, big hole where
16   army of mices were coming, vermin; very bad
17   condition in kitchen.  And I understand
18   because I'm not, again, I see a lawyer for
19   C violations of the building which understand
20   are very serious violations and I understand
21   that, specifically, Chris Santee and Nicolas
22   Legrand point out to Gail Brewer the
23   C violation which is a very, very serious
24   condition of the building.

Page 26

Rolande Cutner    26

1        Q.   Did Ms. Brewer or Mr. Meade or any
2    of the individuals from the Department of
3    Housing say anything to you or --
4        A.   I talk only to Ms. Brewer.
5        Q.   Did Ms. Brewer say anything to you
6    regarding the conditions of the building?
7        A.   Yes, she did.
8        Q.   And what did she say?
9        A.   "Don't worry, everything is going
10   to be fine.  Just trust me, I understand,
11   Ms. Cutner.  I understand you completely.
12   Don't worry, don't worry, don't worry."
13       Q.   Did you hear any of the other
14   individuals that were visiting say anything
15   about the conditions of the building?
16       A.   Not to me.  I only talk to Ms. Gail
17   Brewer.
18       Q.   Did you overhear any of the other
19   individuals saying something to somebody else
20   regarding the conditions of the building
21   during this visit?
22       A.   It's difficult for me to pinpoint
23   because, as I explain, they were huge
24   delegation from New York Department of

Page 27

Rolande Cutner    27

1    Housing, I believe.  You have huge
2    department, F, New York Department of
3    Housing.  I think one of the girl's name is
4    Jessica Katz, elected official, and it was a
5    huge crowd of people, you know.  And so
6    people were discussing but I cannot say
7    people use discretion.  It was this huge
8    group of people and I only talk to Gail
9    Brewer.
10       Q.   After that visit, did you have any
11   other contact with Ms. Brewer?
12       A.   No, never.
13       Q.   Do you know if anyone else from the
14   tenant advisory board had any further contact
15   with Ms. Brewer?
16       A.   I think that Chris Santee, the man
17   that I indicate to you, several times went to
18   her office to complain and he was, I would
19   say, very concerned.
20       Q.   Did he actually meet with
21   Ms. Brewer or one of her representatives?
22       A.   I think so.
23       Q.   Did he tell you anything about
24   anything that he discussed with Ms. Brewer?

Page 28

Rolande Cutner    28

1        A.   No.  He was a little bit, would I
2    say, laughing at me or smiling at me and said
3    that she will never do anything for us.  I
4    think I remember the sentence because the
5    fact I have naive and what he said to me, he
6    said, "she will never do anything for us."
7        Q.   Other than what you've already
8    testified to, did you participate in any
9    other activities in your capacity as a member
10   of the tenant advisory board?
11       A.   I went to see the lawyer of the SRO
12   building to try to get help.
13       Q.   Is that Mr. Islam?
14       A.   Mr. Islam, I visit him in his
15   office.
16       Q.   What did you discuss with
17   Mr. Islam?
18           MR. CUTNER:  I object to
19       that.
20           Privileged communication.
21       Q.   Mr. Islam, is he an attorney for
22   the building or for the tenants?
23       A.   He's attorney for the SRO law
24   project.

Page 29

Rolande Cutner    29

1
2      MR. CUTNER: I'm sorry, I
3   thought he was the attorney for the
4   tenants.
5      THE WITNESS: No, no. He's
6   SRO. It's called SRO law project
7   and he explained to me not only I
8   can say he's a little bit for the
9   building because he has our
10   building in his portfolio but it's
11   very difficult to see because he
12   told me they have ten buildings
13   like that, so the guy's slumped
14   with work and it's a miracle they
15   received me, he accept to see me
16   because they have ten buildings
17   like that.
18      Q.  Who does Mr. Islam -- who is his
19   client, who does he represent?
20      A.  I think he is, as again I said, SRO
21   law project. It's a project, you know, SRO
22   law project, and we are not only building.
23   There are several buildings.
24      Q.  What is the SRO law project?
25      A.  I understand a body created by, I

Page 30

Rolande Cutner    30

1
2   don't know if they are volunteers or maybe
3   big law firm in New York City and some lawyer
4   of that I don't know but I understand the SRO
5   law project is huge.
6      It's a project to help people like
7   us to help who are permanent tenant in SRO
8   building, where I would say it's a project to
9   help people who are permanent tenant in SRO
10   building.
11      Q.  You say, you allege in Paragraph 13
12   that the tenant advisory monitored closely
13   the redevelopment plan of 319 West 94th
14   Street; do you see where I'm referring to in
15   the complaint?
16      A.  Right.
17      Q.  How did the tenant advisory monitor
18   the redevelopment plan?
19      A.  In asking questions.
20      Q.  Who did you ask questions of?
21      A.  As I said, Chris Santee and Nick
22   Legrand were very active in this board and
23   the board was asking questions to the Lantern
24   Group to HPD Department, "What's going on,
25   what's going on, what's going to happen to

Page 31

Rolande Cutner    31

1
2   us?"
3      Q.  After the March 2006 meeting that
4   you referenced earlier, did anyone from the
5   Lantern Group meet with the tenants again
6   regarding the redevelopment of the building?
7      A.  As I indicated, those two dates,
8   maybe January 2007 or October 2007.
9      Q.  Are the tenant advisory board's
10   meetings that you referenced earlier, those
11   were also meetings where the members of the
12   Lantern Group were present?
13      A.  Chris, again, was very active and
14   if he raised hell then maybe Rafal Markwat
15   would tiptoe or this lady, Harriet Cohen,
16   would tiptoe into the building. So yes.
17      Q.  And after March 2006, when was the
18   next time that Ms. Cohen or Mr. Markwat or
19   anyone else from the Lantern Group came to
20   the building to have discussions with the
21   tenants?
22      A.  September 2007 or August. Again, I
23   am not very sure the months but I would say
24   the Summer of 2007.
25      Q.  Who from the Lantern Group came to

Page 32

Rolande Cutner    32

1
2   the building in September 2007?
3      A.  Harriet Cohen.
4      Q.  Do you remember what Ms. Cohen said
5   at this meeting?
6      A.  Yes.
7      Q.  What did Ms. Cohen say?
8      A.  "Don't worry. I am here to listen
9   to your complaints. Everything is going to
10   be fine. Now we have a rule and regulation
11   and you have to follow the rules and
12   regulations in the building." That's when
13   the Lantern Group issued rules and
14   regulations and said, "You better follow
15   those rules and regulations."
16      Q.  What were these rules and
17   regulations that Ms. Cohen introduced?
18      A.  No delivery, no cleaners, no
19   delivery of newspaper, no delivery of Federal
20   Express, no delivery of food. That means
21   that if you are sick in bed, you have to go
22   out and try to get some food. No delivery,
23   no delivery of anything, that's the rule.
24      Q.  Did this mean no delivery to your
25   specific room or no delivery to the building?

Page 33

Rolande Cutner    33

1     A.  To the building.
2     Q.  If somebody wanted to order a
3  pizza, would they be able to have a pizza
4  delivered to the building?
5     A.  I don't ask for pizza because I am
6  always on a diet but I suppose, I mean, I did
7  not test this rule.  I test it for the
8  clothes but not this rule but that was the
9  rule, no delivery in this building.
10    Q.  It wasn't that people couldn't
11  deliver things to your individual room, it
12  was that you couldn't even go down to the
13  lobby and pick it up yourself; is that
14  correct?
15    A.  I cannot recall about specifically
16  coming down, I cannot recall.  Maybe she said
17  that but I cannot recall that.  I don't
18  recall that this minute.
19    Q.  Did Ms. Cohen give any kind of
20  reason why she implemented this rule?
21    A.  Yes.
22    Q.  What was the reason that she gave?
23    A.  "We are afraid of stealing, we
24  don't want to be responsible for mail being

Page 34

Rolande Cutner    34

1  stolen" or my clothes being stolen.  "We
2  don't want to have any responsibility and we
3  are concerned about stealing."
4     Q.  Do you know --
5     A.  Although that they have the
6  security guard that you forgot to ask me,
7  they have the security guard.  But her
8  concern was stealing.  That I remember very,
9  very vividly because we had a very strong
10  discussion at that time, and I remember that.
11    Q.  How, in what way was it a very
12  strong discussion?
13    A.  Because I said, "I live in this
14  building since September 1994.  I have
15  clothes delivered since September of 1994."
16  They always put the clothes, there's a hook,
17  you know, by the window.  Since 1994 I have
18  my clothes delivered there twice a week.
19  Nobody stole anything.  We had doorman at
20  that time.
21        We had, you know, a doorman from --
22  they like to talk to me because they speak
23  French.  We never had anything stolen in this
24  building so don't come now and say, oh, we

Page 35

Rolande Cutner    35

1  are afraid of stealing.
2     Q.  Do you know if anyone else in the
3  building had any complaints regarding
4  stealing?
5     A.  I am not aware of that.
6     Q.  This redevelopment plan, did they
7  tell you how the building was changing?  I
8  know you referenced that 80 percent of the
9  building was going to be demolished but was
10  anything supposed to be put in its place?
11    A.  Yes.  They explain to us that they
12  will install 60 people called, quote/unquote,
13  "NY3 population."  So I ask, do you know what
14  is this?  No, you don't know, you know.  Do
15  you know what is NY3 population?
16    Q.  No.
17    A.  Ex-convict, people having AIDS,
18  ex-drug addicts, ex-pornographers,
19  pedophiles; people coming out of jail because
20  New York City is closing the psychiatrist
21  department in the hospital, people so-called
22  feeling now that they can live in society but
23  they are living the psychiatrist mode of the
24  hospital that New York City is closing and

Page 36

Rolande Cutner    36

1  they will be monitored by medication.  So I
2  ask the question, I said, "Monitor how?  How
3  they are going to be monitored?"
4        And they say, "Well, from 9:00 to
5  5:00 we are going to have a social worker in
6  the building."  Oh, yeah, and after
7  5 o'clock, no, no, no.  This person works
8  from 9:00 to 5:00.  So I say, "You mean that
9  I am going to sleep next to a pedophile or a
10  rapist and nobody is going to be looking at
11  this person from 9:00 in the evening until --
12  from 5:00 in the evening until 9:00 in the
13  next morning?"
14        "Yes, that's right."
15        So that was you are asking me about
16  the description that was the discussion I had
17  with Ms. Harriet Cohen.
18        So then I said, "Ex-drug addicts,
19  oh, they are cured, people coming out from
20  psychiatrist hospital, oh, they feel much
21  better.  How do you know?"
22        She said, "Oh, they don't take
23  drugs anymore."  I said, "How do you know."
24        "Well, we just asked them."  This

Page 37

Rolande Cutner    37
1    is Mrs. Harriet Cohen, but "we ask them."
2    Q.  Do you know what Ms. Cohen's title
3    was with the Lantern Group?
4    A.  I believe, I am not sure.  I
5    believe she was the director of the social
6    service but I believe, I am not sure.
7    Q.  Do you know if the Lantern Group
8    ran other buildings that serviced the NY3
9    population?
10    A.  I am not aware.  Maybe, but I am
11    not aware of that.
12    Q.  Do you know whether the Lantern
13    Group's purpose is to service the NY3
14    population?
15    A.  I could not answer this question
16    because I don't believe that the purpose is
17    to serve the NY3 population but I go in
18    in order to get the million dollars tax free
19    and tenant free, New York City said, "Okay, I
20    give you $38 million but you have an
21    obligation to house 60 persons coming out of
22    the psychiatrist ward of the hospital that we
23    are closing because you have the special
24    ability to house them because we give you the

Page 38

Rolande Cutner    38
1    38 million," that -- I understood that.
2    Q.  Now, you mentioned that part of the
3    redevelopment plan was to service this
4    population.
5    Was this something that happened
6    immediately when the Lantern Group took over?
7    A.  Yes.  They mention it, I believe,
8    at the first presentation, especially because
9    Ms. Harriet Cohen was there and I believe she
10    was director of the social services and I
11    believe, I can be, I don't think wrong but on
12    March 2006 when they took over the building,
13    they did not mention it like that.  They just
14    mention, "Oh, we are going to have to house
15    NY3 population."  Uh-huh, but they did not,
16    you know, elaborate on that.
17    Q.  Did these NY3 individuals start
18    moving in immediately or were they going to
19    move in after the building had been
20    redeveloped?
21    A.  I don't know that.  I don't know.
22    Q.  I'm going to direct you to
23    Paragraph 14.
24    Where did you learn that the

Page 39

Rolande Cutner    39
1    Lantern Group is a non profit entity?
2    A.  On that first meeting when
3    Ms. Harriet Cohen was present and maybe, I'm
4    not sure, Rafal Markwat and Eric Galloway
5    were present at the first meeting or at
6    another meeting but they explain that to us.
7    Q.  What did they explain about the
8    fact that Lantern Group was non profit?
9    A.  They just said that it's a non
10    profit.
11    Q.  Did they explain what the Lantern
12    group's non profit purpose was?
13    A.  No, I don't recall.
14    Q.  Did they explain whether the
15    Lantern Group was a non profit entity?
16    A.  I don't recall.  I mean verbally, I
17    think that they gave us maybe, I would have
18    to look into my file, but on that particular
19    meeting I don't recall today but, I mean, I
20    could go into my file and maybe they gave us
21    this piece of paper when they mention they
22    were a non profit.  I know that they mention
23    that verbally but they might have give us
24    also a piece of paper explaining.

Page 40

Rolande Cutner    40
1    Q.  Do you remember what the piece of
2    paper said?
3    A.  It was a description of the
4    renovation of the building that I remember
5    because I was concerned by the fact that
6    living in the back I would be, quote/unquote,
7    "protected" because they were first moved
8    everybody in the back.  That, I remember
9    that, vividly, yes.
10    MS. HOLTZER:  I'm just going
11    to call for the production of the
12    piece of paper.
13    THE WITNESS:  If I find it.
14    If I find this paper.
15    Q.  How did you learn that the Lantern
16    Group was receiving public funding to
17    redevelop the building?
18    A.  In this paper that I, again, I have
19    to look, that they gave us on the first day
20    of the meeting or I have read it someplace.
21    Maybe I read it in another piece of paper.
22    I'm not sure but I must have read it
23    someplace.
24    Q.  I'm going to direct you now to

Page 41

```
1              Rolande Cutner        41
2  Paragraph 16.
3        Do you see where it says, "The
4  Lantern Group wishes to convert a six-story
5  pre-war structure into a nine-story
6  monstrosity"?  Why do you refer to it as a
7  monstrosity?
8        A.  Because not only they want to move
9  the people in the back and they want to add
10 three more floors on the top and add on the
11 backyard so that building will be so high
12 that it will be a monster compared to the
13 other buildings which are five floors, that
14 was, in that huge monster would be sitting
15 there like a huge green monster.  It was a
16 little bit to make fun of the Lantern Group,
17 the word that I used, "monster."
18       Q.  In the pamphlet that they gave you
19 at the meeting, did they have a picture or at
20 any time did they show you a picture of what
21 the proposed redevelopment of the building
22 looked like?
23       A.  I don't recall.
24       Q.  I want to direct you to
25 Paragraph 26.  You allege here that you
```

Page 42

```
1              Rolande Cutner        42
2  suffer from multiple sclerosis.
3        When were you diagnosed with MS?
4        A.  I think 1992 because you have to
5  understand it's very difficult to get
6  diagnostic.
7        Q.  When did you first experience
8  symptoms?
9        A.  In probably 1983 because I was
10 falling a lot, falling in the street, falling
11 coming out of the baths, falling coming out
12 of the subway.
13       The first thing is that you fall a
14 lot and the second thing, your bladder
15 dysfunction and I could not pee, you know, so
16 that's an indication that something is
17 definitely wrong.
18       Q.  When did you first experience that
19 symptom?
20       A.  At the very beginning, between
21 1983, '84.  And it became so bad that I could
22 not pee.  I mean, you know, it was really so
23 bad and I started to really be concerned
24 about most the falling.  I couldn't explain
25 it because I was good and, and I was doing
```

Page 43

```
1              Rolande Cutner        43
2  a marathon before.  A lot of the people tell
3  me you are fatigue, you stop your marathon
4  but when the bladder start to act up, that
5  really start to concern me.
6        Q.  When did you first go visit a
7  doctor regarding the bladder dysfunction?
8        A.  Like in 1990.
9        Q.  What doctor did you visit?
10       A.  I always visit French doctor, why,
11 because I am a French citizen and I have, as
12 you know, everything is free in France.  That
13 you know because, because of French
14 citizenship everything is free.
15       Q.  What is the name of the doctor that
16 you visited in 1990?
17       A.  Etienne Roulett; E-T-I-E-N-N-E,
18 R-O-U-L-L-E-T.
19       Q.  What did Dr. Roullet tell you when
20 you told him your symptoms?
21       A.  He suspected because, at that time,
22 you know, it's very difficult to give you a
23 diagnostic, so in 1990 he suspected multiple
24 sclerosis and he sent me to another professor
25 for my bladder dysfunction, Professor
```

Page 44

```
1              Rolande Cutner        44
2  Amarenco, A-M-A-R-E-N-C-O, for bladder
3  dysfunction.
4        Q.  And how did Dr. Amarenco treat your
5  bladder dysfunction?
6        A.  It's wonderful.  Let me explain to
7  you.  He teach you to self-catheter and that
8  change my life completely so I went to a
9  special hospital to be taught to
10 self-catheter and that give me freedom.
11       I don't have to wear a permanent
12 tube coming from the bladder down with a bag
13 which is horrible because before that they
14 did not know how to treat bladder dysfunction
15 so you had to carry, you know, a tube and a
16 bag and but now with this self-catheter, it
17 gives you freedom.
18       It gives you the fact that today
19 I'm talking to you and when we have a break,
20 I am going to go to the ladies' room and
21 self-catheter myself.
22       Q.  Did you experience any other
23 symptoms of multiple sclerosis other than the
24 falling down and the bladder dysfunction?
25       A.  Yes.  You lose what they call the
```

Page 45

Rolande Cutner    45

1 grip function. For instance, if I want to
2 grip this, if I don't pay attention, I'll do
3 like that (indicating). But now, I am
4 trained with the brain to say "to grip" so,
5 you know, so you lose the grip function of
6 the two first fingers. You lose a little bit
7 the eye function. You have the bladder, you
8 have the leg, the eyes and the grip function.
9     Q. Do you still experience all of
10 these symptoms today?
11     A. Oh, yes. You never, there is no
12 cure. MS has no cure, has no cure.
13     Q. Other than the self-catheter, is
14 there any other manner in which your MS is
15 treated?
16     A. You mean treatment?
17     Q. Right.
18     A. They gave me what we call in
19 French -- means that you enter the hospital
20 and they put in your vein cortisone at high
21 levels for two, three hours, so you had to
22 enter the hospital because they give you this
23 cortisone and it supposedly makes you feeling
24 better for the walking. So I did have, at
25

Page 46

Rolande Cutner    46

1 that time, the treatment for that but not
2 anymore, not now.
3     Q. How often did you have to go for
4 this treatment?
5     A. Let's separate first bladder
6 function which is so important. I have to go
7 every months because the catheter is a little
8 bit, it's a plastic little thing like that
9 (indicating) and it cost a fortune and I am
10 doing that ten times a day so that means, I
11 mean, Sonde, S-O-N-D-E, what you call in
12 France, this is a catheter in this country,
13 you call it catheter. So I have to go all
14 the months because I do the bladder ten
15 times, and why ten times because when you
16 self-catheter, at the same time you send germ
17 in your bladder so the way to eliminate the
18 germ without having high fever is to prevent
19 the germ from getting married because the
20 germ in your bladder, they swim, you know,
21 like little (indicating), then they see a
22 female germ and they get married but when
23 they are male, they have ten million children
24 every four hours, so that mean if you don't
25

Page 47

Rolande Cutner    47

1 self-catheter, eliminate the urine, urine,
2 urine, this germ stay in your bladder.
3     What happens, they go up, they give
4 you fever, they give you a lot of very bad
5 fever and you might die. So because of that
6 I have to self-catheter ten times a day to
7 eliminate the urine and eliminate the germ.
8     Q. When you say that you have to go
9 every month, is that to visit the doctor in
10 France?
11     A. Yes, because the rule in France
12 is -- because this is very expensive, you can
13 imagine. In France they monitor you because
14 they pay, the government pay for this
15 treatment so they monitor you so every month
16 I have to request, you know, it's not, you
17 cannot send it through the mail to America
18 because it's monitored because it's so
19 expensive. It's very, very expensive.
20     So I would say, let me add to that,
21 maybe, like, if I can have every six weeks
22 instead of every four weeks, you know, I beg
23 the doctor and administratively they say,
24 "Okay, give her six weeks." But it's very
25

Page 48

Rolande Cutner    48

1 controlled because it's very expensive. This
2 is the reason.
3     Q. The cortisone treatment that you
4 described earlier, how often?
5     A. That stopped completely.
6     Q. When did that stop?
7     A. I stopped like two -- two, three
8 years ago I stopped.
9     Q. Why did you stop that treatment?
10     A. It did not help me. It put my
11 liver in danger because this cortisone is a
12 hormone and it can damage the liver and
13 because it did not help me, the doctor said,
14 "Stop that, that's not helping you."
15     Q. Other than the catheter and the
16 cortisone treatment, is there any other
17 treatment that you received for your multiple
18 sclerosis?
19     A. No. Not that I am aware of, no.
20     Q. Other than the visits to France
21 that you described in order to get your
22 catheter treatments, how often do you visit
23 the doctor regarding your multiple sclerosis?
24     A. Every months to get the catheter or
25

Page 49

Rolande Cutner    49

1    one every six weeks, let's say, if I can
2    stretch it.
3        Q.  When you go to France for your
4    treatment, where do you get treated?
5        A.  Hospital Tenon; H-O-S-P-I-T-A-L,
6    second word T-E-N-O-N.  That's the most I go;
7    Hospital Rothschild for the bladder because
8    Hospital Rothschild is specifically dedicated
9    to neurological bladder, it's a specific.
10   You receive treatment of that.  This
11   Professor Mancott (phonetic) that I told you
12   about.
13       Q.  Did you still treat with
14   Dr. Amarenco?
15       A.  Yes, and Dr. Mancott passed away of
16   a massive heart attack and everybody was
17   horrified by his death, you know.  He was --
18   nobody could understand how he can have this
19   massive heart attack.
20       Then I was going to Dr. Henfeld's,
21   H-E-N-F-E-L-D, office.  The hospital now is
22   changed; it's Hospital General, General
23   Hospital of Poissy, P-O-I-S-S-Y.
24       Q.  In Paragraph 30 of your complaint

Page 50

Rolande Cutner    50

1    you say that you are placed at risk of
2    falling if you carry anything and this high
3    risk is due in nature of your condition; do
4    you see where I'm referring to?
5        A.  Yes.
6        Q.  What do you mean by "anything?"
7    Would you be able to lift something that's
8    very light?
9        A.  My handbag, for instance.  You have
10   to understand.  Can I show it to you?  I can
11   carry my handbag.
12       Q.  Is there a limit on how heavy
13   something can be for you to be able to carry
14   it?
15       A.  See, you have to understand also
16   two different things:  The weight from my
17   handbag, if it's very heavy, I could not.
18   But also the balance because, for instance,
19   I, I cannot carry an umbrella.  This is
20   always why you see me with this rain cape
21   with a hood, see (indicating).
22       If you're asking me why do you
23   carry with you in this beautiful weather a
24   cape with a hood, my answer is I cannot carry

Page 51

Rolande Cutner    51

1    an umbrella and I don't want to be drenched
2    by the rain.  Therefore, every day I have my
3    cape with a hood.  So it's not related, I
4    mean, it is related to the weight but it's
5    related to balance because I cannot carry an
6    umbrella and go like that (indicating).  I
7    fall forward, I fall on the back.  It's
8    balance.
9        Q.  Just for my own understanding, if
10   something was very light but was also very
11   long, would that present a problem?
12       A.  I cannot carry it.  I am talking,
13   for instance, again, let's go back to this
14   cleaners, my clothes.  I cannot, you know,
15   when you go to the cleaners, they give you
16   things high and long.  If I carry it on my
17   shoulder, I might fall on my back, which is
18   terrible because I have metallic plate on my
19   back; if I carry it in front my foot because
20   it's long, I fall in front so for instance
21   for a simple clothes in a cleaners bag which
22   is light I cannot carry it.
23       Q.  The alternative if something was
24   heavy but was small, would you be able to

Page 52

Rolande Cutner    52

1    carry that?
2        A.  Not too heavy.  My handbag I carry.
3        Q.  About how heavy is a handbag?
4        A.  I don't know, I don't know.  It's a
5    woman handbag so you might say -- let me put
6    it this way, it's a woman handbag and a
7    lawyer handbag so I might have papers, books,
8    my makeup.  It's a woman handbag.
9        Q.  I want to turn Page 9, still within
10   Paragraph 30.  You say towards the middle of
11   the page that you have to use a leg brace?
12       A.  Yes.
13       Q.  On which leg do you wear the brace?
14       A.  On the right leg but I don't use it
15   every day.  For instance, this morning I did
16   not wear it.  I use it -- again, you have to
17   understand this disease.  When the fatigue is
18   so intense I cannot even raise my leg so I
19   have to brace it to help me.
20       Q.  How often do you wear the brace?
21       A.  It's related to fatigue so I could
22   wear it every day if I am really fatigue and
23   I cannot get out of bed in the morning so I,
24   you know, whip myself to go out of bed.

Page 53

```
 1              Rolande Cutner        53
 2        As I told my doctor, I don't walk
 3   with my leg, I walk with my brain.  In the
 4   morning I am paralyzed.  I say, "You get them
 5   and you go into the lobby, in the bathroom"
 6   because we don't have any bathroom facility.
 7        We have to walk to the lobby and I
 8   say "you do that, you walk, you do that," and
 9   sometime I cannot do it and I put the brace
10   and whip very, very tired so it's not like,
11   you know, every day because it depends on
12   fatigue.
13        Q.  How long is the leg brace?
14        A.  It start -- I don't wear it today
15   but I mean, it start from the foot -- no, it
16   start at the -- here, I can show it to you.
17        It start here (indicating)
18   underneath the foot.  There is this plate
19   then it goes up like that into the knees
20   because, in fact, it's to help me to raise
21   this part which is weak so it started at the
22   middle of the foot and go up to the knees
23   (indicating).
24        Q.  It comes up to just above knee or
25   does it stop at the knee?
```

Page 54

```
 1              Rolande Cutner        54
 2        A.  It stop at the knee.
 3        Q.  I want to go to the next page,
 4   Paragraph 37.
 5        A.  (Witness complies.)
 6        Q.  How often would you say that since
 7   September of 1994 you always had your laundry
 8   bag delivered by Maxene Cleaners; how often
 9   did you have your laundry delivered prior to
10   the Lantern Group's new rule?
11        A.  I would say more or less twice a
12   week, more or less; could be once a week,
13   could be twice a week.
14        Q.  Now, I know you mentioned earlier
15   that you had a strong discussion with
16   Ms. Cohen where you said you had never had an
17   issue of stealing.  During this conversation
18   with Ms. Cohen, did you tell her that you
19   needed your laundry delivered because you had
20   a disability?
21        A.  Yes.
22        Q.  What did she say in response?
23        A.  "Don't worry, don't worry, we'll
24   think about it."
25        Q.  What did you say to her regarding
```

Page 55

```
 1              Rolande Cutner        55
 2   your disability?
 3        A.  I would say I retraced the history
 4   of the building at that particular meeting.
 5        MR. CUTNER:  No, the
 6        question is what did you say to
 7        Ms. Cohen about your disability.
 8        A.  I said, "I am disabled, I cannot
 9   carry anything."
10        Q.  After you told her, she responded
11   that they would think of something; is that
12   correct?
13        A.  Yes, yes.
14        Q.  When was the next time you
15   approached someone at the Lantern Group and
16   told them that you had a disability and that
17   was why you wanted to have your clothes
18   delivered?
19        A.  I don't understand the question.
20   It was with Harriet Cohen on that particular
21   date.
22        Q.  Did you have any other
23   conversations with anyone after this
24   conversation with Ms. Cohen about your
25   disability?
```

Page 56

```
 1              Rolande Cutner        56
 2        A.  You mean with Ms. Cohen or with
 3   other persons?
 4        Q.  With anyone at the Lantern Group?
 5        A.  At the Lantern Group?
 6        Q.  Anyone who works for the Lantern
 7   Group?
 8        A.  Let me clarify because, you know, I
 9   talked to you about that, the security guard;
10   they refuse everything and I said to the
11   security guard, "Ms. Cohen said she's going
12   to look into this problem.  How do you dare
13   to prevent my delivery boy" so I don't know
14   legally if they are, I know they are not from
15   the Lantern Group but the security guard -- I
16   did not look at the contract but I believe
17   the security guard are under direction and
18   control of the Lantern Group, I believe that
19   but I did not look at the contract so my
20   answer is yes, I told the security guard,
21   "How come you dare to turn aware my delivery
22   boy when Ms. Cohen said I am thinking about
23   it?  How do you dare?"
24        Q.  On how many occasions would you say
25   you had this conversation with one of the
```

Page 57

Rolande Cutner 57

1 
2 security guards?
3    A.   Twice a week.
4    Q.   What did they say in response?
5    A.   "Well, you know, lady, fuck you.
6 We are not going to accept anything delivery.
7 You understand, lady."
8    Q.   Who said this?
9    A.   Security guard.
10    Q.   Was that always their response or
11 was there sometimes a different response?
12    A.   "I don't know what delivery, I
13 don't know.  I don't know.  What are you
14 talking about?  What clothes, what delivery,
15 what cleaners?  I don't know what are you
16 talking about.  I don't even understand what
17 you are talking about."
18    Q.   Was it always the same security
19 guard?
20    A.   No, it's changing at almost -- at
21 one point it was changing almost every day
22 and I would say, "What's your name?  Give me
23 your name."
24       "No, lady, I'm not going to give
25 you my name.  Fuck you.  You understand,

Page 58

Rolande Cutner 58

1 
2 lady.  You have no business to ask my name."
3    Q.   Did you ever learn any of their
4 names, any of the security guards' names?
5    A.   No.  They will never give their
6 name.
7    Q.   Do you know what they looked like?
8 Can you describe what any of the security
9 guards who said this to you looked like?
10    A.   Tall.  Because I am 5'1" everybody
11 look tall and handsome.  Some of them good
12 looking, very young.  Some of them trying to
13 help.  I mean, not everyone say, "fuck you,
14 lady."  Some of them trying to help and say,
15 "I don't know, I don't know.  See with the
16 management."
17       I say, "I talked to Ms. Cohen," and
18 they say, "well, I don't know, lady.  I don't
19 know.  See with the management.  I don't
20 know."
21    Q.   Do you remember what the one who
22 said "fuck you, lady" looked like?
23    A.   No.  It will be unfair to me to --
24 they are young people, probably totally
25 uneducated and they don't even know the

Page 59

Rolande Cutner 59

1 
2 building because one of them I said, "Why
3 don't you know?"  So I ask if we, "Why don't
4 we look."
5       I wanted to retrieve something in
6 the yard, in the backyard and I said, so I
7 ask to go look and he said, "No, you have no
8 right to go into the backyard."
9       So I said, "Why don't we go into
10 the backyard with me to retrieve the thing,"
11 and at one point one was pretty nice, he
12 said, "Okay, let's go.  I go with you," so we
13 go.
14       We go downstairs, doors are locked.
15 You cannot go into the backyard so I said,
16 "You have the key?"
17       "No, I don't have the key."  I
18 said, "Well, maybe we can go by the
19 elevator."  So we go to the elevator.  "Oh, I
20 don't have the key of the elevator going
21 downstairs.  I don't."
22       I said, "Ask the manager where is
23 the key."  He ask the manager and he said, "I
24 don't know, lady."  And it was a young man,
25 he was almost in tears.

Page 60

Rolande Cutner 60

1 
2       I am telling you, not every
3 security guy were obnoxious.  This young man
4 was almost in tears and I said, "How come
5 they did not give you the key?  And he said,
6 "Well, lady, we have no training.  They did
7 not train me."
8       I don't know.  I don't know the
9 guy.  The guy did not know and as I say, he
10 was almost in tears.
11    Q.   You mentioned earlier that the
12 security guards were changing almost daily?
13    A.   Oh, yes.
14    Q.   Did that particular security guard
15 that you were just discussing, did you ever
16 see him again in the building?
17    A.   The one who was almost in tears?
18    Q.   Yes.
19    A.   No, no.
20    Q.   Are the security guards still
21 changing almost daily?
22    A.   Now it's a little bit better.  I
23 would say they might last one or two weeks.
24 It's a little bit better but they are still
25 young, probably no education and probably

Page 61

Rolande Cutner    61

1 inexperienced. I would say probably, I don't
2 know, but I would say they are under the
3 control of the Lantern Group. I did not see
4 the contract, of course. I don't know.
5     Q.  What makes you think that they're
6 under the control of the Lantern Group?
7     A.  Because one of them I said, "Don't
8 talk to me like that," and he said, "you have
9 nothing to say to me because, you know, I
10 come from New York City, I am the company,"
11 and I say, "but you are security guard,"
12 "yes, but you know, the company we are hired
13 by the City, our company has" -- I don't know
14 what he said about related to the City so at
15 that point I wonder and I felt maybe I really
16 told him you are a bad person and the poor
17 guy belong to the City of New York, I mean,
18 it was a confusing. I was not sure but the
19 Lantern Group controls them. How they could
20 be a security guard without being controlled
21 by the Lantern Group, that doesn't make
22 sense.
23     MR. CUTNER:  Would this be a
24     good time for a short recess.

Page 62

Rolande Cutner    62

1     (Whereupon, a recess was
2     taken at this time.)
3     MS. HOLTZER:  Please read
4     the last question and answer.
5     (Whereupon, the requested
6     portion was read by the reporter.)
7     Q.  In your complaint when you state
8 that the Lantern Group was adamant not to
9 have you allowed to have your laundry bag and
10 cleaners delivered --
11     MR. CUTNER:  Where is the
12     reference?
13     MS. HOLTZER:  I'm referring
14     to Paragraph 46 on the next page.
15     Q.  -- are you referring to the
16 security guards?
17     A.  No, that I was referring to Harriet
18 Cohen.
19     Q.  How is Harry Cohen adamant not to
20 have the laundry bag and clean clothes
21 delivered?
22     A.  Because I complain and I don't
23 remember if it was during meeting with a
24 Harriet Cohen but I remember she was in the

Page 63

Rolande Cutner    63

1 lobby and I complain to her directly about my
2 clothes, about my clothes not being
3 delivered. I complained to her directly.
4     Q.  And is this the same conversation
5 you were referring to earlier where you told
6 her you had a disability and she said they
7 would think of something?
8     A.  Yes.
9     Q.  Other than what you already
10 testified to, was there any other way that
11 you perceived the Lantern Group was being
12 adamant not to allow you, not to have your
13 clothes delivered?
14     A.  The answer is yes, because they
15 issue regulations. I remember vividly this
16 piece of paper with regulations, yes. So my
17 answer is "yes" with the assurance of the
18 regulation.
19     Q.  After this conversation with
20 Ms. Cohen, did you have any further
21 conversations with Ms. Cohen regarding the
22 delivery?
23     A.  I had one more confrontation; I
24 would say "confrontation."

Page 64

Rolande Cutner    64

1     Q.  When was this?
2     A.  Probably in June 2008 at 40 Rector
3 Street inside the building of the Board of
4 Estimate there was this hearing and she was
5 there because the Lantern Group was there,
6 and I approach her again because again, my
7 clothes, I mean the delivery boy of the
8 Maxene Cleaners were turned away and it
9 happened that she was at this meeting so I
10 approach her immediately and I say, "I'm sick
11 and tired that my cleaners are still, I mean
12 the boy, the delivery boy is turned away when
13 you told me that everything will be
14 arranged?" And I must say I kind of shouted
15 at her at that point. I confront directly.
16     Q.  What did Ms. Cohen say in response
17 after you said this to her?
18     A.  She was, I should not say
19 flabbergasted.
20     MR. CUTNER:  What did she
21     say, if anything?
22     A.  What did she say, nothing, no. She
23 looked at me like the ceiling fall on her.
24 Nothing. She look at me and nothing, no.

Page 65

Rolande Cutner    65

1
2    She said absolutely nothing.
3        Q.   When you said this to her and she
4    said nothing, how did you respond to the fact
5    that she said nothing?
6        A.   I was such in a fury because she
7    said nothing.  I said, "You are the boss.
8    You said you are the boss.  You said you will
9    fix everything and I don't have my clothes."
10   I was in a fury, you know, I really shout at
11   her.
12       I'm sorry.  This is what I said,
13   "You are the boss" -- I memorize it -- "You
14   are the boss and you said you will fix
15   everything."
16       Q.   Did she respond to that?
17       A.   Nothing.
18       Q.   How did the conversation end?
19       A.   Well, I was because it was such a
20   harsh, I mean, you have to realize it's a
21   public place, I confronted her.  Maybe I was
22   wrong to raise my voice and she said nothing
23   and I was, I mean, it was wrong.  I was
24   wrong, whatever.
25       Q.   Did you say anything else to her?

Page 66

Rolande Cutner    66

1
2        A.   No.
3        Q.   Did you walk away or did she walk
4    away?
5        A.   She was sitting because, as I say,
6    it was a hearing and she was sitting, and I
7    was in the same room in this hearing and I
8    walked to her and I face her.  I confront
9    her.  She said nothing and I went back
10   sitting, you know, in my chair.
11       Q.   Was this before the hearing started
12   or after it was over?
13       A.   Before.
14       Q.   Other than that first conversation
15   that you reference in this line, this
16   conversation in June of 2008, did you have --
17       A.   I'm not sure if it is June or May,
18   I mean, maybe it's, I'm certain of May.  I
19   mean, I have to look into my calendar for
20   that.
21       Q.   Other than these two conversations
22   that you testified about, did you have any
23   other conversations?
24       A.   No, no.
25       Q.   What about with anyone else from

Page 67

Rolande Cutner    67

1
2    the Lantern Group?
3        A.   Rafal Markwart; R-A-F-A-L,
4    M-A-R-K-W-A-R-T.
5        Q.   Mr. Markwart, when did you have a
6    conversation with Mr. Markwart about your
7    disability?
8        A.   Again, I probably had -- let me
9    think.
10       Q.   Sure.
11       A.   I have three, let's say
12   confrontations other than conversation.
13   Confrontation.
14       Q.   When was the first time you spoke
15   with Mr. Markwart about your disability?
16       A.   It was a long time ago, March
17   2006 -- probably in September 2006.  I'm not
18   sure.  Again, I have to look to my book but
19   probably then that was the day of the
20   visiting with the group, I already mention,
21   probably August 2007 and May 13, 2008 in this
22   hearing at 40 Rector Street.
23       Q.   What did you say to him in
24   September of 2006?
25       A.   "I am disabled, I have multiple

Page 68

Rolande Cutner    68

1
2    sclerosis.  I cannot carry anything.  I have
3    a lot of problem with the cleaning in the
4    building.  The building is deteriorating,
5    it's getting worse."  You know, complaints.
6        Q.   What did he say to you in response?
7        A.   "Don't worry, I'll see what I can
8    do."
9        Q.   Did you say anything else to him?
10       A.   No, no, no.
11       Q.   Did he say anything else to you?
12       A.   No.
13       Q.   What about in August 2007, what did
14   you say to him about your disability again?
15       A.   Again, I explain to him, "I am
16   disabled, I cannot carry anything.  You do
17   understand that I need my cleaners to be
18   delivered to the building.  You do understand
19   that it's very important to me and the
20   building is dirty," complaining about state
21   of the building and I think at that day, I'm
22   not sure but maybe that day -- I'm pretty
23   sure it is that day -- he said, "Well, if you
24   tenants would pay your rents then we have
25   money to clean this building."  And I say,

Page 69

Rolande Cutner    69

1
2  "What, I am paying my rent all the time." So
3  that was also confrontation.
4      Q.  Do you know if all the other
5  tenants are paying their rent?
6      A.  I am not aware.  I am not aware of
7  that.  I don't know.
8      Q.  Did he say anything to you with
9  regards to what you had told him about your
10  disability?
11      A.  No, nothing.
12      Q.  What did you say to him at the
13  hearing on May 13th?
14      A.  Same thing: "I am disabled, I
15  cannot carry anything.  Promises has been
16  made that the delivery system" -- no, wait.
17  Restart.
18      "Promises has been made that it
19  will be a waiver of the rule of the building
20  for disabled people" and because I am
21  disabled, it would be a waiver of the rule
22  and I confront him again.
23      I said, "You long time ago said
24  that there's a waiver for people with
25  disability and nothing is happening," and I

Page 70

Rolande Cutner    70

1
2  said, "nothing is happening."
3      Q.  What did he say in response?
4      A.  Nothing.
5      Q.  Did you say anything else to him
6  when he said nothing, what was your response?
7      A.  I walk away because, because I
8  felt, you know, it's useless, you know.  At
9  that point I felt discouraged and I felt it's
10  useless.
11      The guy look at you with very stern
12  face, you know, without smiling or even
13  without saying "I don't know" to acknowledge.
14      I tell you, can I tell you
15  something?  I had feeling it was a zombie,
16  you know, like in a movie when you have those
17  people who are walking from outer space in
18  the street -- you have seen those movies, you
19  know, with those people and he look at you,
20  but he look at you, but his eyes are not
21  where they're looking at you like he want to
22  engage in a conversation but he look at you
23  and said nothing, absolutely nothing,
24  nothing.
25      Q.  You testified earlier that some of

Page 71

Rolande Cutner    71

1
2  the security guards when you would confront
3  them about the fact that the delivery boy had
4  been turned away and that some of the
5  security guards responded that you should
6  talk to management, did you ever call
7  management on specific instances where your
8  deliveries were turned away?
9      A.  I wrote letter.  If you look into
10  my document that I provide pursuant to
11  discovery, you will see a lot of the letters
12  that I wrote.
13      Again, for the reason is when you
14  talking to those people, they are like
15  zombies.  They are like their eyes do not
16  focus to you.  It's a silence.  It is a
17  silence.  So I resume writing letter, and if
18  you look in my file and interrogatories, you
19  will find all my letters.
20      Yes, I complain with letters
21  because you cannot talk to them.
22      Q.  Did anyone ever respond to your
23  letters about the deliveries?
24      A.  Yes, Ms. Cohen corresponded.
25      Q.  How would Ms. Cohen respond?

Page 72

Rolande Cutner    72

1
2      A.  "Don't worry, we look into the
3  problem."
4      Q.  Did she respond verbally?
5      A.  Verbally?
6      Q.  Did she call you or come visit you?
7      A.  No, verbally and at that particular
8  lobby meeting that I mentioned to you she
9  said, "Don't worry, don't worry.  I look into
10  the problem."
11      Q.  And you testified earlier that the
12  Lantern Group had at some point issued a
13  waiver where people with disabilities would
14  be able to receive packages.  When did this
15  occur?
16      A.  She said she mentioned that
17  probably on September 15th.  Again, I have to
18  look at my calendar.  2007 that they will
19  issue a waiver of the regulation for disabled
20  people like me.
21      Q.  Were you able to, did you receive
22  deliveries after that waiver was issued?
23      A.  One or two times it was okay and I
24  had hope because it's every two, one or two
25  weeks, it was okay and then it resumed that

---

Page 73

Rolande Cutner          73

1
2    the security guard refused and the cleaners
3    lady would call me in my office and tell me,
4    you know, "lady, the doorman" because she
5    keep tell me, "the doorman refuse the
6    delivery boy, what can I do? Can you come at
7    four o'clock because we are closing at 5:00,
8    come, come" and then I would write a letter
9    and said again, the delivery boy was turned
10   down and I write a letter and I send a letter
11   to management.
12       Q.   On or about September 15th, the
13   Lantern Group issued a waiver and you got
14   your deliveries for about one or two weeks;
15   is that correct?
16       A.   Yes.
17       Q.   And at some point in October
18   2007 --
19       A.   It reversed to the bad behavior, I
20   mean, I would say quote/unquote, "bad
21   behavior."
22       Q.   Did that continue from October 2007
23   until today?
24       A.   Yes. Last two weeks again and I
25   would say yes, and I have to write letter.

---

Page 74

Rolande Cutner          74

1
2    You might look into your file. I, I enter a
3    copy of it.
4        Q.   Is every single delivery returned
5    or is it periodically that one gets returned?
6        A.   It's difficult to say. I would
7    arrive and ask, "where is my delivery."
8    Sometimes some of the security guards accept
9    and sometimes he would say, "no, there is no
10   deliveries in this building," and I would
11   say, "Yes, there is delivery. Why don't you
12   look at the door." Then he would go look at
13   the door and some guard would say, "okay, I
14   look and somebody accept," and sometimes the
15   other guard, other shift don't accept, you
16   know. So it's very flexible.
17       Q.   How often would you say your
18   deliveries get rejected?
19       A.   Oh, I would say almost every two
20   weeks I have a fight or I have to take a
21   taxi, rush to the cleaners before 5 o'clock
22   and, I mean, you know, it's, it's a battle.
23   Let's say it's a battle.
24       Q.   Now, you say in Paragraph 45 of
25   your complaint that the denial of the

---

Page 75

Rolande Cutner          75

1
2    packages created physical, mental and
3    emotional injuries; what are the physical
4    injuries that the denial of the packages
5    cause?
6        A.   Again, I have to explain about the
7    relationship between the neurological disease
8    that I have. In multiple sclerosis when you
9    are extremely upset, the leg don't function
10   so the doctor always tell me "don't put
11   yourself in a situation where you are
12   extremely upset because immediately your legs
13   are going to fall down, you won't be able to
14   walk so I warn you, don't put yourself in
15   that type of situation because it's very much
16   related when you are under stress that your
17   leg won't function."
18       So with this constant battle, not
19   only for the delivery for the clothes, the
20   bed bugs, the mice, the rats, the bathroom
21   and human feces, all this upset me terribly
22   and that affect my legs. That's the
23   physical.
24       Now, also there is some fear. You
25   have to realize my office is in 60 Broad

---

Page 76

Rolande Cutner          76

1
2    Street. It's next to the Stock Exchange.
3    People there are very elegant, very well
4    dressed, not only in my building but at the
5    Stock Exchange. All over Wall Street people
6    are really well dressed. You should see, I
7    mean, they keep themselves very well, not
8    only my office but around the street. And
9    when I am not well-dressed with clean clothes
10   and clean underwear and everything clean, I
11   am terribly upset. That upset me beyond
12   belief and also in a meeting, I am in a
13   meeting -- I give you as an example.
14       I am in a meeting, people are
15   talking and there is a lunch break and
16   especially when it is very hot like that,
17   people will make joke about bodily odor, for
18   instance and they say, "oh, you know, this
19   guy, I could not even sit next to him. We
20   were looking at some document and would you
21   believe that the guy had bodily odor," for
22   instance.
23       So they kind of laugh about that
24   and to me maybe it's -- I hope it is not true
25   but to me, mentally, I start to say, oh, my

---

Page 77

Rolande Cutner                77

1    god, if I am not very well-dressed with my
2    clean clothes sitting next to somebody,
3    somebody is going to say, "she's not
4    correctly dressed or she smell bad."
5        This is the way, I mean, let's --
6    this is the way I am so this is why I put
7    that in my complaint is that this constant
8    battle with the laundry bag with the clothes
9    to me become a big issue because I don't have
10   the facility that you might have in your
11   building -- you go down, you have the washing
12   machine and I don't have that. I don't have
13   that.
14       Q.   Other than what you just mentioned,
15   are there any other physical, mental or
16   emotional injuries -- I'm just talking with
17   regards to the laundry now, we'll discuss the
18   conditions of the building later -- is there
19   anything else, any other physical, mental or
20   emotional injuries cause by the denial of the
21   laundry?
22       A.   As I just explained to you now,
23   tremendous stress in my office because we go
24   to meeting and I am so afraid to, you know,

Page 78

Rolande Cutner                78

1    maybe it's a fear that I should not have but
2    the fact is I have this fear.
3        Q.   In Paragraph 48, you mention
4    harassment. Is the harassment that you're
5    referring to in this paragraph the rejection
6    of the laundry bags?
7        A.   Yes, yes, yes. That's the type of
8    harassment.
9        Q.   In Paragraph 49, you allege that
10   you left work at 4 o'clock in order to reach
11   the cleaners by 5:00?
12       A.   Yes.
13       Q.   What time would you normally leave
14   work?
15       A.   About 7:00 or 8:00 because a lot
16   of --
17           MR. CUTNER: The question
18       is, what time.
19       A.   What time, 7:00 or 8:00 in the
20   evening.
21       Q.   When you had to leave your office
22   at 4:00, how would you make up for the time
23   that you lost by not being in your office?
24       A.   I notify the appointment, if I can,

Page 79

Rolande Cutner                79

1    telling my client to come the next day or I
2    don't go to the meeting.
3        Q.   How often did you have to miss a
4    meeting because you had to leave work at
5    4 o'clock?
6        A.   Well, I'll say, you know, maybe 52
7    meetings, 52 meetings, once a week.
8        Q.   Weren't these meetings rescheduled
9    for another time?
10       A.   Sometimes, sometimes no. Sometimes
11   no.
12       Q.   On the next page, Paragraph 50, you
13   say that was the only time when Cutner could
14   obtain a delivery boy from Maxene Cleaners.
15   What are you referring to when you say that
16   was the only time?
17       A.   Because the lady boss of Maxene
18   Cleaners, she tell me after 5 o'clock the
19   delivery boy leave and I don't have to have a
20   second delivery boy to be waiting for you at
21   7:30, and she said, "I don't have two
22   delivery boy. I have this one. He leave at
23   5:00."
24       Q.   So is it correct that the cleaners

Page 80

Rolande Cutner                80

1    itself was open to 7:30 but you needed to get
2    there by 5:00 in order to have the delivery
3    boy walk with you; is that correct?
4        A.   Yes, yes.
5        Q.   In Paragraph 52, you reference of
6    verbal assault from the Lantern Group's
7    management team.
8            Who verbally assaulted you from the
9    Lantern Group management's team?
10       A.   I think it was this young man
11   called Felix. I'm not sure of his last name,
12   DeJesus and Jose, the porter.
13       Q.   What did Felix say to you that was
14   a verbal assault?
15       A.   Again, you have to realize that
16   eventually that I'm an American citizen. I
17   speak with a French accent so the French
18   accent is the letter R is coming from here
19   (indicating), so if I say "where is the
20   ladies' room, where is the rest room," and
21   when I say "where is the rest room," it sound
22   like a G and they say "what?" So he would
23   say "what room?"
24       I say, "the rest room."

Page 81

1              Rolande Cutner        81
2        "What room? I don't understand
3   what you said, lady." And they laugh and
4   laugh and laugh and laugh and laugh, you
5   know, at me, they make fun. Any word with a
6   R, I cannot pronounce because the French R --
7            MR. CUTNER: The question
8        asked was, what did they say.
9        A.   They laugh. It's not really what
10  they say -- "what do you say, excuse me, what
11  do you say, I don't understand." They make
12  me repeat ten times. I am almost in tears,
13  "what do you say, what do you say" and --
14       Q.   Do you think they were asking you
15  because they didn't understand you?
16       A.   No, because they were laughing at
17  me. They were laughing at me.
18       Q.   How often did this occur?
19       A.   As of the first time I asked them
20  for -- for something, they were laughing at
21  me. At the end, again, you will see it in
22  the multiple letters that I wrote because I
23  was so, so sad and upset and I say "it's no
24  use to talk to those people, I am writing a
25  letter to complain."

Page 82

1              Rolande Cutner        82
2        It went that way because they were
3   laughing at me -- Jose, the porter; Felix,
4   the security guard. They just, I mean, they
5   just laugh and I recognize it be laughing.
6        If I were in the mood it would be
7   funny, I mean, I recognize that it would be
8   funny, but to me it was not funny because it
9   make me repeat ten times and that was not
10  funny.
11       Q.   You mention that you wrote letters,
12  who did you direct your letters to?
13       A.   Rafal Markwart.
14       Q.   What did you write in these
15  letters?
16       A.   About no delivery, failure to
17  deliver, people making fun of me, people not
18  listening to me, an inability to communicate,
19  things like that and, again, I have to look
20  into my letter because there's quite a
21  numerous -- you might have remember that you
22  have seen numerous numbers of letters that
23  you might have seen already.
24       Q.   Did Mr. Markwat ever respond to
25  your letters?

Page 83

1              Rolande Cutner        83
2        A.   Yes.
3        Q.   Did he respond verbally or in
4   writing?
5        A.   In writing.
6        Q.   What did he write in response?
7        A.   "Don't worry, everything is going
8   to be taken care of. We understand your
9   concern, we look at your letter and you don't
10  worry."
11       Q.   Did you ever have any conversations
12  with anyone at the Lantern Group regarding
13  the fact that Felix and Jose were laughing at
14  you?
15       A.   No, because I was writing it.
16       Q.   You mention that you were hesitant
17  to seek redress from the Lantern Group?
18       A.   Yes, yes, that's correct.
19       Q.   What kind of redress were you
20  hesitant to take, what do you mean by
21  hesitant to seek redress?
22       A.   Make sure, again, I repeat myself
23  ten times, make sure that the delivery boy is
24  accepted, that the security guard are
25  accepting my delivery, that the community

Page 84

1              Rolande Cutner        84
2   bathroom will be clean when I because there's
3   has been a considerable with this for many,
4   that all the mouse and things like that, they
5   would take into consideration my complaint
6   and that type of thing.
7        Q.   In what way, why were you hesitant
8   to seek redress from the Lantern Group?
9        A.   Because when you deal with people
10  who say "don't worry, I take care of that,
11  don't worry," the first feeling is to believe
12  them. When nothing is done, you say maybe I
13  did not explain it so you go back and then
14  you write letter and then nothing is done,
15  then you say maybe I am dealing with zombie.
16       It is, again, like this movie from
17  outer space people because they never look at
18  you in the face and they always say "don't
19  worry." So after you get discouraged,
20  discouragement, and you say it's no use, I
21  mean, it's really, really no use so this is
22  why you have this very slowly discouraged
23  feeling and I would explain it like that.
24       Q.   Did you ever stop raising issues
25  with the Lantern Groups's management because

Page 85

Rolande Cutner    85

1    you felt hesitant to seek redress for the
2    reasons you just mentioned?
3    A.  No, because my last letter is
4    probably -- we are what, in July, what's the
5    date today?
6    Q.  July.
7    A.  July.  Probably again May I
8    withhold complaining about the non delivery
9    of my clothes so I not, never get discouraged
10   to the point where I'll not write it, at
11   least I write letter.
12   Q.  I want to look at Paragraph 57.
13   A.  Yes.
14   Q.  Now, you say that the new rule of
15   no delivery at the building reinforces
16   stereotypes; what stereotype are you
17   referring to?
18   A.  It was seemed to me that's my
19   personal feeling that the reason why the
20   Lantern Group management would dismiss my
21   complaint is because they would say SRO
22   population, they are drug addicts, they are
23   alcoholics, they are former, you know,
24   homeless, they are crazy people, they are

Page 86

Rolande Cutner    86

1    bunch of, quote/unquote, "asshole," they are
2    loser in life so why should we even be
3    concerned.
4        You have to understand, when you
5    live in a building like that, when people,
6    you complain, you fill out the form, you
7    write letter, you try to talk to somebody and
8    you don't see the long term goals, you only
9    see the security people, you feel you are
10   almost in jail, in jail and that's the thing
11   you feel that they treat you like the
12   population of under below human being because
13   they don't answer, they never answer, never
14   and except for "don't worry, everything is
15   going to be all right."  They never answer.
16   Q.  How do you know that this
17   stereotype that you described exists, how do
18   you know that people hold this stereotype?
19   A.  Because in the street coming out of
20   the bus or the subway you would have
21   activists in the neighborhood.  Let me
22   explain to you, relating to why I use
23   stereotype.  Let me explain it to you.
24       Coming out of the bus or coming out

Page 87

Rolande Cutner    87

1    of the subway you have activist who
2    distribute leaflet and in this leaflet like
3    everyday read the leaflet they say homeless
4    people or drug addict, alcoholic are living
5    in this neighborhood and we are sick and
6    tired that New York City is using this street
7    like a garbage dump, we are sick and tired of
8    that and they give you this leaflet, you
9    know, and you know, what I see on the
10   leaflet, I see the address of my building, uh
11   huh, so now I am considered like a below
12   human being by the neighbors.  So this is how
13   I got the idea and I have the leaflet.  I can
14   show it to you because I was so upset.
15   Q.  Do you know whether or not the
16   Lantern Group holds this stereotype?
17   A.  I don't know.
18   Q.  Do you know whether the Lantern
19   Group operates to service people who are
20   homeless, mentally ill?
21   A.  I don't know.
22       MS. HOLTZER:  Off the
23       record.
24       (Whereupon, a discussion was

Page 88

Rolande Cutner    88

1    held off the record.)
2        (Whereupon, a luncheon
3        recess was taken.)
4    Q.  Let's look at Paragraph 55 on
5    Page 13 on the bottom where is says Page 13.
6    A.  (Witness complies.)
7    Q.  In Paragraph 55 you referenced your
8    future relocation.
9        You testified earlier that only the
10   people with rooms in the front of the
11   building are going to be relocated.  Did that
12   plan change at some point?
13   A.  Yes, after they told us and I don't
14   remember what, if it was -- not a meeting --
15   it was a piece of paper like a leaflet that
16   was distributed to the permanent tenants.  I
17   think they mention the renovation -- no,
18   first it was front going to the back then the
19   back was going to be relocated to Hunter
20   Moons, so whenever they ask what is Hunter
21   Moons that this building the Lantern Group is
22   the owner of this building, it is located
23   someplace in Broadway, maybe upper Westside,
24   I did not go there and I understand because

Page 89

Rolande Cutner    89

1  you have to remember, the building there is
2  permanent tenant and when they see you coming
3  out of the elevator and they say oh, did you
4  hear, blah, blah, blah, blah so these rumors
5  are circulating and I understand the Lantern
6  Group was trying to convince people to move
7  to Hunter Moons and terribly, one old man,
8  Black guy by the name of, name of Mr. Woods,
9  W-O-O-D-S, so I talk to him so this is the
10 one that I can testify about because I talk
11 to him, so he was convinced by the Lantern
12 Group to go -- let me describe him.
13         He's a old man probably without any
14 family, probably maybe disabled and he was
15 moved from the first floor to the third floor
16 next to my room. This is how I met him
17 because he introduced himself and he said, "I
18 am your neighbor, hi, hello, how are you" and
19 then it is that I saw him on the street and
20 then he disappeared and then I said, "What
21 happened to you, Mr. Woods?" "Oh," he said,
22 "the Lantern Group, they convince me to go to
23 Hunter Moons."
24         "What is Hunter Moons?"
25

Page 90

Rolande Cutner    90

1         "Oh, this is the building that the
2  Lantern Group manage. I don't know if they
3  are owner or managing or -- but they convince
4  me to go to the Hunter Moons."
5         Then two weeks elapse then I see
6  him back in the room next to me. "Hi," I
7  say. "Mr. Woods, what happened?" "Oh," he
8  said, "I have been assaulted. It's terrible.
9  People beat me up, they stole my money. I
10 told the Lantern Group I don't want to stay
11 at Hunter Rooms and I am back at 319 West
12 94th Street."
13         So the ceiling fell over me. I
14 said, "the Hunter Moons building is worse
15 than our building?" He said, "yes, as a
16 matter of fact, yes, because over there you
17 get assaulted and I was beaten."
18         So this is a thing so the Lantern
19 Group never approach me to relocate me but
20 this story was told to me.
21     Q.  Did Mr. Woods say who had assaulted
22 him and stolen his money?
23     A.  In the building.
24     Q.  Other tenants?
25

Page 91

Rolande Cutner    91

1     A.  Yes.
2     Q.  You said that Mr. Woods might be
3  disabled, what do you mean by that?
4     A.  Because he's limping but I did not
5  ask, you know, I don't want to investigate
6  his limping. And it look like he's maybe
7  he's in pain or he's limping, that's all and
8  about age, he's probably maybe 65 or 70.
9     Q.  Other than telling you that the
10 Lantern Group spoke with him about moving to
11 Hunter Moon, did he tell you anything that
12 the Lantern Group had told him about Hunters
13 Moon?
14    A.  No, no. He just talk about his bad
15 experience. He did not tell me why he moved
16 there except that he said, "they convince me,
17 they convince me to move to Hunter Moons."
18    Q.  Did he tell you what they said or
19 did to convince him to move?
20    A.  No, no.
21    Q.  On the next page, Paragraph 59, you
22 said that the Lantern Group's action has been
23 geared to break Cutner as well as other
24 permanent tenants' morale; what action are

Page 92

Rolande Cutner    92

1  you referring to there?
2     A.  Lantern, to break me. I refer to
3  my previous testimony. It's all this
4  terrible condition that I felt was trying to
5  break me.
6     Q.  Do you think that the Lantern Group
7  was intentionally taking these actions
8  specifically to break you?
9     A.  I think so.
10    Q.  Why do you think that?
11    A.  Because, to me, every time I
12 complain and it would be "don't worry, we
13 take care of it" and nothing happened for
14 months and months and you write letter and
15 nothing happen and then you fill out the form
16 because there is this big battle about the
17 form, nothing happened.
18         I said to myself it got to be a
19 will to break me. I mean, it's impossible
20 that human being would act that way unless
21 they want to break me because every time you
22 complain, you have to understand, they say
23 "don't worry, we take care of it." So you
24 feel you go to your office, you feel that's

Page 93

Rolande Cutner    93

1    it, your problem is resolved and then you
2    complain again and again and again and again
3    and you write letter and nothing happen and
4    you say something, nothing happen.  There is
5    a will there.
6        Q.  What do you think they were trying
7    to accomplish by trying to break you?
8        A.  To make me leave.
9        Q.  Why do you think they wanted you to
10   leave?
11       A.  Because of all the permanent tenant
12   which are already broken down maybe by
13   disease, maybe because they are old, maybe
14   they take some drug, I don't say they are
15   drug addict but maybe they are disabled,
16   sure; maybe I was the only one that they
17   could not break so they were trying to break
18   me.  I was convinced of that, so it was my
19   conviction, that's all.
20       Q.  Other than the fact that you allege
21   that they didn't respond properly to your
22   complaints, what other actions do you believe
23   they took in order to break you?
24       A.  As I said, direct the security

Page 94

Rolande Cutner    94

1    guard to refuse my cleaners knowing how
2    important it is to me.  I suppose, you know,
3    I did not say that.  I say Felix telling the
4    security guard turn away, I did not say that.
5    I said I suppose, you know, I suppose it was
6    that because, you know, it doesn't make
7    sense.
8        If say I complain, they say "don't
9    worry, that's going to be taken care of" and
10   then nothing happened so you feel humiliated
11   and say they are making fun of me, they treat
12   me like cattle or they are crazy, which I
13   would not say that, they look perfectly
14   normal so there is -- who would you think
15   that you think they want to break you?  It's
16   only reasonable reason because you have to
17   understand they will never shout at me or
18   say, you know --
19            MR. CUTNER:  Just try to
20        stay to the question.
21       A.  Whatever.  Just say I had the
22   ultimate conviction they were trying to break
23   me.
24       Q.  Is it your testimony that that

Page 95

Rolande Cutner    95

1    someone from the Lantern Group's management
2    directed the security guards not to accept
3    your deliveries?
4        A.  Definitely.  It's my testimony that
5    someone at the Lantern Group directed the
6    security guard not to, definitely.
7        Q.  How do you know that the security
8    guards just weren't aware of the waiver?
9        A.  Because I cannot explain why some
10   week it would there behind the door and the
11   week after suddenly it wasn't there.  It was
12   turned away, they turned away the delivery
13   boy and believe me, I tried to.
14        There was this woman security
15   guard.  I talked to her on a Saturday
16   morning.
17            MR. CUTNER:  Are you
18        answering the question now?
19            THE WITNESS:  Wait, wait.
20       A.  I talk to her and she said --
21       Q.  What did she say?
22       A.  She said, "You know, we don't know.
23   We don't know what to do."  Because again, I
24   confront her.  I confront her.

Page 96

Rolande Cutner    96

1        Q.  When she said "we don't know what
2    to do," what context was she saying that in?
3        A.  Because I said again, again, again
4    two days and this morning my delivery clothes
5    is not there behind the door so she said, "I
6    don't, we don't know what to do" like she was
7    waiting for the Lantern Group to get
8    direction and that I can only assume she
9    said, this woman, "we don't know what to do"
10   so I assume she was expecting the Lantern
11   Group to tell her what to do.
12       Q.  Did that woman indicate that she
13   knew that she was supposed to accept
14   deliveries for disabled tenants?
15       A.  No, she never said anything to
16   that.  She just said she didn't know what to
17   do.
18       Q.  On the next page, the top of the
19   page you say that there are some permanent
20   tenants who left the premises to look
21   elsewhere for housing; do you see where it
22   says that?
23       A.  Uh-huh.
24       Q.  Who were the permanent tenants that

Page 97

```
1            Rolande Cutner      97
2    left to look elsewhere for housing?
3        A.   There is a man, another Black guy.
4    I know only his first name, Lee, L-E-E, Lee;
5    and he told me and I don't know.
6        MR. CUTNER:  The question
7            was the names of the people.
8        A.   Lee, L-E-E; it's a Black guy. He
9    was living at the Room 141 and he told me
10   that question.
11       MR. CUTNER:  The question
12           was the names of the people.
13       A.   Lee, L-E-E.
14           MR. CUTNER:  Okay, answer
15           the question.
16       Q.   Did you have any conversations with
17   Lee about his reasons for leaving the
18   building?
19       A.   Yes.
20       Q.   What did he tell you?
21       A.   He said that he could not take it
22   anymore, that he just said that he couldn't
23   take it anymore and he was leaving and he
24   said he was leaving to go back to Ireland and
25   this is what he said.  He couldn't take it
```

Page 98

```
1            Rolande Cutner      98
2    anymore.
3        Q.   Did he tell you what he meant by
4    it, he couldn't take it anymore?
5        A.   No.  He just said, "I can't take it
6    anymore."  This is what he said.  I remember
7    his expression, "I cannot take it anymore."
8        Q.   Do you know what he was referring
9    to when he said he cannot take it anymore?
10       A.   Dirt, mice, bugs, bed bugs.
11       Q.   When did Lee leave the building?
12       A.   Probably November 2007, probably.
13       Q.   Were there any other permanent
14   tenants who left the building to look
15   elsewhere for housing?
16       A.   I already mention Mr. Woods.
17       Q.   Other than Mr. Woods and Mr. Lee,
18   do you know of anyone else?
19       A.   No, I didn't talk.  There were
20   rumors that some people have left some time,
21   who leave and they said those people leave
22   but not particularly a name that I could give
23   you, rumors.  I would say rumors.
24       Q.   In Paragraph 62 you said the
25   Lantern Group caused the management of the
```

Page 99

```
1            Rolande Cutner      99
2    building to be so disruptive that it affected
3    the morale of Cutner as well as of other
4    permanent tenants.  How did the Lantern Group
5    cause the management of the building to be
6    disruptive?
7        A.   The Lantern Group did not give the
8    permanent tenant key to the main entrance of
9    the building.  That situation gave, that
10   situation create a lot of the very bad
11   incident where people were stuck outside
12   without having a key to enter the premises.
13           Example:  In the middle of the
14   night in the Winter, you ring the bell, I'm
15   talking now on the main entrance and you are
16   out on the street and the wind, because you
17   have to see the wind is coming from the
18   Hudson River because there is this beautiful
19   riverside park and the wind is so fierce that
20   the wind, after the Winter when you get to
21   the building you want to get into your
22   building, right so you ring the bell, ring
23   the bell, nothing happened.  Why?  Because
24   the security guard went outside smoke
25   marijuana, it was true.  I don't know if he
```

Page 100

```
1            Rolande Cutner      100
2    smoke marijuana.  And other security guard
3    left, they just left and the door is closed
4    so people were locked outside because of
5    that.
6            Another example, let me give you
7    more because this lady, she talk to me
8    personally, Florence Bella.  Seven o'clock in
9    the morning she has a little dog, she take it
10   out to pee.  She's in her pajamas in the
11   heart of the Winter.  After, she wants to get
12   back in and it's dark, seven o'clock in the
13   morning, she cannot enter.  Why?  Because the
14   security guard is sick and tired of his
15   night, he leave and the new security guard
16   arrive at 8:00.  So between 7:00 and 8:00 you
17   are locked out, you have no key.  She's in
18   her underwear and her sleepwear with her
19   little dog, the wind is almost killing her
20   and her little dog and she's waiting there
21   and ringing the bell and ringing the bell and
22   finally, at eight o'clock the security guard
23   who is starting the day at eight o'clock have
24   a key in the building and then she get in.
25   So I was so mad when she told me that.
```

Page 101

Rolande Cutner    101

1    I immediately wrote a letter and at
2    that time, the management recognize that
3    problem and at that time, they gave us key to
4    the building only because I wrote the letter,
5    furious letter so at that time in the heart
6    of the Winter they issue new regulation the
7    permanent tenant are allowed now to have the
8    key to the building.
9        Q.  That first example that you gave me
10    where someone was trying to get into the
11    building and they couldn't because the guard
12    was out smoking marijuana --
13        A.  I was told, I mean, let's say he
14    was out. Somebody say he was smoking
15    marijuana but I didn't see it.
16        Q.  Is this a story that someone told
17    you happened to them?
18        A.  Yes.
19        Q.  Who told you that this happened?
20        A.  Chris Santee.
21        Q.  Was Mr. Santee himself locked out,
22    was he talking about something he
23    experienced?
24        A.  I think he was locked out himself.

Page 102

Rolande Cutner    102

1        Q.  And he was unable to get into the
2    building because the guard wasn't present?
3        A.  So you have to wait until the
4    change of shift and have the new guard to
5    open the building to enter.
6        Q.  Is there only one bell for the
7    lobby or does each room have its own intercom
8    system?
9        A.  No, no, no. There is a big door
10    and one bell and you ring the bell and you
11    walk inside.
12        Q.  So if someone were coming to visit
13    you then they would have to go, they would
14    ring the bell to the lobby, they wouldn't be
15    able to ring up to you?
16        A.  Yes.
17        Q.  When did the Lantern Group issue
18    the new regulation that the permanent tenants
19    can have keys?
20        A.  Yes, yes. Probably it was in the
21    Winter because it happened because of this
22    lady was stuck so probably October or
23    November 2007, I would say, but I could be
24    wrong on the date but it's around, let's say,

Page 103

Rolande Cutner    103

1    the Fall of 2007, let's say, to be more
2    correct.
3        Q.  In Paragraph 67 you allege that the
4    Lantern Group has enacted new rules and
5    regulations regarding urgent repairs for the
6    building; what were the urgent repairs that
7    needed to be made?
8        A.  Bathroom clog up, the human waste
9    in the closet, in the WC because it's coming
10    from below. I mean, I am on the third floor
11    so I don't know if it's coming from the below
12    and going up and I mean, bathroom plumber, I
13    am not a plumber but the tub, you cannot take
14    a shower because it's full of waste water and
15    the WC has human waste and I talk to Chris
16    because Chris was pretty good and, you know,
17    talking to the management so at that point it
18    was so horrible that we could not even take a
19    shower.
20        Q.  Did Chris also live on the third
21    floor?
22        A.  No. He live on the ground floor.
23    Nicolas Legrand live on the third floor.
24        Q.  Did each floor have a bathroom?

Page 104

Rolande Cutner    104

1        A.  Yes. It's a community bathroom
2    that you share with other people.
3        Q.  With other people on the floor?
4        A.  Yes.
5        Q.  Do you know if the other bathrooms
6    were kept in similar condition?
7        A.  I hear rumor because going to the
8    sixth floor, I don't go. I did not see
9    visually but you hear rumor that it has been
10    bad in those bathrooms but I did not check by
11    myself.
12        Q.  Other than the bathroom, were there
13    any other urgent repairs that you felt needed
14    to be made in the building?
15        A.  The kitchen.
16        Q.  Did each floor have a community
17    kitchen?
18        A.  Yes, yes.
19        Q.  What repairs did you feel needed to
20    be done to the kitchen?
21        A.  The sink clog up. Also, I don't
22    know because I am not a plumber but at that
23    point, you know, when you, you cannot close
24    the tap because the water continuously flow,

Page 105

Rolande Cutner    105

1    you cannot close the tap, you see, the tap
2    and then the stove burner are broken, there
3    is no gas coming out, you don't know and also
4    electrical, it's scary because you somehow
5    you want to go to the bathroom and there is
6    no electricity and because in the bathroom
7    there is no window, it's black, as black you
8    can dream of, you don't even see the WC. It
9    is black and no electricity and things like
10   that that you can see.
11           And the kitchen was pretty bad and
12   also underneath of the sink when you open if,
13   for instance, you want to leave your personal
14   things but and also there is all this waste
15   water and it is rusty and you would not put
16   your pant there, you know, and also the
17   broken door, you know, of the little closet
18   where you can put your pant, the door is
19   broken and if you open, you have a lot of the
20   "kish, kish, kish" cockroaches running around
21   and sometimes you don't want even to enter
22   but the cockroaches took over the kitchen so
23   I never eat there, you know. I never, never
24   have any food there. Never, never.

Page 106

Rolande Cutner    106

1    Q.  If when you weren't able to use the
2    kitchen on your floor, would you use a
3    kitchen on the other floor?
4    A.  No, no.
5    Q.  What would you do in the
6    circumstances?
7    A.  I go to the coffee shop on
8    Broadway.
9    Q.  And what did you do on the
10   circumstances when you felt the bathroom was
11   too dirty?
12   A.  I go to Broadway and I use the
13   bathroom in the coffee shop.
14   Q.  What were the new rules and
15   regulations regarding repairs that you're
16   referring to in Paragraph 67?
17   A.  This is a form.
18   Q.  The work order form?
19   A.  Yes. Bathtub is full, it's clogged
20   up so it's full of waste water so you go down
21   and say, "Please, would you unplug the
22   bathroom tub 'cause you cannot even put your
23   foot in."
24           "Did you fill out the form?"

Page 107

Rolande Cutner    107

1            "Where is the form?"
2            "I don't know, I don't have the
3    form but you have to fill out the form."
4            "Would you please give me the
5    form."
6            "Well, you have to come back this
7    afternoon. We don't have the forms this
8    morning."
9            And in the afternoon like after
10   5:00 or 6:00, "Do you have the form?"
11           "Let me look. No, I don't have the
12   form. Come back the next day."
13           Meanwhile, you cannot use the
14   bathroom. "No, I don't have the form." I
15   get so bad, you know, so I said, "Okay, give
16   me a piece of white paper and a pen. I'm
17   going to write."
18           "I don't have a piece of paper and
19   a pen. I don't have it."
20           "Never mind, I go to the third
21   floor."
22           I go to my room, I take a piece of
23   paper, I go down and I write down, "Please,"
24   you know, "clean and unplug the bathroom." I

Page 108

Rolande Cutner    108

1    give it to the guard. The next day nothing
2    happened.
3            So I come back, maybe Felix is
4    there, you know, the manager. "Felix, I ask
5    you to repair the bathroom."
6            "Did you fill out the form, where
7    is your form?"
8            "I give the form."
9            "Well, do you have a copy to use,
10   the form, you say you gave me the form but I
11   don't have it. You have a xeroxed copy?"
12           I get so angry, I have a
13   confrontation. I said, "I am not going to go
14   to the coffee shop on Broadway to copy the
15   form and go back and give you the form and
16   keep a copy for myself."
17           That's the type of -- wait, they
18   say you must fill out the form -- this is
19   what it says and this is a really bad so I
20   write letters and then I was so mad that I
21   finally they print the whole thing in plastic
22   with the form outside the desk and that I'm
23   pretty proud of myself because now the tenant
24   could go and pick up the form and I am proud