Page 109

Rolande Cutner    109

1    myself because I was so mad and I wrote so
2    many letters that finally they put the form
3    outside. Big victory.
4        Q.  When you would go down to the front
5    desk and request a form and they didn't have
6    it, what would the people on the third floor
7    do in the meantime when the tub was too
8    clogged to be able to take a shower, were
9    people directed to use showers on other
10   floors?
11       A.  I don't know. I don't know. What
12   I can add on this story is that is that
13   whenever I ask for the form, you know, "oh,
14   we don't have the form."
15           MR. CUTNER:  The question
16           is, what did the other people do.
17           That's the question.
18       A.  I said I don't know. I know what I
19   did.
20       Q.  And what did you do?
21       A.  I said, "Call the management,"
22   uh-huh. "You don't have the phone number to
23   call the management." So he called the
24   management, nobody answer. It's the same

Page 110

Rolande Cutner    110

1    thing, it's like, like zombie coming from the
2    planet Mars. You call, nobody answer in
3    front of me (indicating).  Nobody answer.
4    That's a reality.
5        Q.  Prior to the Lantern Group making
6    this rule that if you were requesting a
7    repair you had to fill out a work order form,
8    how were repairs requested?
9        A.  You mean before it was a long time
10   ago, to conversation with management, is that
11   your question?
12       Q.  Well, did you have to fill out a
13   work order form the entire time the Lantern
14   Group was in management or is that something
15   the Lantern Group changed at some point?
16       A.  I don't understand your question.
17       Q.  When the Lantern Group first took
18   over the building, did you immediately have
19   to use this work order form or was there some
20   other way you could request repairs in the
21   beginning?
22       A.  I don't recall, I don't recall
23   that. I could not say that one months later
24   we had this agreement, I don't recall.

Page 111

Rolande Cutner    111

1        Q.  Do you recall making any requests
2    for repairs to the Lantern Group before they
3    started directing people to use this form?
4        A.  Probably, yes, probably.
5        Q.  And how would you request repairs
6    to Lantern Group?
7        A.  Talking, talking to the girl at the
8    management and telling the girl, call the
9    management because Felix was the manager at
10   that time in the really beginning, "call
11   Felix, call the manager, call Jose the
12   porter," yes, it was told at that time.
13       Q.  So when you said you would orally
14   request it, would that be with a person in
15   the lobby or would you have to call someone
16   on the telephone?
17       A.  No, I would stop by at the desk.
18       Q.  So then the only change in policy
19   was that instead of being able to request
20   repairs orally, you had to put it in writing;
21   is that correct?
22       A.  Yes, yes.
23       Q.  Typically, when you were able to
24   give the request for repairs orally, how long

Page 112

Rolande Cutner    112

1    would it typically take for the repairs to be
2    made?
3        A.  Oh, two, three days because I
4    remember specially with the bathtub being
5    clogged, the kitchen was always in a terrible
6    state so I stopped going to the kitchen. I
7    never put my food in the kitchen so I cannot
8    testify to that but the bath tub two, three
9    days.
10       Q.  Do you know what the kitchens on
11   the other floors were like?
12       A.  No, never. Matter of fact, I never
13   go to the other floors so I cannot testify to
14   that. I never go. I'm kind of scared. I
15   never go.
16       Q.  Why are you scared?
17       A.  (Indicating.)
18       Q.  Are you scared of the other tenants
19   on the other floors?
20       A.  No; mice, rats, bed bugs, because
21   my room, you know, I buy a lot of insecticide
22   and I put them all over my room and all
23   around my bed so they cannot crawl into my
24   bed and I buy every week and I change so I, I

Page 113

Rolande Cutner          113

1    don't wait.
2         For one months every week I buy and
3    I put that under my bed, around the foot of
4    my bed, all over along the bottom of the
5    wall, at the door and every week I have this
6    discipline to do that.
7         Q.  Once you had to make your requests
8    in writing, how fast was the turnover, how
9    long would it take for the repairs to be
10   made?
11        A.  Like two days providing that the
12   request was easily accepted or they did not
13   forgot it.  I don't know, you know, because
14   this to me, this form was a way to harass
15   people.
16        Q.  Why do you feel it was a way to
17   harass people?
18        A.  Because before they put it on the
19   outside of the desk you have to request the
20   person give me the form to fill out and they
21   were never any forms so you telephone, you
22   ask, you said, "call the manager."  The
23   telephone of the manager never answer and you
24   get tired of doing that, see.  So to me

Page 114

Rolande Cutner          114

1    service, it was a way to harass people.
2         Q.  Do you think that it was a way they
3    were trying to harass you specifically or the
4    tenants as a whole?
5         A.  Well, because of me, I felt I was
6    harassed, you know, but I am sure other
7    people felt the same way but let's say the
8    answer is I felt harassed.
9         Q.  Do you think that they were only
10   trying to harass you or they were trying to
11   harass all of the tenants in the building?
12        A.  I felt they were trying to harass
13   me.
14        Q.  About how many tenants live in the
15   building?
16        A.  Fifty-seven.
17        Q.  Were all 57 tenants required to
18   fill out the form?
19        A.  I understood, yes, it was a rule.
20        Q.  Why do you think they were only
21   trying to harass you, specifically?
22        A.  Because at that time I asked for
23   the form, there were no forms.
24        Q.  Do you think anyone else in the

Page 115

Rolande Cutner          115

1    building had a similar experience when they
2    requested the form?
3         A.  I think Chris Santee and Nicolas
4    Legrand also request a lot of the times a
5    form and were unable to locate the form or
6    have the form delivered.  I'm talking about
7    the blank form.  There was this big, big
8    battle to get the blank form.
9         Q.  Does Christopher Santee have a
10   disability?
11        A.  Not that I am aware of, no.
12        Q.  What about Nicolas Legrand?
13        A.  No, I am not aware of any.  I don't
14   think so.  I don't think so.
15        Q.  On the next page, on Page 16,
16   towards the top of the page, you allege that
17   you had to frighten to sue the management in
18   order to have the form located and delivered
19   at the front desk.
20        A.  Yes.
21        Q.  How do you frighten to sue, what
22   did you do to frighten to sue them?
23        A.  I tell them.  I just tell them.  I
24   said, "Look, I'm sick and tired to ask for

Page 116

Rolande Cutner          116

1    the form so if I don't have the form
2    tomorrow, I'm going to sue you."
3         What else?  Simple than that.
4         Q.  Who did you tell this to?
5         A.  To the girl at the desk or and
6    Felix also, Felix by extraordinaire was
7    present.
8         Q.  What did they say in response?
9         A.  "Don't worry, Mrs. Cutner.  We will
10   locate the form and we give it to you
11   tomorrow."
12        Q.  What did you say after they told
13   you they would locate the form and give it to
14   you tomorrow?
15        A.  "Thank you.  I wait for the form
16   tomorrow."  That was before we had -- you
17   understand that we had the order of the form
18   was outside because I really raised hell for
19   to have that.
20        Q.  Did they have the form the next
21   day?
22        A.  Not every time but I raised hell so
23   much that.
24        Q.  When they said to you, "don't

Page 117

Rolande Cutner    117

1 worry, we'll have the form for you tomorrow,"
2 when you asked them tomorrow, did they have
3 the form?
4     A.   Sometimes they had, sometimes they
5 did not have and another confrontation was
6 brewing.
7     Q.   There's an allegation where you
8 said you had to frighten to sue the
9 management, was that just one time?
10    A.   Yes, I did that, I said "I sue
11 you."
12    Q.   Was that just one time or did you
13 say that more than once to them?
14    A.   More than once.
15    Q.   Each time, was it always to Felix
16 or was it to other people?
17    A.   The girl at the desk or Felix,
18 Felix.
19    Q.   So whoever was at the desk?
20    A.   I put a fright.
21    Q.   And if Felix was present?
22    A.   I would tell him.
23    Q.   Did Felix and the girl at the front
24 desk always have the same response?

Page 118

Rolande Cutner    118

1     A.   Yes. "Don't worry, don't worry,
2 we'll have it tomorrow."
3     Q.   And sometimes they would have it
4 the next day and sometimes they wouldn't?
5     A.   Sometimes, right.
6     Q.   When they would say to you "we will
7 have it tomorrow" and you would go back the
8 next day and they wouldn't have it, what
9 would you say to them?
10    A.   I raise hell. "Look at me, I'll
11 sue you. It's not going to go like that for
12 one more day."
13    Q.   And would they have the same
14 response?
15    A.   "Don't worry."
16    Q.   You say that the Lantern Group's
17 management gave you incorrect information; on
18 what occasions did they give you incorrect
19 information?
20    A.   (Witness perusing documents.)
21    Q.   Do you see where it says "in the
22 worst cases the Lantern Group's management
23 gave Cutner incorrect information?"
24    A.   We, we -- it was to, as I said, you

Page 119

Rolande Cutner    119

1 know, we, we are -- it's always, you know,
2 "we are going to repair but it's too
3 complicated, it's huge repair." I mean, it
4 was very complicated, for instance, plumbing,
5 it's an old building. It's huge, it's huge
6 repair and, like, they tell me, you know,
7 they don't have the money, it's a huge
8 repair, giving me the feeling that they will
9 have to replace the old plumbing. That kind
10 of, I would say, information.
11    Q.   Why do you feel that this is
12 incorrect information?
13    A.   Because it could have been so
14 simple to call a plumber and to have the
15 bathroom in good repair order. Why make it
16 so cumbersome that they cannot repair?
17    Q.   You testified earlier that it was
18 the bathroom that was frequently clogged and
19 the sink was frequently clogged?
20    A.   Yes.
21    Q.   So why do you think that a plumber
22 could have simply fixed it from not being
23 clogged?
24    A.   Because I suppose and again, I am

Page 120

Rolande Cutner    120

1 not a plumber, that in New York City this
2 problem of clogged up bathroom must exist and
3 they must repair it so how come in our
4 building they cannot repair and in the street
5 they do, I mean, it does not make sense, you
6 know.
7     Q.   Do you know if these other
8 buildings had as frequent problems with
9 clogging?
10    A.   No. That I have no knowledge but I
11 suppose that. I have no knowledge of that.
12    Q.   Other than the repair and what they
13 told you with regard to the repairs to the
14 bathroom, was there any other information
15 that they gave you that you feel was
16 incorrect?
17    A.   Well, they, again, you know, say
18 but it was a hint that we don't need to
19 repair because the building is going to be
20 demolished but not in that particular
21 wording, you know, but it was a hint, a clear
22 hint and also, "if you are not happy, why
23 don't you leave because this building is
24 going to be demolished."

Page 121

Rolande Cutner    121

1
2    Q.   Did anyone ever say to you, "If
3    you're not happy, why don't you leave?"
4    A.   Not that way.  They say, "Why don't
5    you return to your own country."
6    Q.   Who said that to you?
7    A.   I think either Felix or George is a
8    porter; George is a porter told me that.
9    Q.   And in what context did they say
10   that to you, what did you say to him that
11   prompted him to say that?
12   A.   Because I complain all the time.
13   'Cause you have to realize, the other
14   tenants, they are so destroyed by the
15   building and maybe by the feeling that there
16   is no use to complain.  You see, gradually
17   when I say --
18        MR. CUTNER:  The question is
19        what did you say to Jose and what
20        did he say to you.
21   A.   I complain, I mean, constantly,
22   constantly, I complain.
23   Q.   And do you think that you were the
24   only tenant that was complaining?
25   A.   I finish by thinking that way.

Page 122

Rolande Cutner    122

1
2    This is why he said, "Why don't you return to
3    your own country?"  Because probably the poor
4    guy was sick and tired of me complaining.
5    That I don't know but he said that.
6    Q.   You said something about how the
7    other tenants felt unwilling to complain --
8    A.   Out of distress and lack of
9    confidence, no.  I would say out of, it is
10   useless anyway.  For instance, this lady,
11   Sheila Hausner, she would say -- she was,
12   would you say, a defeatist so she would say,
13   "you know, we cannot fight those people."
14   She would say, "you know, you cannot fight
15   those people" and she would say "it's no use"
16   because I would tell her she needs to
17   complain with me and she also belongs to this
18   board, the, this advisory board.  I would say
19   "come with me and complain."
20   Q.   Did she live on the same floor as
21   you?
22   A.   No, no.  She live on the 6th floor.
23   Q.   Did she ever complain to you about
24   the conditions of the building?
25   A.   Yes, a lot of the times.

Page 123

Rolande Cutner    123

1
2    Q.   What did she say to you?
3    A.   One day she came she was frightened
4    because she said the building, another
5    building people come from the roof, they
6    cross and they go down to our building and
7    she was terrified.  She was terrified and she
8    said, "you know, it's foreign people, I could
9    get hurt or killed" or whatever, "foreign
10   people."  So I immediately I write a letter.
11        You can look at my folder of all
12   the letters because she came to me to
13   complain because she was too distraught to do
14   it herself.
15   Q.   And who did you direct that letter
16   to?
17   A.   Rafal.
18   Q.   And what did you write in the
19   letter?
20   A.   That this lady and another lady,
21   two ladies came to me and said we are
22   terrified because people are crossing by the
23   roof and they live on the 6th floor and going
24   down and they were afraid to be raped, I
25   mean, I don't know, they were afraid I don't

Page 124

Rolande Cutner    124

1
2    know about what, but they were afraid so they
3    said to me because, as I said, they are so
4    destroyed by the condition of the building
5    that they don't have the strength to complain
6    so they said to me and I write a letter.
7    Q.   Did they tell you that they were so
8    distraught from the condition of the building
9    that they --
10   A.   No, they just said they were
11   afraid.  They were afraid because during the
12   night those people were crossing the roof on
13   the roof and go down and they live on the 6th
14   floor so they mention they were so afraid and
15   I, my comment is they have no strength left
16   because of the condition of the building.
17   That's my comment.
18   Q.   Did you get a response to your
19   letter about this situation?
20   A.   Yes.
21   Q.   Who responded to the letter?
22   A.   Rafal.
23   Q.   Did he responds orally or in
24   writing?
25   A.   No, no, in writing.

Page 125

Rolande Cutner    125

1
2    Q.   What did he say in his response?
3    A.   "That is a total lie, Mrs. Cutner,
4    because the roof, the door on the roof is
5    always locked by the security" so I was
6    furious because he called me a liar.
7           MR. CUTNER:  The question
8        was, what did he say.
9    A.   He says that that is a total lie
10   because the roof door is closed.
11   Q.   Did you respond in any way to
12   Mr. Markwat's response?
13   A.   No, no, it's -- what's the use?
14   Q.   Did you feel that his response was
15   incorrect?
16   A.   Yes.
17   Q.   Why do you feel that it's
18   incorrect?
19   A.   Because it's two women living on
20   the 6th floor approach me and said, "We are
21   terrified because during the night foreigners
22   walk through the roof and, and go down and we
23   were afraid to be raped."
24         I would be very surprised those two
25   women are liars.

Page 126

Rolande Cutner    126

1
2    Q.   You said they went on the roof and
3    came down, do you mean into the building?
4    A.   Well, the two women.  I did not see
5    anybody.  Those two women told me that.
6    Q.   They told you that people were
7    entering the building from the roof?
8    A.   Uh-huh.
9    Q.   Did they tell you that they
10   actually saw the people in the building?
11   A.   Yes.
12   Q.   How did they know that those people
13   came in through the roof?
14   A.   Because they live on the 6th floor
15   and probably they hear tiptoe.  I don't know,
16   again --
17         MR. CUTNER:  The answer is
18       "I don't know."
19   A.   I don't know.
20   Q.   You testified that they said that
21   they told you that foreigners were walking
22   across the roof?
23   A.   No, they say some man, some male
24   and --
25   Q.   Do you know if anyone ever checked

Page 127

Rolande Cutner    127

1
2    the door to the roof to see if the security
3    guard was locking it?
4    A.   Well, what I know that Rafal said
5    and he said it's impossible.
6           MR. CUTNER:  The question
7        is, do you know if anyone checked
8        the door.
9    A.   That's the question?
10         MS. HOLTZER:  Please read it
11       back.
12         (Whereupon, the requested
13       portion was read by the reporter.)
14   A.   That I don't know.  I know only
15   what Rafal told me in his letter.
16   Q.   Do you know if the Lantern Group
17   conducted any kind of investigation regarding
18   the contents of your letter?
19   A.   I don't know that.
20   Q.   You said you allege that the
21   Lantern Group's management made the process
22   to obtain repairs too cumbersome to navigate;
23   are you referring to the work order form --
24   A.   Yes, that's too complicated.
25   Q.   You also say that some employees

Page 128

Rolande Cutner    128

1
2    deny the existence of a problem; which
3    employees denied the existence a problem?
4    A.   Felix.
5    Q.   What did he say to you that
6    indicated that he was denying the existence
7    of a problem?
8    A.   They say, "No, it is clean.  I
9    don't see any problem with the bathroom.  The
10   bathroom are clean."
11   Q.   You also referenced the elevator
12   and the garbage.
13         What did you feel was the problem
14   with the elevator?
15   A.   It's very dirty and on the floor,
16   sometime maybe people vomit, they are sick,
17   it's not their fault but nobody clean, maybe
18   they, they pee, I don't know, I don't know
19   but there is human waste on the floor of the
20   elevator.
21   Q.   Did anyone ever deny that that was
22   taking place, did anyone ever say no that's
23   not --
24   A.   No, no, no.  Nobody denied.  I told
25   Felix and he said, "No, the porter clean it

Rolande Cutner    129

1
2    if there is some human waste, the porter
3    clean it immediately," you know.  If somebody
4    is sick, that could happen.  If someone is
5    sick in the elevator it happened, I mean it's
6    not tragedy, it's cleaned immediately and
7    it's not true.
8        Q.  How often did it occur that you saw
9    human waste in the elevator?
10       A.  Once.  Once to me, maybe twice
11    because once was probably vomit and another
12    time was a smell, probably was urine.
13       Q.  Did you report it to the people in
14    the front?
15       A.  Immediately.  You bet.
16       Q.  How soon after you reported it was
17    it cleaned?
18       A.  The next day.
19       Q.  The next day.  So when you went
20    back in the elevator it was still there; is
21    that correct?
22       A.  Well, I would see, let's see.  It
23    was 8:00, 9:00, so the elevator was vomit or
24    other time was urine.  I immediately complain
25    to the desk then, I don't want to want to

Rolande Cutner    130

1
2    enter the elevator, so I walk very slowly
3    about the stair and up to the third floor of
4    my room and I go to sleep.  The next day it
5    would be clean for the incident the elevator.
6        Q.  So you don't know that they waited
7    the next day to clean it, you just know the
8    next time you went to use the elevator it was
9    clean?
10       A.  It was clean.
11       Q.  And when you reported it to them,
12    did they already know about it and did they
13    react as if they were hearing if for the
14    first time?
15       A.  No, they just -- no.  They seemed
16    that they knew about it.  They were not
17    surprised.
18       Q.  Do you know if there were any
19    employees living in the building?
20       A.  I don't know that.
21       Q.  Do you know if there were any
22    employees that were responsible for the
23    cleaning of the building?
24       A.  Felix and Jose, the porter.
25       Q.  Do you know if there were any

Rolande Cutner    131

1
2    live-in employees that were responsible for
3    the maintenance of the building?
4        A.  I don't know.  I don't know that.
5    I don't know if Felix -- I don't know where
6    Felix lives.  I don't know if Felix was
7    living there and Jose is a porter.  I don't
8    know where.  The answer is I don't know.
9        Q.  You say that employees demonstrated
10    substantial or complete ignorance about how
11    to obtain a low cost purchase of brooms and
12    brushes and liquid to clean.  Were the
13    employees that you're referring to here?
14       A.  That's because I complain to the
15    desk and I was so mad that, you know, I say,
16    "If you tell me where to get a broom, I do it
17    myself."  You know, being so mad, "where it
18    is, where can I get it?"  They say, "I don't
19    know, I don't know."
20       Q.  By employees you're referring to
21    the people at the front desk?
22       A.  At the desk, yes.
23       Q.  So you had asked them where you
24    could go to buy a broom; is that correct?
25    And they responded that they didn't know?

Rolande Cutner    132

1
2        A.  Yes, "I don't know."
3        Q.  Now, you referred to the new rules.
4    Other than the rules that you already
5    testified to regarding packages and the work
6    order form, what other new rules did the
7    Lantern Group institute?
8        A.  No newspaper deliver, no magazines,
9    no Federal Express, and the letter were put
10    in a small box with individual name, number
11    and Lantern Group gave us a key for the box.
12    That was the new rule.
13       Q.  So you had your own mailbox and key
14    but the Lantern Group wouldn't accept
15    delivery of things that couldn't fit into the
16    mailbox; is that correct?
17       A.  Correct.  And the mailbox is so
18    small that even a normal, for instance you
19    have a letter like that, this type
20    (indicating), it doesn't go into the mailbox.
21    The mailbox is so small that it's just could
22    be for just little and individual envelope,
23    you know, it's tiny, tiny.  A thing like that
24    you could not put into a mailbox let alone
25    Federal Express, UPS.

Page 133

Rolande Cutner                133

1
2    MR. CUTNER: So the record
3    is clear, when she said "something
4    like that," she was referring to
5    Exhibit A, she's saying that that
6    would not fit into the mailbox.
7    Q.  And do you mean one piece of paper
8    or if someone was mailing something of this
9    thickness and this is about 60 pages?
10   A.  That could not fit in the mailbox.
11   Now, one piece, which I believe this is
12   8 by 11, if you fold it in four, actually, I
13   can show it to you.
14        If you fold it in four
15   (indicating), that you can put it in the
16   mail.  You see how little it is but it's
17   interesting, fold it in four and you can put
18   it in the box.
19   Q.  Someone reading the transcript may
20   not understand because they're not here to
21   see what you just showed me so let me just
22   ask you:
23        If someone wrote a letter to you on
24   this size of 8 by 11 paper, folded it up and
25   put it in an envelope and mailed it to you,

Page 134

Rolande Cutner                134

1
2    would that fit in your mailbox?
3    A.  Yes, folded but not this
4    (indicating).
5    Q.  In a big package where the 8 by 11
6    paper had to be laid flat, that wouldn't fit;
7    is that correct?
8    A.  No.
9    Q.  Were there any other new rules that
10   the Lantern Group implemented other than what
11   you already told me about?
12   A.  Let me -- there was a newspaper
13   rule:  No Wall Street Journal, no New York
14   Times, no newspaper, no magazine, nothing
15   like that.  And no Federal Express, of
16   course.  No Federal Express.
17   Q.  How did they communicate this new
18   rule to you?
19   A.  By a piece of paper which trigger a
20   lot of the complaints from other tenants, not
21   only me.  Then I think after several months
22   of battle it was Chris Santee and Nicolas
23   Legrand.
24        Where they changed the rule and
25   they say you could have that type of a piece

Page 135

Rolande Cutner                135

1
2    of paper, I think they change the rule if
3    they deposit at the desk but they change for
4    two, three days and then after that reverse
5    the rule to the rule they say no more.
6        For two, three days they change the
7    rule and after they reverse because this is
8    something very important about the Lantern
9    Group.  They change the rule three days
10   later.  It's a new rule so it disturbs the
11   tenant of where this rule, what kind of rule
12   it is.  It's disturbing.
13   Q.  I just want to make sure I
14   understand.  So they had this rule where you
15   couldn't get packages, anything that wouldn't
16   fit into your mailbox, they wouldn't accept
17   delivery then they change the rule so that
18   you can?
19   A.  I think they change it and, again,
20   I have to go back in my file because they
21   send a piece of paper that if you notify the
22   desk that you are expecting an envelope more
23   important, you could receive it as long as
24   the desk is notified ahead of time and then
25   it did not matter because how do you know

Page 136

Rolande Cutner                136

1
2    that somebody is going to send you something
3    like that, you cannot all the time know.  I
4    think -- so after, after two, three days of
5    one week, then they change the rule again and
6    then they change and I said to Chris, I said,
7    "How are you doing?"  And he said he opened a
8    personal P.O. box at a post office and, "I
9    have all my mail delivered at the P.O. box
10   office."
11   Q.  After they changed the rule from no
12   acceptance of packages to accepting of
13   packages, as long as you notify them in
14   advance, did they change the policy again?
15   A.  I think so.  At that point I am not
16   sure but I think so.
17   Q.  When was the new policy?
18   A.  No reverse to.
19   Q.  It went back to no packages?
20   A.  To no packages but I am not sure
21   when it was this flip flop, like I would use
22   it as flip flop.
23   Q.  You also say in the beginning of
24   Paragraph 68, "engaged in subtle harassment."
25   What do you mean by that, subtle harassment,

Page 137

Rolande Cutner                137

2  what do you mean by subtle harassment?
3      A.  It's because it's destroy you from
4  the merchandise but it's very subtle because
5  let's go back to the example of the form.
6  You know, there is no problem, also no form.
7  "Why don't you fill out the form," but if you
8  never find a blank form, obviously, you
9  cannot fill out the form so some of it's
10  subtle because you say, "what are you talking
11  about, Mrs. Cutner, we told you to fill out
12  the form so why don't you do it?"  It's
13  subtle, you see, because the form is not
14  there.
15      Q.  Do you know whether the fact that
16  the desk employees couldn't locate the form,
17  do you know whether that was intentional on
18  the part of the Lantern Group or whether it
19  was either incompetent or poor training or
20  just a lack of knowledge on the part of the
21  desk employees?
22      A.  To me, to me that's only to me I
23  think it was intentional but it could be
24  incompetent as you mention, but I cannot
25  believe to me living there every day, it's

Page 138

Rolande Cutner                138

2  impossible that it's negligence because when
3  you have a manager with negligence, you do
4  something about it when you are aware that
5  your desk employees are negligence but day in
6  and day out for months, and months and
7  months, it's not negligence.  It's willing to
8  destroy the person.  That's my view.
9      Q.  There were always different desk
10  employees, weren't there; you testified
11  earlier you never saw one for more than a few
12  weeks?
13      A.  Yes, yes, yes, that's correct.
14  That's correct.
15      Q.  On the next page, on Page 17 in
16  Paragraph 69, you mention that you pay $500 a
17  month rent and you pay your rent for six
18  months at a time; is that a Lantern Group
19  policy?
20      A.  No, no.  That's just me because I
21  have so much stress and referring to what my
22  neurologist said, "Don't you put yourself
23  into situation of stress."  So thank you,
24  doctor, thank you.  I really do appreciate
25  your sense of humor.

Page 139

Rolande Cutner                139

2      One way to suppress the stress
3  because I am a lawyer, a client will pay me,
4  let's say, $5,000.  Immediately I will pay my
5  rent for six months but I cannot have more
6  stress because other clients who wait for
7  months and months and months before I get
8  paid so I cannot live like that.  I don't
9  have my $500 so no, if I have a client who
10  pay 4, 5,000, boom, I pay six months.  That's
11  for my own comfort.  It's not only from
12  Lantern Group.  It's for my own comfort but
13  the $100 you want to see a battle, you want
14  to hear about it?
15      Q.  We'll get to it.  The $100 that you
16  just referenced, is that a security deposit?
17      A.  Uh-huh.
18      Q.  When did you pay that $100?
19      A.  September '94.
20      Q.  Now, you referenced in your
21  complaint in Paragraph 70 that you
22  received -- you paid $3,000 for your rent and
23  you received an invoice for $3,000; was that
24  a receipt for the payment that they received
25  from you?

Page 140

Rolande Cutner                140

2      A.  Yes.
3      Q.  Now, was the $100 deposit always
4  reflected?
5      A.  Before, before Lantern Group and
6  during the Lantern Group management before,
7  from September '94 to March 2006 I pay and I
8  receive a receipt.  It always say 3,000
9  because as I said, that's my own decision to
10  pay six month and below you have $100 deposit
11  and for always years, and years and years,
12  suddenly, with the Lantern Group, I receive
13  3,000 receipt and I don't see down the line
14  the $100 deposit and I immediately go to the
15  desk and tell them that's not correct.
16      "What do you mean, Ms. Cutner,
17  that's not correct?"  "Where is my $100
18  deposit?"  "No, Mrs. Cutner, you never pay a
19  $100."  I say, "Wait a minute, now, I have
20  been living there for 15 years and $100 were
21  put on my receipt down below."
22      "No, Madam Cutner, you never paid
23  that."
24      Q.  Since when you had paid the $100
25  deposit?

Page 141

Rolande Cutner    141

2  A.  Yes, in September of '94.
3  Q.  In September of '94, the Lantern
4  Group didn't own the building at that point;
5  is that correct?
6  A.  No, no.  It was a family in
7  Brooklyn, Margolis family in Brooklyn.
8  Q.  That was a payment that you had
9  made to the Margolis family; is that correct?
10  A.  Sure, sure.
11  Q.  Do you know whether the Lantern
12  Group has records of the security deposits
13  that people paid?
14  A.  No.  Probably after my compliant
15  they wrote me a letter which say, "We find
16  out about your $100 deposit.  We recognize
17  and we put it down."  And I was explaining
18  that to one of the tenants and he said, "Oh,
19  Mrs. Cutner, you were really pretty good
20  because me, I have been here for 15 years and
21  my $100 deposit did not jump and I never saw
22  it again," so I don't know.
23  Q.  What did they mean that the $100
24  did not jump and they never saw it again?
25  A.  Because when they receive the

Page 142

Rolande Cutner    142

2  receipt, the $100 that they put 15 years ago
3  is never mentioned on receipt so I don't
4  know.  This guy told me that.
5  Q.  Do you know if it's the Lantern
6  Group's policy to issue receipts for payment
7  that's received or --
8  A.  I don't know exactly.
9  Q.  Do you know if it's the Lantern
10  Groups's policy to reflect security deposits
11  on their receipts?
12  A.  Probably because when I complain
13  they quickly reflect my security deposit.
14  Q.  Now, when you receive receipts from
15  the Lantern Group, do the receipts reflect
16  the $100 deposit?
17  A.  Now, it's another story.  I don't
18  receive anything.  I continue to pay like I
19  just in June, I pay 3,000 from June to
20  December.  I never receive a receipt.  I
21  don't care.  Now I cannot.  I gave up on
22  that.  The management is so disorganized but
23  I am still waiting for my receipt.
24  Q.  Did you contact anyone at the
25  Lantern Group to request your receipt?

Page 143

Rolande Cutner    143

2  A.  I write letter.
3  Q.  Was this June payment the first
4  time you didn't get a receipt?
5  A.  No, no.  I also I think December, I
6  mean there is two or three, maybe December I
7  did not have the receipt.  I have to write to
8  get my receipt, I mean, you have to
9  understand, everything you need, you have to
10  write, you have to make an effort and
11  eventually they do it but you, now are, you
12  know, constantly, constantly, constantly to
13  write, "I want my receipt, I want $100
14  deposit," but now for June but you know, it's
15  only July so let's give them a little leeway,
16  you know.
17  Q.  Do you know if other tenants in the
18  building have had similar problems?
19  A.  Yes, Chris Santee, Nicolas Legrand;
20  those two people that I talk to, maybe Sheila
21  Hausner, several people.
22  Q.  Does Ms. Hausner have a disability?
23  A.  She's limping also.  I don't talk
24  to her.  It's very private so.  I see her
25  she's limping but I never ask.

Page 144

Rolande Cutner    144

2  Q.  The person that you were referring
3  to before the person that said that their
4  security deposit is gone, who are you
5  referring to?
6  A.  That's the tenant, I see him from
7  time to time.  I don't know his name.
8  Q.  Do you know what floor he lives on?
9  A.  I don't know.  I see him at the
10  elevator probably on the third floor but I
11  don't know his name.
12  Q.  Looking on the next page, on
13  Page 18, you make allegations regarding your
14  checks not being cashed.
15  A.  Oh, yes.  That was so upsetting to
16  me.
17  Q.  Why was it upsetting to you?
18  A.  Because I live on a tight budget
19  and, as I say, I pay the 3,000 to make sure
20  that I am not going to be alone out on the
21  street but it's important to me to have my
22  check with me and the fact that they did not
23  send back the check and maybe because it is I
24  am so precise about that, I start to worry
25  that they would not accept my check, cash my

## Page 145

Rolande Cutner     145

1
2  check and that worried me tremendously
3  because I said maybe they are trying to expel
4  me or to evict me so they take my money, you
5  know. I don't know.
6        It was to me, it was a situation
7  where I felt frightened by that or whatever,
8  my feeling. I can only express about my
9  feeling. I felt frightened by that.
10       Q. Did you contact anyone at the
11 Lantern Group?
12       A. Yes, I did. I write it.
13       Q. What did you say in these letters?
14       A. I said that, I said I was very
15 upset. That if someone was holding my check
16 I wish that someone would tell me who is
17 holding my check; if not, cash my check so
18 that was in July 2007 and finally they cash
19 my check but it's frightening.
20       Q. Did they ever respond to your
21 letter?
22       A. No, they cash the check on July 17,
23 2007.
24       Q. You say it is clear that Cutner
25 suffered from the outright hostility.

## Page 146

Rolande Cutner     146

1
2        Are you referring to them not
3  cashing your checks?
4        A. Yes. I felt that was a way to
5  frighten me, to maybe they want to somehow
6  evict me. It was a hostile, I took -- let me
7  rephrase. I took it as a hostile action not
8  to cash my check.
9        Q. Why did you take it as a hostile
10 action?
11       A. Because I was thinking they want to
12 evict me for some reason.
13       Q. Did anyone ever tell you that from
14 the Lantern Group, tell you that you were
15 going to be evicted or that they wanted to
16 evict you?
17       A. No, no.
18       MR. CUTNER: This be a good
19 time for a break.
20       MS. HOLTZER: Sure.
21       (Whereupon, a recess was
22 taken at this time.)
23       MS. HOLTZER: Please read
24 back the last question and answer.
25       (Whereupon, the requested

## Page 147

Rolande Cutner     147

1
2        portion was read by the reporter.)
3        Q. You also state that the fact that
4  the Lantern Group didn't cash your checks was
5  a subtle discrimination.
6        Why do you think that their failure
7  to cash your checks was discriminatory?
8        A. Because I complain and I felt they
9  want to discriminate against me because I am
10 a complainer.
11       Q. Did anybody else, did any other
12 tenants ever mention to you that their checks
13 hadn't been cashed either?
14       A. No.
15       Q. On the next page, you state that
16 people from the Lantern Group were nasty.
17 Who was, other than what you've already
18 testified to about from the Lantern Group,
19 nasty? Were there any other instances where
20 someone from the Lantern Group was nasty to
21 you?
22       A. Jose, the porter, was assault me
23 verbally; Felix was making fun of my accent.
24       Q. Other than what you've already told
25 me about when Jose would ask you what you had

## Page 148

Rolande Cutner     148

1
2  said or when Jose asked you why you're still
3  living there, was there anything else that
4  Jose said or did that you felt was being
5  nasty to you?
6        A. "Fuck you, lady," you know, "don't
7  bother me. Fuck you."
8        Q. Jose said that to you?
9        A. Yes.
10       Q. When did he say that to you?
11       A. Because I complain that on the
12 third floor there were a mother with two
13 little children, Mexican mother and Mexican
14 little children and the filth, that
15 particular part was incredible and I was so
16 mad and I went to the desk and I said "clean
17 immediately," and Jose the porter arrived and
18 I say "clean immediately" and he said that.
19       Q. Who is the mother and children that
20 you're referring to?
21       A. The sister or the daughter, I am
22 not sure, of Monica Sandoval, permanent
23 tenant next to me.
24       Q. How did you know that she's
25 Mexican?

Page 149

Rolande Cutner                149

1
2  A.  They spoke Spanish and she approach
3  me, the mother, and she said, "Please, plead
4  for me and my children because I don't speak
5  good English."  And I speak little bit
6  Spanish so I was able to communicate with
7  her.
8      Q.  You testified that Felix made fun
9  of your accent; on what occasion did he make
10  fun of your accent?
11     A.  Every time I talk to him.
12     Q.  How did he make fun of your accent?
13     A.  Well, to mimic me because I know
14  that I cannot say, like I say "zee, zat."
15  They mimic the fact that the R is like "woo."
16  "What do you say?"  Just mean.
17     Q.  Was there anything else that Felix
18  said or did to you that you felt was being
19  nasty towards you?
20     A.  Make me feel that I am a liar, I
21  lie especially for the mother with the little
22  children.  We had a big confrontation about
23  that.
24     Q.  In addition to having a discussion
25  with Jose about the mother and children, you

Page 150

Rolande Cutner                150

1
2  also had a conversation with Felix?
3      A.  Yes.
4      Q.  What did you say to Felix about the
5  mother and her two children?
6      A.  That the mother proposed to me and
7  ask me to translate a request that if the
8  Lantern Group give her money to buy liquid
9  and brush and broom she will clean the
10  bathroom and the kitchen herself because
11  she's not working.  She's with two little
12  children and she's in the room 24 hours a day
13  and she will clean in the Lantern Group to
14  give her either a brush and liquid or give
15  her money to buy a broom, brush, liquid and
16  please, could I translate this in English to
17  the management.
18     Q.  Had Ms. Sandoval previously
19  submitted this request to the Lantern Group
20  or was she asking you to submit the request
21  for her?
22     A.  Monica Sandoval is a permanent
23  tenant.  The mother and the sister is totally
24  Spanish-speaking.  I believe that the sister
25  was the mother of the two little ones.

Page 151

Rolande Cutner                151

1
2  Either it is her sister or daughter, that I
3  am not able to discern the relationship
4  between Monique Sandoval and this woman, this
5  Mexican young woman, very young and the two
6  little children.
7      And this young woman approached me
8  because she doesn't speak English and she was
9  the one to propose the broom, the brush and
10  liquid buying and cleaning herself.
11     Q.  She hadn't previously asked the
12  Lantern Group that, she was asking you to --
13     A.  To go to the Lantern Group and
14  makes this proposition.
15     Q.  Did you?
16     A.  And I did.  I make the proposition
17  on her behalf.
18     Q.  Was this in writing?
19     A.  Writing.
20     Q.  Was it to Felix or to the
21  management?
22     A.  To the management.  It was copied
23  to Felix.
24     Q.  Did either of them respond to you?
25     A.  Rafal respond to me.

Page 152

Rolande Cutner                152

1
2      Q.  Did he respond in writing or
3  orally?
4      A.  In writing, too.
5      Q.  What did he say in response?
6      A.  Again, you know, more or less that
7  I was a big liar because if this young woman
8  did not speak English but only Spanish, Felix
9  spoke Spanish, she could have gone directly
10  to Felix to put this request and second, that
11  they had a big bull porter who would do the
12  job everyday and it's probably a lie if it is
13  dirty and I mean, it's, it's a letter of that
14  type of letter.
15     Q.  Did he say that he thought that you
16  were lying?
17     A.  Well, he said that.
18         MR. CUTNER:  You have the
19  letter, the letter here?
20         THE WITNESS:  I give them to
21  them.
22         MR. CUTNER:  Do you have the
23  letter?
24         MS. HOLTZER:  I have the
25  letter.

Page 153

Rolande Cutner 153

1
2    MR. CUTNER: You have been
3    asking her about letters that were
4    written by the client so why don't
5    you show her and why don't we look
6    at the letter that you said your
7    client wrote.
8    THE WITNESS: It's Felix
9    wrote this letter.
10    MS. HOLTZER: Off the
11    record.
12    (Whereupon, a discussion was
13    held off the record.)
14    MS. HOLTZER: Please mark.
15    (Letter was marked
16    Defendants' Exhibit B for
17    identification, as of this
18    date.)
19    Q. Ms. Cutner, is this the response
20    from Mr. Markwat that you were referring to
21    (handing)?
22    A. This is the letter.
23    Q. In the letter?
24    A. "As of yet, we have not received
25    this type of request from our tenant."

Page 154

Rolande Cutner 154

1
2    Q. Isn't that consistent with what you
3    testified to earlier that she hadn't made any
4    prior request?
5    A. I understood she was coming to me
6    because she could not speak English. This is
7    what I understood.
8    Q. What part of that letter did you
9    interpret as Mr. Markwat insinuating that you
10    were lying?
11    A. First of all, that first part of
12    the letter, again, it is this, you know,
13    "unfortunately, we do not have any recall of
14    your communication." I mean, how's the dare
15    to say that, how's is it dare to say that
16    when I told you the story about the phone and
17    all that and then "unfortunately, we do not
18    have any recall of your communication."
19    Q. Did you have any communication with
20    Mr. Markwat?
21    A. And all men on staff about that
22    matter, how is it dare to write this.
23    Q. Did you have any conversations with
24    Mr. Markwat about the work order form?
25    A. Not with him.

Page 155

Rolande Cutner 155

1
2    Q. Well, do you know whether the --
3    A. With Felix, with security guard or
4    whoever is at the desk; with Jose the porter
5    but this guy, Rafal, he's never there.
6    Q. Do you know if whether Felix ever
7    reported your concerns about the work order
8    form to Rafal?
9    A. I have no way to report that.
10    Q. Do you know whether the people at
11    the front desk ever reported your complaints
12    about the work order form to Mr. Markwat?
13    A. I have no way to know that.
14    Q. So is it possible you made the
15    complaint to the front desk?
16    A. Yes.
17    Q. Do you agree that it's possible
18    that the people at the front desk or Felix
19    never reported your complaints to management?
20    MR. CUTNER: I object to the
21    form of the question.
22    MS. HOLTZER: Well, she can
23    still answer the question.
24    MR. CUTNER: Well,
25    anything's possible.

Page 156

Rolande Cutner 156

1
2    MS. HOLTZER: You can
3    answer.
4    A. Because I don't know.
5    MS. HOLTZER: Off the
6    record, please, just for one
7    second.
8    (Whereupon, a discussion was
9    held off the record.)
10    Q. The first sentence that you're
11    referring to, "thank you for submitting your
12    complaint in a form that can be documented."
13    Is that what you're referring to?
14    A. Uh-huh.
15    Q. Do you feel that that statement is
16    harassing in any way?
17    A. Uh-huh.
18    Q. Why do you feel that way?
19    A. Because when you ask for the form,
20    the form is not there and then you tell the
21    guy call the manager, bring the form and he
22    call, no answer on the telephone; ringing,
23    ringing, ringing.
24    Q. But do you know whether Mr. Markwat
25    was aware that you were making these oral

Page 157

1       Rolande Cutner       157
2  complaints?
3           MR. CUTNER:  That's already
4       been asked and answered.
5       A.  Don't know.
6       Q.  Now, do you know whether there are
7  three employees who are on call 24/7 for the
8  maintenance of the building?
9       A.  I never met any employee on call 24
10 hours a day, seven days a week.  Never.
11      Q.  And before this, before you
12 received this letter, have you ever heard
13 about there being any employees that were on
14 call?
15      A.  Never.
16      Q.  The sentence where Mr. Markwat
17 says, "we have always enhanced the
18 maintenance of the building by allowing
19 tenants to inform the front desk of any
20 immediate cleaning requirement so that it can
21 be reported to maintenance personnel."
22          Do you know whether that's true?
23      A.  I complain immediately so I knew
24 what I did.
25      Q.  Have you ever made a complaint

Page 158

1       Rolande Cutner       158
2  after five o'clock p.m.?
3       A.  I made a complaint generally in the
4  morning at 8:00 before leaving for my office
5  but I could, yes, my answer is yes, sometimes
6  after five o'clock, yes, yes.
7       Q.  The Lantern Group was able to
8  address the maintenance complaints even
9  though they were made after
10 five o'clock p.m.; is that correct?
11      A.  I don't know because I went to
12 sleep.
13      Q.  Now, do you see the next to last
14 sentence where Mr. Markwat says, "We'll ask
15 our maintenance staff to perform cosmetic
16 work in the bathroom in your section to make
17 it look cleaner."
18          Was that actually done?
19      A.  No.
20      Q.  Did anyone make any attempts to
21 clean the bathroom after this letter was
22 written?
23      A.  Not to my knowledge, not
24 immediately; maybe one week later but not
25 immediately.

Page 159

1       Rolande Cutner       159
2       Q.  Other than Mr. Felix, did anyone
3  else in management ever make fun of your
4  accent?
5       A.  No.  I would say Jose, Felix.
6           You mean management?
7       Q.  Yes.
8       A.  Jose, Felix; this is two person.
9       Q.  Did anyone else hired by the
10 Lantern Group ever make fun of your accent?
11      A.  Not that I recall.
12      Q.  I want to look at Page 20.
13      A.  Okay.
14      Q.  You say that the Lantern Group
15 discriminated against you because you were
16 being viewed by them as a French national, of
17 French heritage with the language and the
18 custom; how do you know that they had this
19 perception of the French?
20      A.  Because of this drama about clean
21 clothes.
22      Q.  Did they ever make any comments to
23 you about the facts that you wanted to have
24 clean clothes?
25      A.  In a way.  When they say, "why you

Page 160

1       Rolande Cutner       160
2  don't go back to your country," you know, "if
3  you want to have clean clothes."
4       Q.  What did you say in response to
5  that when they said "why don't you go back to
6  your country if you want to have clean
7  clothes?"
8       A.  I don't say anything.
9       Q.  Other than Jose, did anyone else
10 say to you go back to your own country?
11      A.  No.
12      Q.  Did anyone ever make any comments
13 to you that made you feel that the Lantern
14 Group had this stereotype of the French?
15      A.  You mean outside of Felix and Jose?
16      Q.  Anyone employed by the Lantern
17 Group?
18      A.  But you know, it's difficult when
19 you say employed.  It's a legal term
20 "employee" so I would say the security guard
21 are employees or are controlled by the
22 Lantern Group.
23      Q.  What comments did the security
24 guards make to you regarding your being
25 French?

Page 161

1              Rolande Cutner          161
2      A.   That I need clean clothes, I make a
3    big drama about this clean, you know, clothes
4    and like I make this big drama because I am
5    French.
6      Q.   Did anyone say to you that you make
7    this big drama because you are French?
8      A.   No.  "You are playing the movie
9    star," I mean, I cannot remember the exact
10   words at that point.  I cannot remember the
11   exact words.
12     Q.   Did they make any other comments to
13   you regarding being French?
14     A.   The accent.
15     Q.   What about Mr. Markwat, did he ever
16   make any comments to you about the fact that
17   you were French?
18     A.   No.
19     Q.   How about Ms. Cohen?
20     A.   No.
21     Q.   Other than making fun of your
22   accent, did Felix ever make any comments
23   about the fact that you're French?
24     A.   No.
25     Q.   You say that you are not a

Page 162

1              Rolande Cutner          162
2    traditional SRO tenant, what do you mean by
3    that when you make that allegation?
4      A.   Because I read the leaflet
5    distributed at the subway entrance.  I
6    understood that the neighborhood SRO tenant
7    were looking down like drug addict,
8    alcoholism, AIDS, and I felt that people look
9    down at people living in an SRO building
10   because of the leaflet.  If you look at this
11   leaflet, you will see reflected.
12     Q.   So why do you feel that the Lantern
13   Group had animosity towards you because you
14   weren't a traditional SRO tenant?
15     A.   Because I complain and I felt
16   justified to complain and I felt my attitude
17   was totally different from the people in the
18   SRO building who are very sick or old and
19   lose hope, lost soul, soul.
20     Q.   Is it your belief that the Lantern
21   Group harassed you and discriminated against
22   you because of your complaints about the
23   condition of the building?
24     A.   Yes, definitely.
25     Q.   You mentioned earlier that

Page 163

1              Rolande Cutner          163
2    Mr. Santee also complained about the
3    building?
4      A.   Yes.
5      Q.   Do you believe that the Lantern
6    Group had animosity towards him also?
7      A.   Yes.
8      Q.   What is the basis for your belief?
9      A.   Because they accepted to me to be
10   my witnesses because on the night of January
11   2008 we had the hearing with the judge,
12   federal judge magistrate and I ask him
13   permission to bring my witnesses and the
14   judge said, "Yes, Ms. Cutner, you may bring
15   your witnesses."
16        And I approach Chris Santee and
17   Nicolas Legrand and two other people to be my
18   witnesses and because in federal court you
19   have to disclose the names of your witnesses
20   and the address of your witnesses ahead of
21   time, I disclose the name Chris Santee,
22   Nicolas Legrand and other people and
23   immediately two days after that, the Lantern
24   Group start eviction proceeding from those
25   people.

Page 164

1              Rolande Cutner          164
2      Q.   When you're referring to federal
3    court, are you referring to this action?
4      A.   Yes.
5      Q.   When you say that you identified
6    Mr. Santee and Mr. Legrand as witnesses, are
7    you referring to the automatic disclosures
8    that you sent to my office?
9      A.   Yes.
10     Q.   Other than the eviction proceedings
11   against Mr. Santee and Mr. Legrand, is there
12   any other way, any other reason why you
13   believe that the Lantern Group has been
14   harassing or discriminating against them?
15     A.   Yes, because to after my disclosure
16   of their name, the Lantern Group had a lock
17   put on their room and they were locked out
18   and they called me frightened because that
19   will be like, they will be homeless and I
20   said, "call the police," at that point, I
21   said, "call the police because the Lantern
22   Group did not have any Court Order to evict
23   you and it's written litigation because you
24   retaliation because you accept to be my
25   witnesses," and I believe because I was in my

ON TIME COURT REPORTING
516-535-3939

Page 165

Rolande Cutner    165

1  office and they called me at eight o'clock, I
2  believe that because I wasn't there, they
3  called the police.
4      The police arrived, call someone,
5  the locksmith and the locksmith open the lock
6  because the Lantern Group was proceeding to
7  quote/unquote, "eviction without any Court
8  Order" but I was not there. I was in my
9  office so I did not see it. This is what I
10  understood at that point.
11      Q.  Are there any other witnesses that
12  you indicated in your automatic disclosures
13  that you feel have been retaliated against?
14      A.  Yes. Mimi Young, Y-O-U-N-G,
15  Chinese. I think Chinese, maybe. She's
16  Asian lady -- immediately receive a Notice of
17  Eviction and she was negotiating with the
18  Lantern Group lawyer and she was terrified to
19  be evicted and she called me and I said,
20  "Look, this is totally illegal. It's
21  retaliation eviction." And I make some
22  research on the law and it's totally illegal,
23  and she was able to fight the eviction and
24  finally, she negotiate I understand because I

Page 166

Rolande Cutner    166

1  did not see what happened, I understand that
2  she negotiate kind of settlement with Lantern
3  Group but it was clearly because she said she
4  would be my witness.
5      Q.  When you say that Mr. Santee and
6  Mr. Legrand were evicted two days after your
7  automatic disclosures, does that mean two
8  days after you put them in the mail?
9      A.  No, it did not happen like that.
10  We were Article 78 proceeding in civil court
11  for the proceeding and Chris Santee and
12  Nicolas Legrand were present and I think
13  another guy also was present and they give
14  their name and they disclose that they will
15  be my witness and that was in the court, the
16  court of the 78 proceeding and two days later
17  they received a Notice of Eviction.
18      Q.  So when you had indicated two days
19  later, that's not two days from the automatic
20  disclosure, that's two days from their
21  testimony from the Article 78 proceeding?
22      A.  Yes, but also before that they were
23  in my list of automatic disclosure but that's
24  the exact date, I think it's two days after

Page 167

Rolande Cutner    167

1  the Article 78 proceeding they start eviction
2  because at that point it was public, their
3  name is on the public record.
4      Q.  Did Mimi also testify at the
5  Article 78 proceeding?
6      A.  No, no.
7      Q.  When did the Lantern Group commence
8  eviction proceedings against Mimi?
9      A.  That was some time in September,
10  October and they were, they were, I think
11  they were trying to negotiate a settlement
12  and when the Lantern Group learned that she
13  was going to be one of my witnesses, suddenly
14  there was no more negotiation of settlement
15  and then she was afraid to be evicted and
16  finally, she was able to settle but I don't
17  know the term of the settlement.
18      Q.  When was it that you learned of
19  Mimi's effort to settle the eviction
20  proceedings?
21      A.  I think November 2007, I think.
22      Q.  But she eventually was able to
23  settle her eviction; is that correct?
24      A.  I think so.

Page 168

Rolande Cutner    168

1      Q.  Is this information that she told
2  you?
3      A.  She told me, yes, and I've seen it
4  on my automatic disclosure because you can
5  see it for all the e-mail related to the
6  court-related and I sent you all the e-mail
7  of all the people who send me e-mail so you
8  probably see it there.
9      Q.  On Page 21, you say you allege that
10  the Lantern Group made nasty remarks because
11  you were leaving for France; who made remarks
12  to you?
13      A.  It's -- I think it's Felix. It was
14  in this frame, "Why don't you go back to your
15  own country," and Jose the porter was in this
16  period.
17      Q.  What did they say to you about the
18  fact that you were leaving for France?
19      A.  "Just go back to your own country,
20  never come back." I mean, I cannot remember
21  but the word was "go back to your own
22  country."
23      Q.  They said to you not to the come
24  back?

Rolande Cutner          169

1
2    A.  Oh, "good riddance." I cannot
3    really remember but it was something in this
4    color, nasty remark.
5    Q.  You allege that you had to write a
6    letter to explain the reason of your travel
7    to Paris; who asked you to write a letter?
8    A.  No. I did. I don't need anybody
9    to tell me to write a letter.
10   Q.  Why did you write a letter to
11   explain your reason of your travel?
12   A.  Because I was afraid, again, that
13   if they told me "good riddance" or "go back
14   to your own country" and all that, again, I
15   was afraid of eviction, who knows what. You
16   have to realize, you live in fear so I wrote
17   a letter.
18   Q.  Who did you give the letter to?
19   A.  Well, I wrote it so probably to
20   Rafal.
21   Q.  Do you know if there's any kind of
22   rule or regulation indicating that, requiring
23   that to be a permanent resident that the SRO
24   has to be your primary residence?
25   A.  Yes.

Rolande Cutner          170

1
2    Q.  Do you think that the Lantern Group
3    may have been concerned that the building
4    wasn't your primary residence?
5    A.  I was afraid they pull that trick
6    on me.
7    Q.  Why do you think it would have been
8    a trick?
9    A.  Because it is my primary residence
10   and I go there only in France for my
11   treatment as I explained for my bladder and
12   all that. I need to have the medication and
13   I need to have self-catheter and I have to
14   go, and I was afraid that they say, "you go
15   to France," I don't know. Again, it's within
16   this frame of being afraid of everything,
17   living in fear.
18   Q.  Was the Lantern Group aware that
19   you were going to France to obtain medical
20   treatment?
21   A.  Oh, yes, I tell everybody.
22   Q.  When did you tell them?
23   A.  Felix or, I mean --
24   Q.  When was the first time you told
25   someone at the Lantern Group that the reason

Rolande Cutner          171

1
2    why you go to France is for medical
3    treatment?
4    A.  All the time.
5    Q.  The first time you went to France,
6    did you tell them that it was because for
7    medical treatment?
8    A.  Well, since I live there, September
9    '94 to March 2006, to when they move in,
10   probably. I mean, I don't remember but
11   probably Felix say, "oh, you are leaving," I
12   would say "yes, I go for my treatment" and
13   because I go so often then they would say,
14   "you are leaving again, good vacation," "oh,
15   it's vacation time," and I say, "no, excuse
16   me, I go for my treatment." That also upset
17   me when people say, "oh, good vacation."
18   That upset me.
19   Q.  Who said to you "good vacation?"
20   A.  Felix. At the desk at one point
21   they have a girl that I am not sure -- she
22   was not a security guard. It was a girl who
23   was like a secretary and she was at the desk
24   at the very beginning but I don't remember
25   her name, at the very beginning of the

Rolande Cutner          172

1
2    Lantern Group taking over this building. It
3    was this girl, I cannot remember her first
4    name but she was definitely an employee of
5    the Lantern Group.
6    Q.  And she wished you a good vacation?
7    A.  "Oui, oui, ah, you're going on
8    vacation," and type of sentence that
9    infuriate me, you see, because I am sick so I
10   get furious.
11   Q.  When she wished you a good
12   vacation, did she already know that you were
13   leaving for medical treatment?
14   A.  Well, the first time I tell her,
15   and the second time I get upset and tell her
16   again and the third time I said, "No, I go
17   for my treatment," and the fifth time, "I go
18   for my treatment."
19   Q.  When you go to France for your
20   treatment, how long are you typically there
21   for?
22   A.  Oh, one week; no more than one
23   week.
24   Q.  When you say that the Lantern Group
25   harasses you daily and that the harassment

Rolande Cutner          173

1  falls into two categories, diminished service
2  and a total failure to maintain a clean, safe
3  and infestation-free building, now, we've
4  already spoken about the change in the mail
5  policy, the change in the delivery policy,
6  and the --
7     A.  The door with the lock.
8     Q.  Well --
9     A.  Because we were locked outside
10 until I complain and they gave us a key, for
11 instance.
12    Q.  Do you still have a key to the
13 front of the building?
14    A.  Oh, yes.
15    Q.  Other than what we've already
16 talked about, were there any other services
17 that have been diminished once the Lantern
18 Group took over?
19    A.  Before the Lantern Group we had
20 doorman and doorman are so important.  They
21 do everything for you.  They receive
22 packages, they receive everything.  They give
23 you, they do everything, doorman and they had
24 doorman.
25

Rolande Cutner          174

1     Now, we have no doorman.  The
2  minute the Lantern Group moved in they
3  suppress the doorman and they put the
4  security guard.  Make you feel that you are
5  ex-convict just coming out of jail.
6     Ah, another rule they say, no
7  visitor and they were so much complain not
8  for me because I have no family, I don't have
9  anybody who visit but no visitors in this
10 building.
11    They had so much complaint that
12 again they flip flop and said okay, okay,
13 curfew, ten o'clock and then they numerous
14 complaints from other tenants so flip-flop,
15 they change the rule:  No visitors and curfew
16 at ten o'clock.
17    Q.  You said that after people
18 complained that they, the Lantern Group,
19 changed their policy to allow visitors; is
20 that correct?
21    A.  Yes.
22    Q.  How long was the policy for no
23 visitors in place?
24    A.  I was not concerned by that
25

Rolande Cutner          175

1  particular rule because, as I said, I have no
2  family and I have nobody to visit me so I was
3  not really concerned by that, but I knew
4  people were very much concerned and lately,
5  like it would be December 2007, I receive a
6  change of rule where signed by Harriet Cohen
7  said there is no curfew in this building and
8  permanent tenants are allowed to receive
9  visitors after 10:00 in the evening and this
10 piece of paper was probably delivered in
11 December 2007.  But to tell you exactly the
12 date I can't because I was not directly
13 suffering from this particular rule.
14    Q.  Do you think the rule preventing
15 permanent residents from having visitors was
16 harassment towards you?
17    A.  On that particular rule?
18    Q.  Yes.
19    A.  No, because I was not aware of the
20 rule.  I mean, I was not suffering from the
21 rule.  Let's say I was not suffering from the
22 rule.
23    Q.  Are all of the residents of the
24 building permanent tenants?
25

Rolande Cutner          176

1     A.  Yes -- no, no, no, no.  We have
2  illegal, excuse me, we have the illegal
3  Mexicans.
4     Q.  How do you know that these
5  individuals are illegal?
6     A.  It's woman in the building.  I saw
7  it for the little girl, Mexican.
8     Q.  Did anyone from the Lantern Group
9  ever mention that these people are illegal?
10    A.  No, it's a big secret and I went to
11 talk to Mr. Islam and I say they are so
12 terrorized by the Lantern Group.  They are so
13 afraid that when you see them in the elevator
14 and I, I speak a little bit of Spanish and I
15 give my name and I talk to them nicely and
16 they are so afraid they don't even want,
17 didn't talk to me and they were totally
18 terrorized by the Lantern Group.
19    And so I went to see Islam Shaffak
20 (phonetic), and I said, "There are illegal
21 Mexicans terrorized by the Lantern Group,"
22 and I don't know how to prove that because
23 the judge said, "Mrs. Cutner, do you have
24 witnesses bring them?  Do you have document
25

Page 177

Rolande Cutner     177

1          Rolande Cutner     177
2   and witnesses, bring them?"  The judge was
3   very much understanding.
4        Q.  Is this the judge of the Article 78
5   proceeding?
6        A.  No, the federal judge.
7             MR. CUTNER:  Let's stick to
8        the question.
9        A.  Islam Shaffak said, "Yes, I know
10  about the illegal Mexican in the building, I
11  know them.  We work to help them," I mean,
12  "the SRO law project, we work to help them."
13  And I say, "I have difficulty because I have
14  to prove that," and he said, "Mrs. Cutner,
15  excuse me, I be your witness regarding
16  illegal Mexican."
17       Q.  In what way have you observed the
18  Lantern Group terrorizing the illegal
19  immigrants?
20       A.  They are so afraid that when you
21  talk to them and say what's your name, I say,
22  "I am Rolande, I am from France," they are
23  afraid.
24       Q.  Do you think there's anything that
25  the Lantern Group has done to these

Page 178

Rolande Cutner     178

1          Rolande Cutner     178
2   individuals that forms your basis that the
3   Lantern Group is terrorizing them?
4        A.  Because they don't want to even
5   answer the question to me.
6        Q.  And why do you believe that's a
7   result of the Lantern Group's actions?
8        A.  Because they are afraid, they are
9   terrorized.
10       Q.  How do you know that they're afraid
11  of the Lantern Group?
12       A.  Because they live in the building.
13       Q.  Couldn't they be afraid for other
14  reasons such as the fact that they're in the
15  country illegally?
16       A.  I don't know that.
17       Q.  You've never actually observed
18  anyone from the Lantern Group terrorizing
19  these individuals; is that correct?
20       A.  No, no.
21       Q.  And other than things that other
22  tenants might have told you, do you have any
23  basis for your allegation that these
24  individuals are in the country illegally?
25       A.  How do you say when they present

Page 179

Rolande Cutner     179

1          Rolande Cutner     179
2   themselves like in fear, when you in fear,
3   when you talk to the person that the person
4   is so much in fear.  That will be my answer.
5        Q.  Other than what you've already
6   testified to, you've already discussed the
7   third floor bathroom, the third floor kitchen
8   and the elevator; is there any other way in
9   which you allege that the Lantern Group
10  failed to maintain a clean, safe and
11  infestation-free building?
12       A.  Outside of the bathrooms, the
13  kitchens, the elevator, the hallway, the
14  garbage.
15       Q.  What is your complaints regarding
16  the hallway?
17       A.  Pieces of garbage in the hallway,
18  banana peels in the hallway.
19       Q.  What about the garbage, you mention
20  garbage?
21       A.  Garbage.
22       Q.  Is that the garbage in the hallway?
23       A.  Plastic in the kitchen, you know,
24  overflowing the big cash counter,
25  overflowing.

Page 180

Rolande Cutner     180

1          Rolande Cutner     180
2        Q.  Earlier you referenced something
3   regarding bed bugs.
4             Did there come a time where the
5   building had infestations of bed bugs?
6        A.  Yes.
7        Q.  When was that?
8        A.  Since March of 2006 or March, April
9   it started in the building and then became
10  bad.  This little mother with the two little
11  children again came to me and complained and
12  showed me the children with the red spots on
13  the hand of the children and the bed bugs, as
14  I said, explain before, I was putting strip
15  of insecticide all over by the wall and my
16  bed.
17       Q.  Do you know whether anyone made any
18  complaint to the Lantern Group regarding the
19  bed bug situation?
20       A.  Yes, a lot of the tenants.
21       Q.  Did the Lantern Group do anything
22  to address the complaints?
23       A.  Yes.  They pass a contact with a
24  company, I don't know the name but I think
25  you have it in your -- the Lithan Company;

Page 181

```
1              Rolande Cutner        181
2    L-I-T-H-A-N.
3        Q.  Are you looking at Page 22?
4        A.  You always ask me how is the
5    building deteriorated.  Before the Lantern
6    Group we have the exterminator.  He comes
7    every months, "squish, squish, squish"
8    (indicating), and we were happy.
9            When the Lantern Group arrived,
10   they stopped the service of the exterminator
11   and they contract with this Lithan
12   Corporation and obviously, it was not
13   working, the system.  I don't know about the
14   system.  It was not working so the
15   infestation became worse.
16       Q.  Now, you say that the extermination
17   process was too complicated that no tenant
18   ever called the company; what do you live
19   feel was so complicated about the process?
20       A.  You have to take the piece of
21   paper, it's two pages of -- they gave us this
22   Lithan Corp leaflet and I would refer to it
23   as this leaflet.  It's two pages.  It's
24   absolutely un comprehensible and you cannot
25   understand what they are talking about.  It's
```

Page 182

```
1              Rolande Cutner        182
2    very complicated.
3            You are supposed to put all your
4    things outside, put everything in some
5    plastic bag for 48 hours, fumigate the place
6    then come back, open your thing which is in
7    the plastic bag, "phoof, phoof" (indicating),
8    spray on the thing.
9            You have to look at the leaflet.
10   It's very complicated and I don't believe
11   that nobody did that so it was a total
12   failure.
13       Q.  Did any other tenants complain to
14   you about the procedure?
15       A.  Yes, they complained to me.
16       Q.  Who complained to you?
17       A.  Chris Santee, Nick Legrand; most of
18   the people that generally talk to me.
19       Q.  Did they tell you that the reason
20   why they didn't call Lithan Company was
21   because the process was too complicated?
22       A.  This is what they said.
23       Q.  Is this the process regarding the
24   extermination of bed bugs or their process
25   for getting rid of bugs, generally?
```

Page 183

```
1              Rolande Cutner        183
2        A.  You have to look at the leaflet.  I
3    cannot comment on that.
4        Q.  How many tenants live on the third
5    floor?
6        A.  I don't know.  I can only talk
7    about the one that I see every day which is
8    Mr. Woods, Monica Sandoval, her daughter, two
9    little children, Nicolas Legrand, one or two
10   persons at the end of the third floor that I
11   don't talk to so I don't know.
12       Q.  How many rooms are on the third
13   floor?
14       A.  I don't know, I don't know.  A lot
15   but a lot of them are empty.
16       Q.  Do you know how many rooms on the
17   third floor have people living in them?
18       A.  No, I don't know.
19       Q.  Now, you testified earlier that you
20   believe that the Lantern Group was targeting
21   you because of the fact that you complain
22   about the conditions of the building.
23           Now, wouldn't the common area
24   affect the other people living on the floor
25   as well?
```

Page 184

```
1              Rolande Cutner        184
2        A.  I don't understand your question.
3        Q.  You're not the only person that's
4    affected by the common area?
5        A.  The tenants are affected by the
6    condition of the building.
7        Q.  Do you have any knowledge as to the
8    condition of the common areas on the other
9    floors?
10       A.  No, I never go to the other floor.
11       Q.  Other than what you've told me
12   about an individual complaining to you about
13   the sixth floor, did anyone else make any
14   complaints to you regarding the conditions of
15   their floors?
16       A.  No, no, because this two ladies
17   only.
18       Q.  Did Chris Santee ever complain to
19   you about the condition of the common areas
20   on his floor?
21       A.  Yes.
22       Q.  What complaints did he make to you
23   about the conditions of the common areas on
24   his floor?
25       A.  Same thing:  Dirty bathroom, waste
```

Page 185

Rolande Cutner    185

1     water backing up into a sink from the water
2     closet; same, same bad quality, kitchen and
3     bathroom.
4         Q.    On Page 24, you say the other
5     tenants received an unsolicited visit from a
6     social worker who came to talk to tenants in
7     special needs and persuade them to leave the
8     premises; do you see that?
9         A.    Yes.
10        Q.    Who were the tenants that received
11    a visit from the social worker?
12        A.    I think it was Christopher. I
13    think his name is Christopher or Chris, not
14    Chris Santee. Ford, I think. I think this
15    is his name.
16        Q.    Did he tell you that he received a
17    visit from a social worker?
18        A.    Yes.
19        Q.    Did he tell you that the visit from
20    the social worker was unsolicited?
21        A.    Yes. This is what he explained to
22    me.
23        Q.    What else did he tell you about the
24    visit from the social worker?
25

Page 186

Rolande Cutner    186

1         A.    He said that he was totally upset
2     because, I mean, this is a man that he gave
3     me, it was in the WC taking a poo and the
4     social worker was banging on the door, "come
5     out, come out, come out," and he said, "wait
6     a minute, wait a minute, I am taking a poo,"
7     and he said, "what do you want?" and the
8     social worker said, "come out immediately, I
9     have to talk to you."
10        So he said, "here I am, you know,
11    taking a poo and this guy did not give his
12    name, did not give his title, did not explain
13    why he was there, bang on the door of the WC
14    bathroom and I am taking poo," and he said,
15    "I went outside and I said, 'I never ask you
16    for social worker'" and he was very, very
17    upset.
18        Q.    Who did he say I never asked you
19    for a social worker?
20        A.    He says that, not social worker, "I
21    never ask you, for you to send social worker
22    to come to me," and he was absolutely
23    behind --
24        Q.    Was this social worker the same
25

Page 187

Rolande Cutner    187

1     social worker that you mentioned earlier that
2     the Lantern Group was hiring to be in the
3     building?
4         A.    I think, this is, again, this is
5     hearsay because this is what Christopher Ford
6     told me about that.
7         Q.    Do you know how long Christopher
8     Ford had lived in the building?
9         A.    No, I don't.
10        Q.    Do you know if he moved into the
11    building after the Lantern Group took over?
12        A.    I don't know.
13        Q.    Did he tell you that the social
14    worker tried to persuade him to leave the
15    premises?
16        A.    Yes, yes. He was very upset.
17        Q.    What did he say that the social
18    worker said to him?
19        A.    He was trying to be convinced to go
20    to this Hunter Moons and this Hunter Moons,
21    apparently, I didn't go there, is so bad that
22    the other guy, John Woods came back and say
23    has been beaten up by tenant in Hunter Moons,
24    and he came back and he said our building is
25

Page 188

Rolande Cutner    188

1     paradise compared to the Hunter Moons and
2     which is Lantern Group is the owner of this
3     building and owner and manager of this
4     building and people are terrified to go
5     there, why, I don't know. I have not been
6     there but apparently, they have a people --
7     apparently, I was not there, fighting.
8         Q.    When Mr. Ford told you that the
9     social worker tried to convince him to go to
10    Hunter Moons, was that during the same
11    conversation after as when Mr. Ford came out
12    of the bathroom and told you about the social
13    worker?
14        A.    Yes, and he was specifically upset
15    because the social worker did not introduce
16    himself. He said, "You know, I am not a dog.
17    They bang on the water closet, they treat me
18    like a dog and I'm taking a poo."
19        Q.    What else did Mr. Ford tell you
20    about this conversation with this social
21    worker?
22        A.    He was afraid to go to Hunter Moons
23    and that they were forcing him to go there.
24        Q.    Other than talking to Mr. Ford

Rolande Cutner          189

1    about Hunter Moons, did Mr. Ford indicate
2    that they did anything else to get him to go
3    to Hunter Moons?
4        A.  No.  He was so upset that he
5    mentioned that, he was being totally upset.
6        Q.  Did he tell you anything that the
7    social worker said about Hunter Moons other
8    than that Mr. Ford should go there?
9        A.  I don't know that.
10       Q.  Do you know of any other tenants
11   that received visits from social workers?
12       A.  Apparently, and Shoshanna.
13       Q.  What did she tell you?
14       A.  She was supposed to be sent to
15   Hunter Moons and apparently, she refused to
16   go and she was very upset and to me it look
17   like, you know, it's almost during like the
18   Nazi occupation where people are in
19   concentration camps and you are moved to the
20   gas chamber, this Hunter Moons and again, I
21   said, "I never been there but people seem to
22   be afraid to go to Hunter Moons and this
23   Shoshanna said, "I am not going and I am not
24   going and they were trying to push me there.

Rolande Cutner          190

1        Q.  Did she say that a social worker
2    had visited her?
3        A.  No.
4        Q.  Did she say how they were trying to
5    force her to go?
6        A.  No, she was just too upset.
7        Q.  And did she eventually move to
8    Hunter --
9        A.  No, she's still in the building.
10       Q.  Do you know how long she's lived in
11   that building?
12       A.  I don't know but a long time.  I
13   think she's a long time permanent tenant.
14       Q.  Do you know if she moved after the
15   Lantern Group took over?
16       A.  I know she was there before,
17   before.
18       Q.  Other than Christopher Ford, do you
19   know if any other tenants received any visit
20   from a social worker?
21       A.  No.  I was talking to Chris.  I
22   learned a lot.
23       Q.  On Page 25 you referenced the fact
24   that the Lantern Group eliminated the service

Rolande Cutner          191

1    of a doorman and replaced him with security
2    guards?
3        A.  Yes.
4        Q.  Do you feel that this is
5    discriminatory?
6        A.  Yes, yes.  I would say yes.
7        Q.  Why do you feel that it's
8    discriminatory?
9        A.  Because when you live in New York
10   City, the building is doorman.  Normally, you
11   go in and out, the doorman ask you if you
12   have guest.  I mean, it's a normal life.
13   With a security guard you have the feeling
14   you are ex-convict and you have the feeling
15   that you committed a crime, who knows and
16   suddenly there is suspicion why are you
17   getting into the building, why are you
18   getting out.  The security guard is there.
19   It's a terrible suspicious life.  It's not
20   anymore a building normal with a doorman.
21       Q.  Do you think the reason why the
22   Lantern Group put in security guards was
23   because of the presence of these NY3
24   population tenants?

Rolande Cutner          192

1        A.  Well, they contemplated in the
2    future, in the future to put these in but I
3    don't know, I don't know why.  I suspect that
4    they wanted to save money, I suspect but I
5    don't know.  I don't know why they put
6    security guard and suppress the doorman.
7        Q.  You express concerns earlier
8    regarding the fact that there were going to
9    be these NY3 tenants in the building and you
10   pressed the fact that the social worker was
11   there only to 5:00 so wouldn't the presence
12   of security guards provide extra, extra
13   security for the tenants who are concerned
14   about them?
15       A.  No, because during the night they
16   leave, they are not there.  We don't know
17   where they are.  You have to understand
18   something, on the surface it's wonderful,
19   there is security guard, the reality is
20   otherwise.
21           They disappear into the evening.
22   We don't know where they are then they show
23   up.  We don't know.  There is no control.
24   You don't feel safe even with a security

Page 193

Rolande Cutner   193

1     guard and one of the ladies, Florence Bella,
2     she's afraid of the security guard because
3     she lives on the ground floor and she says
4     these guys, they smoke marijuana, go in and
5     out. It's scary.
6         Q.   And on how many occasions did you
7     go downstairs at night and see that the
8     security guards weren't there?
9         A.   Between 2006 and 2008, in two
10    years, between this period, you mean?
11        Q.   In the entire time that there has
12    been security guards instead of a doorman,
13    how many times have you observed that
14    security guards were not on their posts at
15    night?
16        A.   Every other week. I mean, during
17    the night if I arrive late, they are there or
18    not there. You don't know where they are.
19    They might be just outside smoking one
20    cigarette. Don't look likes it's something
21    bad that they do but I could not tell. I
22    could say every week they are there.
23        Q.   How many security guards does the
24    building typically have on staff, like one at

Page 194

Rolande Cutner   194

1     a time, two at a time?
2         A.   One at a time, one at the desk.
3         Q.   So if the one security guard needed
4     to use the rest room, there would be no one
5     at the desk?
6         A.   Yes, also no one at the desk or the
7     security guard could be called by a tenant,
8     even myself, you know. If I am afraid, I'll
9     tell the security guard "go with me" to the
10    third floor, for instance.
11        Q.   Did you ever complain to the
12    Lantern Group about the fact that the
13    security guards weren't always at their post?
14        A.   Yes.
15        Q.   Who did you complain to?
16        A.   I wrote letter.
17        Q.   Did anyone respond to your letters?
18        A.   I don't think that I send in that
19    particular letter, a subsequent letter. I
20    receive volume writing of letter.
21        Q.   Other than what you've already
22    testified to, is there any other reason why
23    you believe that the Lantern Group's
24    replacement of a doorman with security guards

Page 195

Rolande Cutner   195

1     was discriminatory or harassing?
2         A.   Oh, yes, multiple reasons.
3         Q.   What are the reasons?
4         A.   They treat you like cattle; they
5     don't treat you like human beings. They
6     treat you like ex-convict; they speak bad to
7     you. They definitely, definitely, definitely
8     harassment. They treat you with contempt,
9     yes. They are never there to help.
10        Q.   Is it your belief that the Lantern
11    Group intentionally replaced the doorman with
12    security guards for the purpose of harassing
13    the tenants?
14        A.   Yes, yes, oh, yes, oh, yes.
15    Because it's so different from any service
16    that you can expect from a doorman.
17        Q.   You reference in your complaint an
18    incident where a man was asleep against your
19    door, can you describe this incident?
20        A.   Yes, I could not go into my room
21    because a guy was sleeping there and totally
22    stretched out across the door so I call the
23    security guard.
24        Q.   What did the security guard do?

Page 196

Rolande Cutner   196

1         A.   He tried to wake him up. The guy
2     was sleeping there and finally, he tried to
3     make him move so the guy either was drunk or
4     he had maybe some physical, you know.
5         Q.   Was the security guard eventually
6     able to wake the man up?
7         A.   I don't know, I didn't stay there.
8     I say that's a problem with the security
9     guard. The security guard and I went over
10    the body of the guy and I think the security
11    guard help me to push my door and I quickly
12    went into my door and closed the door.
13        Q.   You went into your room and closed
14    door?
15        A.   I wrote a letter. Naturally, I
16    wrote a letter.
17        Q.   When was the man sleeping in front
18    of your room finally taken away from your
19    room?
20        A.   I don't know.
21        Q.   Do you know of any action the
22    security guard took after you went into your
23    room and closed your door?
24        A.   No. I, I was terrified.

Page 197

Rolande Cutner    197

1
2    Q.  Did you hear anything going on
3    outside your room?
4    A.  No.
5    Q.  Do you know whether the security
6    guard contacted the police or an ambulance?
7    A.  No, I don't know that but I wrote a
8    letter so we could refer to the letter and I
9    wrote a letter that I'm sure everything is
10   there.
11   Q.  The next time you left your room,
12   the man wasn't still there, was he?
13   A.  In the morning?
14   Q.  Right?
15   A.  No.
16   Q.  And so at one point when you went
17   into your room at night and when you left
18   your room in the morning, the security guard
19   took action to remove the man from your
20   apartment; is that correct?
21   A.  I don't know.  I just went into my
22   room and closed the door.
23   Q.  You mentioned on the next page that
24   in the months after the Lantern Group took
25   over that you became increasingly suspicious

Page 198

Rolande Cutner    198

1
2    that strange individuals were roaming the
3    premises; why were you suspicious of this?
4    A.  Because I was in my room and I hear
5    all this galloping outside.
6    Q.  Outside of your room or outside of
7    the building?
8    A.  Outside of my room.
9    Q.  What made you think that it was
10   that the individuals that you heard galloping
11   weren't tenants?
12   A.  Because before that for all the
13   years that I have been living there, it was a
14   very nice and quiet building.  It was quiet
15   and matter of fact, it was quiet building,
16   you know, no complaints.
17   Q.  Do you know whether new tenants
18   moved in once the Lantern Group took over?
19   A.  The Mexican, yes, they both; 34
20   Mexican.
21   Q.  How many tenants were there in the
22   building?
23   A.  We have 67 permanent tenants plus
24   34 mixed, illegal Mexican.
25   Q.  So the 34 illegal immigrants are an

Page 199

Rolande Cutner    199

1
2    addition, not 67 tenants?
3    A.  Yes, yes.
4    Q.  Do you know of other than those 34
5    individuals there, were other new tenants
6    moved in after the Lantern Group took over?
7    A.  I have no way to know.
8    Q.  Do you know whether there were new
9    people on your floor that you haven't seen
10   before the Lantern Group took over?
11   A.  On my floor, no, no, no.
12   Q.  Did you recognize new people in the
13   building that you hadn't seen before the
14   Lantern Group took over?
15   A.  No, no, no except for as I say, in
16   the elevator when I meet with those Mexican
17   who are really not talking.
18   Q.  Other than the fact that you heard
19   noises outside of your room, do you have any
20   other basis for believing that strange
21   individuals were roaming the premises?
22   A.  It's just -- let me explain to you.
23   Again, between September '94 and until March
24   2006 it was a quiet building.  Then the
25   Lantern Group took over the management and

Page 200

Rolande Cutner    200

1
2    then it was frightening this galloping at
3    night and but you can understand, I did not
4    open the door and investigate.  I stayed put.
5    Q.  Other than the incident where two
6    women on the sixth floor told you about their
7    belief that people were on the roof, did
8    anyone else ever complain to you that strange
9    individuals were roaming the premises?
10   A.  No, no.
11   Q.  Towards the bottom where you say
12   that there was a large sign glued to the
13   front door that said, "Please enter the
14   building," can you describe that sign to me,
15   about how big was it?
16   A.  The building has a big door and the
17   lock was broken and they put tape, tape and
18   then they put piece of paper and they put
19   "Please enter the building" written on this
20   piece of paper and tape so you could enter
21   and go out and in and out like that.
22   Q.  Was it a handwritten sign?
23   A.  A handwritten sign.
24   Q.  Do you know who wrote that sign?
25   A.  No, no.

## Page 201

Rolande Cutner    201

1
2    Q.   The lock was broken?
3    A.   The lock was broken.
4    Q.   Do you know who wrapped the lock in
5    tape?
6    A.   No.
7    Q.   Do you know who made the sign?
8    A.   No.
9    Q.   Did you have any conversations with
10   the security guards about the lock and the
11   sign?
12   A.   I complained.  Trust me on that.
13   Q.   What did you say to them?
14   A.   I said, "You know, instead of
15   putting a tape, why don't you call locksmith
16   and have it repaired?"
17   Q.   What did they tell you in response?
18   A.   "Don't worry, Ms. Cutner.  It's
19   going to be done."
20   Q.   Was the lock eventually repaired?
21   A.   It stayed a long time, at least one
22   week.
23         MS. HOLTZER:  Can we take at
24         least a five-minute break?
25         (Whereupon, a recess was

## Page 202

Rolande Cutner    202

1
2    taken at this time.)
3    Q.   Now, I want to look at Page 34.
4    Now, you have quote words at the bottom of
5    the page where you say "the victim does not
6    have to be the person harassed but could be
7    anyone affected by the offensive conduct."
8         Who do you think in your building
9    was being harassed by the Lantern Group?
10   A.   Me.
11   Q.   Well, you refer to the victim not
12   having to be the person harassed; do you
13   think there were other people harassed as
14   well?
15   A.   Yes, yes, in a way.  In the system
16   I was harassed but the system by itself
17   create that because the fact that they put
18   the security guard, the fact that they are
19   treating people like cattle and not human
20   being, you know, so even in the management, I
21   feel they were treated badly each other, I
22   mean.
23   Q.   What do you mean by that?
24   A.   They were treated badly.  When I
25   complain a lot to Felix and so Felix would

## Page 203

Rolande Cutner    203

1
2    say, "do you believe it is for me.  I am sick
3    and tired of this organization" and things
4    like that.  Even within the frame, the
5    Lantern Group, a guy like Felix complain.  I
6    don't know if it was true or untrue.  He felt
7    even himself was harassed.
8    Q.   You mention something about the
9    system; are you referring to the Lantern
10   Group system?
11   A.   Yes, the system where under the
12   cover of approving the disabled, the people
13   in life, help the approve the disable.  I
14   repeat, they are like Nazi.  They are like
15   Germany Nazi.  They treat the people as bad
16   as they treat the people in the Second World
17   War.
18        Every time you complain it's like
19   you are against the wall, "Don't worry,
20   everybody is fine and everything is going to
21   be fixed," and even in the eyes, as I
22   explained again, they are like zombies.  They
23   don't talk to you like human beings.  It's a
24   system and the system to me is wrong.
25   Something is wrong in the system.  This is

## Page 204

Rolande Cutner    204

1
2    what I'm trying to explain.
3    Q.   What do you think the Lantern
4    Group's purpose was in harassing these other
5    people?
6    A.   To make leave, to empty the
7    building.
8    Q.   Why would the Lantern Group want to
9    empty the building?
10   A.   Because they want to demolish 80
11   percent of the buildings or rooms, so I
12   understand, under the law and again, I am not
13   a real estate lawyer but I understand under
14   the laws they have to provide room for people
15   that they evict during the construction.
16        This is the reason we are trying to
17   move the people of the front of the building
18   into the rear of the building but they have
19   an obligation and those organization to
20   provide the people with room equivalent and
21   in the same neighborhood where we live and
22   it's costing them a lot of money so if people
23   leave entirely, then the whole organization
24   decreased.
25   Q.   Do you know what the Lantern Group

Page 205

Rolande Cutner                205

1
2    intended to do with the building after the
3    new renovation is completed?
4            MR. CUTNER: If you know.
5            MS. HOLTZER: Well, I asked
6        her.
7            The question was, do you
8        know.
9    A.   No, I don't know. I don't.
10    Q.   Why did you put this quotation in
11    your complaint --
12           MR. CUTNER: Which
13       quotation?
14           MS. HOLTZER: The one at the
15       bottom of Page 34 that I had just
16       asked Ms. Cutner about.
17    A.   Because, as I said, inside the
18    system of the Lantern Group people like
19    Felix -- I feel sorry for the guy -- they are
20    also victimized or even Jose the porter, they
21    are in the system and they are themselves
22    victim.
23    Q.   In what way are they victimized by
24    the Lantern Group system?
25    A.   Because they get the first wave of

Page 206

Rolande Cutner                206

1
2    complaining. I did this day in and day out,
3    day in and day out and Felix, Felix told me,
4    "I'm sick and tired. It's upsetting."
5    Q.   Where did you get this quotation
6    from?
7    A.   You know, I am an insomniac. I
8    read hundreds of books. I probably, I don't
9    even know but I probably took it, I do a lot
10    of research. I go to the library. I could
11    find it if you ask me but I'll look again. I
12    am reading a lot of books but by the way, I
13    don't have TV so in the evening I read a lot
14    of books.
15    Q.   I'm just going to leave a blank in
16    the transcript for the source of the
17    quotation and if you could fill it in.
18    A.   Sure, sure, if I find the book.
19    (INSERT):
20    Q.   On the next page on Page 35, you
21    allege that you asked Mr. Markwat why he
22    doesn't at least repair the C violations in
23    room 341; did you actually use that language
24    with him, the term C violations?
25    A.   Yes, because Chris Santee showed me

Page 207

Rolande Cutner                207

1
2    that he had contact some building inspector
3    and the building inspector explained that
4    there is violation A, B and C, and C
5    violations are very, very serious and Chris
6    Santee was telling me because he asked me,
7    "How much do you pay? And I pay $500 a month
8    and he said, "Do you know that with a
9    C violation you could stop paying your rent
10    because you don't have to pay rent if there
11    is C violation which hasn't been repaired?"
12    And I said, "I am too terrified to be
13    evicted. I pay because I don't want to be
14    evicted." We have enough litigation like
15    that not only but Chris Santee told me that.
16    Q.   What does Chris Santee do for a
17    living?
18    A.   I think he's in some kind of
19    computer business or he's probably a man
20    around 50 years old who has been probably
21    destroyed by some disease that I don't know
22    what he does but I think he's in the computer
23    business.
24    Q.   Did he tell you that someone had
25    told him about the C violations?

Page 208

Rolande Cutner                208

1
2    A.   No. I think he talk to the
3    building inspector who told him. I know that
4    he got that from the building inspector the C
5    violation because he told me I did not have
6    to pay my rent.
7    Q.   Did he tell you who told him with
8    C violations you don't have to pay your rent?
9    A.   I think the conversation was with
10    the building inspector but I was not there.
11    Q.   And did he tell you that the
12    building inspector told him these things?
13    A.   Yes, he was relating to me a
14    conversation with a building inspector.
15    Q.   How did Mr. Markwat respond when
16    you asked him to repair the C violations?
17    A.   I think I already mentioned that
18    there was a big meeting with Gail Brewer and
19    I think that was that day that he told me, I
20    think.
21        You know, I told you the story, "if
22    you pay your rent, we will have money to
23    repair because you don't pay then we don't
24    have any money to repair," I think I told you
25    the story. We have to look in the

Page 209

Rolande Cutner    209

1    transcript.
2        Q.  Did he say that you, specifically,
3    didn't pay your rent or was he referring to
4    you as the tenants?
5        A.  Tenants.
6        Q.  Do you know if the other tenants
7    were paying their rent?
8        A.  No, I don't discuss that at all.
9    It's very, very private.  I never discuss
10    that.
11        Q.  I want to go to Page 38.  You
12    allege at that time Lantern Group
13    substantially profited from the acquisition
14    of the SRO; how do you know that, what is
15    your basis for saying that they profited from
16    the transaction?
17        A.  Because in the neighborhood there
18    is a real estate lady, a lady broker and she
19    made an analysis of the prices of the
20    building in our street, 94th Street, West
21    94th Street and she claim -- and again, I did
22    not look at the number -- she claimed that
23    the Lantern Group, to buy the building, would
24    manage to buy the building with a higher

Page 210

Rolande Cutner    210

1    price from the Brooklyn Margolis family.
2        The price was inflated because the
3    Lantern Group was not using its own money but
4    the money from the taxpayer, HPD money, from
5    the New York City taxpayer and she, the
6    broker, explain that if the Lantern Group
7    bought the building at inflated price, not
8    with the money of the Lantern Group but with
9    the money with the taxpayer so difference
10    between the real price and the inflated price
11    was money that they probably share under
12    cover or they would share.
13        They were kind of under cover
14    agreement because "why," she explain to me,
15    she said, "why is the Lantern Group bought a
16    building which is inflated price up on the
17    same street?"  Something like that.
18        MR. CUTNER:  Maybe this will
19    be a good time to stop, Melissa.
20        THE WITNESS:  That was what
21    I was told.
22        MS. HOLTZER:  I just want to
23    state for the record we've been
24    going through Ms. Cutner's

Page 211

Rolande Cutner    211

1    complaint.  We still have not
2    covered a substantial amount of
3    Ms. Cutner's complaint so we will
4    likely have to continue this
5    deposition on another date.
6        -o0o-
7        (Whereupon, the examination
8    of Rolande Cutner was concluded at
9    5:02 p.m.)
10
11
12
13
14        ROLANDE CUTNER
15
16
17    Subscribed and sworn to
18    before me this      day
     of          , 2008.
19
20
21
22    NOTARY PUBLIC
23
24
25

Page 212

212

1        I N D E X
2
3
4    WITNESS        EXAMINATION BY    PAGE
5    Rolande Cutner    Ms. Holtzer        4
6
7
8        EXHIBITS
9    DEFENDANTS'              PAGE
10    A        Complaint        19
11    B        Letter        153
12
13
14        REQUESTS FOR PRODUCTION
15    DESCRIPTION            PAGE
16    Piece of paper explaining        40
     Non profit status
17
18
19        INSERTS
20    DESCRIPTION            PAGE
21    Source of quotation        206
22
23
24
25

```
1                    213
2
3        C E R T I F I C A T E
4
5      I, MARY E. SANTIAGO, a Notary Public
6   within and for the State of New York, do
7   hereby certify:
8        That the witness(es) whose testimony
9   is hereinbefore set forth was duly sworn by
10  me, and the foregoing transcript is a true
11  record of the testimony given by such
12  witness(es).
13       I further certify that I am not
14  related to any of the parties to this action
15  by blood or marriage, and that I am in no way
16  interested in the outcome of this matter.
17
18
19
20       MARY E. SANTIAGO
21
22
23
24
25
```