ORIGINAL



Page 214

214

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------x

ROLANDE CUTNER,
Plaintiff,
-against-
THE LANTERN GROUP, ST. LOUIS HALL, L.P., SRO HOTEL THE ST. LOUIS a/k/a THE ST. LOUIS HALL, 319 REALTY SERVICES, LLP and 319 WEST LLC, and XYZ CORPORATION, (Said name being fictitious; it being the intention of CUTNER to designate any corporation having a legal interest in the SRO HOTEL THE ST. LOUIS),

Defendants.

---------------------x

450 Seventh Avenue
New York, New York

August 5, 2008
10:11 a.m.

CONTINUED EXAMINATION BEFORE TRIAL FROM JULY 10, 2008 of ROLANDE CUTNER, the Plaintiff in the above-entitled action, held at the above time and place, pursuant to Order, taken before Mary E. Santiago, a shorthand reporter and Notary Public within and for the State of New York.

Page 215

215

A P P E A R A N C E S:

ROLANDE CUTNER, ESQ.
Pro Se
60 Broad Street
Suite 3502
New York, New York 10004

MIRANDA SOKOLOFF SAMBURSKY SLONE VERVENIOTIS, LLP
Attorneys for Defendants
The Esposito Building
240 Mineola Boulevard
Mineola, New York 11501
BY: MELISSA HOLTZER, ESQ.

Page 216

216

S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that filing, sealing and certification be and the same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed and sworn to before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the Court.

Page 217

217

R O L A N D E C U T N E R,
the witness herein, having been previously duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION BY
MS. HOLTZER:

Q. Good morning. We're here today for a continuation of your deposition which the first day of -- which was held on July 10, 2008.

MS. HOLTZER: I just want to have this marked as Exhibit C.

(Interim Package Handling Policy was marked Defendants' Exhibit C for identification, as of this date.)

Q. I'm going to show you what has been marked as Exhibit C (handing). The extra file I gave you is for your file.

Do you recognize this document?

A. Yes, I do.

Rolande Cutner 218

Q. What do you understand what this document to be?

A. It is a notice entitled "Interim Package and Handling Policy."

Q. Do you see where it says under procedures where it says "tenants who desire the reception desk to accept packages must fill out and sign the request form for package delivery and package assistance," the package delivery assistance form?

A. No.

Q. Why didn't you fill out this form?

A. Because I talked personally, I mean during that meeting that we had and I don't remember, it was maybe September 10th or September 15th. I know it was in September, but I don't remember the exact date.

This lady from the Lantern Group as present, I think her name is Harriet Cohen and I talked to her personally so I did not feel that it was necessary to fill out the form.

Q. Do you know whether the security guards at your building were aware that you



Rolande Cutner 219

had spoken to Ms. Cohen about the package delivery?

A. I don't know. I spoke to her.

Q. Do you see under procedures after the second bullet point where it says "if you are expecting a package, be sure to check with the reception desk."

Did you ever check with the reception desk and let them know you were expecting a package?

A. Let me explain. I talked to the security guard. Every time they turn out the delivery boy, delivery of my cleaners. Instead of package we should put cleaners so my answer is yes, I talked to the security guard about the delivery boy. That's the correct answer.

Q. Do you see how at the top under where it says "St. Louis Hall," it says "September 10, 2007."

Did the security guards ever reject the delivery boy after September 10, 2007?

A. Yes.

Q. On how many occasions?



Rolande Cutner 220

A. A lot.

Q. About how often?

A. Considering that I deliver, I asked for delivery of my clean clothes twice a week, it would be twice a week, roughly.

Q. So every time the delivery boy came with your laundry they would be turned away?

A. Yes.

Q. You said that you would speak to the security guards; was it always the same security guard?

A. No.

Q. What would you say to the security guards?

A. "Where is my clean clothes?"

Q. What would they say in response?

A. "I don't know."

Q. Did you tell them that you have a physical disability and the Lantern Group has a policy where the reception desk is supposed to accept deliveries with tenants with disabilities?

A. You bet I did.

Q. What did they say in response?



Rolande Cutner 221

A. Nothing.

Q. Do you recall the names of any of the security guards that you spoke with?

A. No, because most of the time when I ask for the name, they would say, "It's not of your business, lady."

Q. Was it a different security guard each time?

A. Yes, I believe so.

Q. Do you recall last time we met at your last deposition you gave testimony regarding the bed bug policy?

A. Yes.

Q. Do you recall your testimony that none of the tenants used, took advantage of the bed bug extermination services?

A. I don't remember my testimony being exactly this wording.

Q. I'm going to show you what was previously marked as Exhibit A (handing).

Ms. Cutner, I'm going to direct you to Page 22 of Exhibit A.

A. I am with you.

Q. Do you see towards the top of the

Page 222

Rolande Cutner 222

page in the second paragraph it says, "as a matter of fact, the extermination described by the Lithan Co. leaflet that no tenants ever called that company."

Do you know for a fact that no tenants ever called the company?

A. I repeat what one of the tenants told me exactly, the sentence I repeat. You know, she said to me "it's so complicated that nobody in the building can following this proceeding" or words to that expression. The tenant talked to me to that.

MS. HOLTZER: I'm going to have this marked as Exhibit D.

(Document was marked Defendants' Exhibit D for identification, as of this date.)

Q. Ms. Cutner, I'm going to show you what has been marked as Exhibit D (handing).

Have you ever seen this document before?

A. I don't recall the document dated September 5th but I certainly recall the

Page 223

Rolande Cutner 223

document that was titled, is the Lantern Co., as of June 26th. This one I remember having seen this one.

Q. Do you recognize this document as a document that you provided to us as part of your automatic disclosures?

A. Yes. This is. I didn't recognize it because I specifically gave it to you.

Q. I want to direct you towards the second page of Exhibit D that says "service improvement schedule."

I want to point you to the third item down where it says "bed bug policy" and do you see where it says "a number of tenants have signed up and had their rooms fumigated," do you know whether or not that's true?

A. I have no way to know that. I don't know.

Q. Do you see where it says "we were outreaching to the remaining tenants to address bed bug issues?"

A. What's your question?

Q. Do you see where it says that?

Page 224

Rolande Cutner 224

A. Yes, I can read it.

Q. Did anyone from the Lantern Group ever reach out to you regarding having your room fumigated for bed bugs?

A. Tenants talk to me about that?

Q. Anyone from the Lantern Group?

A. No, I don't recall.

Q. I want to direct you to the last page of the document -- no, the next to last page, the page that says the Lithan Co.

As of June 26, 2006, is the procedure outlined here, the procedure that you're referring to in your complaint?

A. Yes, that's correct.

Q. What about this procedure did you believe was complicated?

A. I just report what one of the tenants told me. It was conversation I would say and this tenant because I believe if my memory is correct, we were talking about bed bug and I said, "Apparently there is a policy to get treated for bed bug." And this lady tenant say, "What? Did you see the policy how complicated? Nobody can follow this

Page 225

Rolande Cutner 225

policy." And she went on and on and on. And I say, "What's the policy?"

So I don't remember if she handed me this or maybe, I'm not sure if it was posted on the wall or she handed that to me, that I am not sure. But, whatever, I saw this document, I took it, I read it, and I said, "I understand what you mean it's so complicated. How in the world people are going to follow this policy?"

That was the extent, substance of the conversation, not every word but the substance.

Q. Do you recall the name of the tenant?

A. Yes, Florence Baylor, B-A-Y-L-O-R, I believe, Baylor, yes.

Q. And do you know whether --

A. Oh, excuse me. And also another tenant, Mr. Chris Santee, S-A-N-T-E-E, and I remember he said "this is a joke" that I remember because I had to agree with him. He said, quote, unquote, "this is a joke," talking about this.

Q. Did you have bed bugs in your room?

A. No, no, because I am myself, I do the bed bug every day so I would say, fortunately, no.

Q. Do you know whether this procedure is necessary in order to rid an apartment of bed bug infestation?

A. I have no idea. I am not a specialist.

Q. I want to direct you back to your complaint, Exhibit A, Page 55.

A. Fifty-five.

Q. In Paragraph 162, you allege that the Lantern Group knowingly and intentionally caused you to be harassed and discriminated against because of your disability. In what way were you harassed because of your disability?

A. In several ways but the most important is that I could not have my clean clothes delivered to the building, and as I explained, I believe I explained to you at the last deposition because of my disease, I cannot carry anything with my hand extended





'cause I would fall on the back or fall on the front.

It's very important to understand that because of my disease I cannot carry on the top of my extended arm, I cannot carry.

Q. You stated before that it was the security guards who declined receipt of your packages; is that correct?

A. I said clean clothes, you know.

Q. Right, but it was the security guards who declined delivery of your laundered clothes; is that correct?

A. Yes.

Q. What is your basis for alleging that the Lantern Group knowingly and intentionally caused the security guards to decline your clean clothes deliveries?

A. Because I spoke several times to Ms. Harriet Cohen about the fact that I cannot carry my clean clothes and I specifically tell her that it's very important because I had metal plate on my back and if I fall on my back, it's a disaster.





And I repeatedly I told her that and I even confront her also at the BSA hearing on 40 Rector Street and I confront her again at CB 7 meeting which is a Community Board 7 meeting again and several other meetings that I have to look into my memory booklet says that in a general speaking way I confront her and nothing happened and because the Lantern Group, I understand but I am not sure, of course, but understand the Lantern Group retain the security guards corporation to enforce the policy in the building. The security guard are controlled by the Lantern Group because the security guard they don't know nothing, they just follow what the Lantern Group tells them to do.

Q. When was the most recent time that you spoke with Harriet Cohen regarding your laundry delivery?

A. The Community Board 7 meeting either in July 2008 or late June. Again, I have to look at my calendar. Let's put it precisely at the last Community Board 7





meeting which I was there and she was present and she had the nerve to say in front of everybody, "I don't know this woman." This is what she had the nerve to say and I confront her facing her.

Q. She said that she doesn't know you?

A. Yes.

Q. In what context did she say that?

A. Because I confront her for the delivery of my clean clothes.

Q. You told her that you needed to have your clothes delivered and your deliveries were being rejected and she responded that she didn't know you; is that correct?

A. Let me explain. They gave me the microphone and I explain that again even this package, my clean clothes, the delivery boy of the clean clothes has been turned away. So I am talking with the microphone and they are all public and I see Ms. Harriet Cohen sitting so I walk and I said, "How come again my clean clothes are not delivered and the security guard turn away my delivery boy?"

Rolande Cutner 230

She look maybe because I don't want to say she was, was because I confronted her, she looked, she said "I don't know this woman" in front of all the community board. So I became so angry, I said, "You don't remember me?" So then a little bit shy she said, "Yes, I think I do remember you." That was I would call it a confrontation.

Q. Why do you say that she said "I think I remember you?"

A. Because we were in an environment with 25 people in the public, they're the whole community board is sitting there, everybody is looking at her. I think, so I think that she did not recognize me and then suddenly she say she recognize me. Let's give her the benefit of the doubt.

So, I mean, you know, what can I say, I mean, you know, she probably then say yes, I recognize you or something like, I mean, you have to understand. It, it was a very confrontational meeting with all the public there and maybe she was "oh, my god, maybe it's true" at the minute she did not



Rolande Cutner 231

recognize me, maybe. I don't want to accuse a person, you know. Maybe.

Q. What I meant by my question was you said that she said it a little bit shy; do you mean that she spoke quietly?

A. Shy in the sense of nervous. Her voice was not coming out. She sound like almost like a child who is under a tremendous shyness, maybe. I mean, I don't want to, you know, elaborate because I'm not sure.

Q. So in terms of the volume of her voice when she said "I remember you," did she say it quietly?

A. Very quietly, almost mumbling into her throat, I think.

Q. When she said "I don't know this woman," was she also speaking quietly?

A. Yes, yes.

Q. About how many times would you say that you spoke with Ms. Cohen regarding the delivery of your clean clothes?

A. A lot of the times and I have to look into my calendar but a lot of the times.

Q. Would it be more or less than five



Rolande Cutner 232

times?

A. More than five times. I mean, we are talking now about, let's say, the two years since the Lantern Group took over in March of 2006, then we have the whole 2007 and then we have from January 2008 until June or today.

Q. Would you say in the entire time period that you just described, would you say you've spoken to her more or less than ten times?

A. Let's say between five and ten over the, let's say, two years period and to be reasonable, say, between five and ten in a two-year period.

Q. Aside from the security guards and aside from Ms. Cohen, was there anyone else at the Lantern Group that you discussed delivery of your clean clothes with?

A. Belonging to the Lantern Group?

Q. Yes.

A. I cannot recall. Maybe but I cannot recall.

Q. Other than the delivery of your



Rolande Cutner 233

clean clothes, is there any other way that you allege the Lantern Group harassed or discriminated against you because of your disability?

A. Yes.

Q. And what other ways?

A. Again, I want to point out that the Lantern Group being the manager and legally being the boss of the security guards, I would tell it is the Lantern Group, but physically, the security guard were verbally harassing me.

Q. How did they verbally harass you, just with regards to your disability?

A. Well, "Lady, you should go to a nursing home. Why don't you go to a nursing home. You don't belong here. Fuck you, lady." And they mimic my accent.

Q. We're just talking about your disability now.

Who do you recall what security guard told you that you should go to a nursing home?

A. The name?

Q. The name or, well, do you recall the name of the security guard who told you that?

A. I have no way to know the name. They will never disclose their name. I already told you that.

Q. Okay. I have to ask: Do you recall what the security guard looked like?

A. Young, tall. He's either Black or, we say in French, light coffee, I mean the skin tone. I don't know how you say in this country, light coffee.

Q. Male or female?

A. Oh, male, definitely, definitely.

Q. Did you ever see the security guard again after that incident?

A. No, it's a different. Almost I would say, I mean I would say almost every week or almost every two weeks, I mean they are different. No, I cannot say of one specific person. They are different people. They are generally very, very obnoxious.

Q. Other than this comment about the nursing home, did any of the security guards





or anyone from the Lantern Group ever make any comments with regard to your disability that you feel are harassment?

A. Yes.

Q. And what other comments were made?

A. Like, I mean regarding to my, the way I walk, the way I proceed. Things like that.

Q. What was said about the way that you walk?

A. Same thing: "You don't belong here." Same thing: "Why don't you go to a nursing home." Things of nature, of that color.

Q. Was this the same security guard or was it different?

A. No, different.

Q. Do you recall the name of the security guard?

A. No.

Q. Do you recall what the security guard that said this looks like?

A. Tall, young. Skin color, maybe a little bit coffee and milk. We said cafT





ofT, coffee and milk skin tone. I cannot tell.

Q. But it was a different security guard than the other one?

A. Yes.

Q. Did any other security guards make a similar comment to you other than the two that you've already mentioned?

A. I cannot recall now but I can, you know, try to recall.

Q. You say in Paragraph 162 and again in Paragraph 165 that you suffered a serious injury as a proximate result of this discrimination. What injuries did you suffer?

A. Again, you have to understand that I have a mess, multiple sclerosis, and it's related to the MS.

When you are extremely upset you have a tendency to fall, you miss your step and you fall, and the more upset you become the more fall you experience, the more falling incidents you experience. So I would say being totally upset I would go out the





building and fall on the stoop, I mean being, how can I explain that being upset, being totally enraged maybe, I mean you can use this word, "boom," I fall. Then I damage my knees, I mean, no. I would say it's related to the multiple sclerosis disease, let's put it that way.

Q. When you say that you damaged your knees, that was as a result of a fall?

A. Yes, yes, definitely.

Q. Did you obtain medical treatment for the damage done to your knees?

A. No, because I fall so many times I would be to see the doctor almost every day if I fall.

Q. Other than what you've already testified to, is there any other way in which you believe the Lantern Group harassed or discriminated against you just because of your disability?

A. Can you repeat again?

Q. Sure.

Other than what you've already testified to, is there any other way, is

Rolande Cutner 238

there any other manner in which you believe that the Lantern Group discriminated against you or harassed you on the basis of your disability?

A. It would be only on those incidents but repeatedly months after months after months. That type of incident.

Q. How often -- I know we discussed the clean clothes -- how often did the security guards make comments to you about your disability?

A. Over the two years period?

Q. Yes.

A. It's difficult for me to pinpoint but over two years period, let's say, maybe ten times, you know, to be reasonable.

Q. Were all of the comments that were made similar to the ones that you testified about, about going to a nursing home?

A. Yes.

Q. So all ten of the comments were saying that you should go to a nursing home; is that correct?

A. This is what I understood. Let's



Rolande Cutner 239

say, quote, unquote, I don't belong there. Oh, and I remember another one related to the fact that I don't belong there, you know.

Another guy said, "You are cheap, you are a cheapee." I remember that he was trying to tell me and that was also related to the going to a nursing home.

The way I understood it, you know, "you are cheap, you are cheapee," something related to that. And I what I understood is because you are so, quote, unquote "cheap," you will not go to a expensive hotel because of some reason it's a SRO, you stay there because you are yourself cheap. It was something related to that because the St. Louis is the SRO and like it was extremely humiliating to me is that I selected to be in SRO because I am cheap.

Q. Why did you understand that to mean that he was telling you that you should be in a nursing home?

A. Why I understand?

Q. What gave you the impression that he was saying that because of your disability



Rolande Cutner 240

or because he felt you should be in a nursing home?

A. Because I am disabled, because I am old. I am disabled, I belong in a nursing home which is extremely humiliating when you are fighting for your life and to try to be in society, so that's humiliation.

Q. But why do you think that he was inferring that you should be in a nursing home as opposed to saying that you should be in a nicer building?

A. I have no idea except that I am disabled. It is true.

Q. He said that you were cheap but he didn't specifically say that you should be in a nursing home or anything specific about your disability; is that correct?

A. No, I would not say it like that. I would say because I am old, because I am disabled I should go to a nursing home and if I am in this, this SRO is because I am, quote, unquote, "cheap."

Q. Did he say those words to you or is that what you understood his words to mean?



Rolande Cutner 241

A. No. Cheap, cheap, cheap.

Q. What you just said about the nursing home, did he say those words to you or is that your understanding of what he said to you?

A. I mean, what kind of question is that? Anybody, -- if I, you, Melissa, somebody tell you why don't you go in a nursing home, you would say wait a minute now, do I look like a old, broken lady, no, I am a, Melissa, I am not an old and broken lady. You would be extremely humiliated so it's the same thing if somebody tell me go to a nursing home.

Q. Well, I'm not asking you how you feel; I'm asking because you testified that he said that you were cheap; that's correct?

A. This is it.

Q. He said the words "you're cheap" or "cheapee"?

A. Yes.

Q. And did he also use the words "you're old and disabled" when he --

A. No. You are asking me what, why he

Page 242

Rolande Cutner 242

say that and my answer is probably because I am not in his brain probably because it is true, I am old and because I am disabled but again, probably, I should say probably because I am not in his mind I am not in his brain. I am not sitting inside his head.

Q. Now, the other two security guards that you referenced earlier, I just want to clarify because I'm not sure, I just want to make sure that I understand.

You said that the other two security guards that you already described said to you, "you don't belong here," is that correct?

A. Yes.

Q. Now, did they use the words "nursing home" to you?

A. Yes, definitely nursing home. Yes.

Q. Both. Did they both use the words "nursing home?"

A. This is what I hear.

Q. You heard them use the words "nursing home?"

A. Yes.

Page 243

Rolande Cutner 243

Q. Other than the falling that you said you suffered because you were upset, are there any other injuries that you allege that you suffered as a result of the disability discrimination?

A. I would say specifically and I would say the soul, your soul; your injury to your soul. See, how do you say in French, we say injury to the soul, you see. It's like you are so upset you are losing confidence in yourself because let me explain a little bit because that is inside of me.

I am fighting to stay alive, I am fighting to go to work, I am fighting not to get in a wheelchair so I certainly not need somebody to tell me "you are cheapee, why don't you go to a nursing home, you don't belong here."

It destroy me inside because I'm fighting, I am a fighter. I'm not a crying baby and I am humiliated and yes, it is an injury to my soul, let's put it that way.

Q. Did you ever seek treatment from a mental health professional regarding your

Page 244

Rolande Cutner 244

injury to the soul or your emotional distress?

A. No, you mean like to go see a psychiatrist?

Q. Right, right.

A. No, I did not go to see a psychiatrist.

Q. Did you receive any treatment from a medical professional, like your general doctor, regarding any of the emotional distress that you allege that you suffered?

A. In France, yes; not in this country.

Q. Did your doctor prescribe you any medication for the emotional distress that you were suffering?

A. No.

Q. Other than the emotional distress and the falling, are there any other injuries or damages that you allege that you suffered as a result of the allege disability discrimination?

A. This is related, again, we go back to the cleaning clothes. This is related to

Page 245

Rolande Cutner 245

that because my office is in Wall Street in the financial district. Because everybody is well dressed, clean, looking good because I want to be like everybody else.

The fact that I cannot have my cleaners is, yes, it is an injury to the soul. Also because I feel humiliated in my office and running into the field to lose my office if I don't arrive clean, beautiful like everybody else in that office.

It would be different if I were working in a factory back in Ohio or Michigan. It's not that. And I am on Wall Street and everybody is well dressed so yes, the injuries is to the soul.

Q. Why are you afraid of losing your office?

A. Because everybody is professional, well dressed up and energetic type of people and I want to belong to that group of people.

Q. You're renting office space; is that correct?

A. Yes.

Q. Do you have a lease for your

Page 246

Rolande Cutner 246

office?

A. No, I have an agreement with the owner of the company, KVB Partners. I have an agreement with them.

Q. Now, are you claiming that if you arrived at the office without clean clothes that they would do away with your agreement with them?

A. You bet they would.

Q. Why do you think that they would do that?

A. Because in my office the two partners they call me -- let me give you an example, it's more easy if I give you a real example:

It's 10 o'clock in the morning, people coming from France, president of corporation. They sit in the conference room, they talk about the project and investment in New York or throughout America come up with a legal question.

Those presidents or vice presidents are French, come up with a legal question and one of the partners at KVB Partners would

Page 247

Rolande Cutner 247

say, oh, wait a minute, we call our, quote, unquote, "in house counsel" and then call on the telephone, "Rolande, would you come."

So I walk to the big conference room, I am well dressed, my hair are fixed, I have my makeup. I walk in, they say this is a French specialist whatever, who is going to explain to you and I deliver an advice, a legal advice on French law or New York law so I deliver this advice.

If I arrive smelling bad, not fixed, dirty clothes, they would say, "Rolande, you see the door, the door is over there and you immediately leave. We don't need you."

Q. What kind of company is KVB?

A. It's tax preparers, financial adviser, accounting services. They provide also all kinds of services for foreign corporation coming in New York.

Let me explain to you. A little bit complicated but I explain to you: Some corporations in Europe, they want to test the waters in New York. They don't want to enter

Page 248

Rolande Cutner 248

a lease for two years or five years or, you know, whatever, because they want to test the waters. They going to make environment for six months so what they would do, they will go to KVB, have an agreement to have an office for six months, let's say, and they work, or they invest or they look at the market for six months. Then if they understand that they product has no possibility to develop in America, they go back to France. And the other way, if they understand or see if the market is welcoming their product, they will decide after six months to maybe start on a bigger scale.

So it's very important for those foreign corporations, it could be French, could be from Istanbul, whatever to have a place for six months so KVB provide this place with legal advice, CPA accounting advice, tax advice, advise them for six months so they are very successful at that.

Q. You mentioned that they might sometimes call you in to give legal advice to some of their clients.

Page 249

Rolande Cutner 249

Do they pay you for your services?

A. No, because I tell you, I have an agreement that I am in this office and I deliver, I mean I don't like to say free legal advice because it's, how would you say a, how do you call this agreement when you change services -- I deliver legal services and in exchange they provide me with an office, telephone, fax, scanner, photocopier, conference room, desk, whatever. I mean, it's an exchange, you see?

Q. Do they also allow to you conduct your own personal business affairs such as your work with your own clients in the office space?

A. Yes, and I would have the conference room to be able to receive my clients if I have clients. This conference room would be available to me after 5 o'clock because of those before they are using the conference room but they say, "Rolande, you know you can have the conference room," which is really great for me so I can entertain my clients, and 5 o'clock is not that too late

into the evening.

Q. Are you alleging that you suffered any financial damages as a result of just the disability discrimination?

A. No. I allege that if I lose this agreement, I have no money to go and rent an office anyplace in Manhattan because it's too expensive so if I lose this agreement which we, I ask them, I said, "What do you think?" And they would say, "Oh, it's $2,000 a month," for instance. So for one year it would be 2,000 that they provide me and I provide them. Understand?

It's a very nice agreement but if I were to be thrown out on the street tomorrow, I could not afford this conference room. I could not afford your office. I could not. It's too expensive.

Q. As of today, you're still there?

A. They did not throw me out, yes.

Q. As of today you haven't been thrown out, as of today?

A. Yes.

Q. As of today, have you suffered any



financial damages as a result of the alleged disability discrimination?

A. On dollar and cent?

Q. Have you had any?

A. Yes. The answer is yes, I suffer expenses.

Q. What expenses?

A. Let me tell you, it's better I tell you like a little story because it's the way my mind operate.

At 4 o'clock, 3:30, the cleaners lady called me, "Ms. Cutner, this again, my delivery boy was turned away. Would you come immediately because the delivery boy leaves at 5:00. You have to be there at 4 o'clock and the" -- you know, "come and delivery boy will come with you."

So what do I do, I rush uptown from Wall Street, boom, and of course I have to take a taxi because, you know, it's too late.

I arrive before 5 o'clock, the lady is there, the boy is there. We both walk down and I am able to have my clothes.

So, first of all, I have to leave



my office at 4 o'clock; second, I have to take a taxi because it's late and I have to rush and no money. I take the subway and because I am disabled, I have the $1 subway ride to go back to my hotel room and then I have $22 of taxi because I have to rush.

Q. Each time that you took a taxi from your office on Broad Street to your building on the upper west side it would cost you $22?

A. It's more or less. It's $22, $23. Generally it's 22.

Q. When you had to leave your office at 4:00, did you ever have to cancel appointments?

A. Sometimes.

Q. When you cancel the appointments, were you able to reschedule them?

A. Sometimes. I would cancel just for the time and I would say, "Excuse me, I have an emergency. I be back at 6:30." Because on the way back I would, you know, immediately go back to my office and tell the client let's put back the appointment at 6:30 or 7:00, and generally my client would agree



and said, you know, "I have an emergency," you know, "excuse me." I would work around the schedule or the next day.

Q. Was there ever an instance where you had to cancel an appointment and you were not able to reschedule it?

A. Yes.

Q. About how many times has that occurred?

A. Maybe two or three times because the person was taking a plane to go back to Paris at 7 o'clock p.m. at Kennedy, could not come back or could not come back the next day.

Q. And these two or three times you weren't able to reschedule, had the meeting taken place, would you have been paid for the meetings?

A. Yes, I would charge consultation fee.

Q. How much is the consultation fee?

A. $375.

Q. If you missed three meetings, so then would your damages be three times 375?

Rolande Cutner 254

A. Yes, I would say, reasonable.

Q. Approximately how many times did you have to take the taxi instead of the subway to get to the cleaners?

A. A lot. A lot of the times.

Q. It was each time that the Lantern Group rejected the delivery that you would have to take a taxi?

A. Yes, because what happens is that the lady at the Maxene Cleaners shop, she's nice and if she sends the boy at 2 o'clock in the afternoon, sometimes, you know, instead of calling me, she would say "let's try again" because also she would say "let's try again at 3:00," so she send back again the delivery boy and sometimes they accept it; sometime they turn it away again the delivery boy.

It's, you cannot tell. There is no specific day but sometimes she would tell me, you know, "Ms. Cutner, I had to send three times the delivery boy before and then accept so I did not call you." So sometimes she, she really tried to help me. She, you know,



Rolande Cutner 255

send two, three times and she would call me willing, that also she told me, "I called you, I send my delivery boy two, three times they turn your delivery boy away and so I have to call you."

Q. Would you say that you had to take a taxi once a month or more than that?

A. More than that.

Q. About once a week, would that be accurate?

A. It depends. As I said, we would say, reasonably over the years, if we say once a month, it's more than that, you know, and but I cannot pinpoint of the time because I don't write it down in my book, you see, but let's be reasonable, at least twice a month. Be reasonable, being reasonable, twice a month.

Q. I want you to take a look at the next page, Page 56.

A. (Witness complies.)

Q. You say in Paragraph 169, the fifth line of that paragraph, you say that such activities constitute a pattern and practice



Rolande Cutner 256

of discrimination targeting individuals on the basis of their ethnic origin; are you alleging that anyone other than you was targeted on the basis of their ethnic origin?

A. I think I had a tenant talking to me who said that he was badly treated because he's an African from one of the countries, African countries, I don't know, I don't remember if it was Cameroon or I could not tell but he talked to me in French and he felt he has been badly treated. I have to recall but I remember the guy telling me that.

Q. Do you recall his name?

A. I have to look at my book. Right now I don't recall but if I look into my note maybe I find his name.

Q. In what way did he tell you he was treated badly?

A. I think that he said that because of ethnic origin like he was Cameroon or Mali, I mean, I cannot remember but it was an African country.

Q. Did he say what the Lantern Group



Rolande Cutner 257

was doing to him that he felt was poor treatment?

A. He did not elaborate but he was telling me he was treated badly.

Q. Did anyone else ever tell you that they believe that they were treated badly because of their ethnic origin?

A. I just remember this conversation with this young man and I'll try to find his name.

Q. In what way do you believe that you were treated differently from other tenants?

A. Also, you know, let's talk about my accent because I have a French accent so I can pronounce the T-H, it goes like a Z. It's difficult for me. Also, the R because a French R is, for instance, if I say "where is the rest room people," don't understand what I say. I have to say "where is the ladies room" because if I say rest room because of the French R, people don't understand me.

And this guy, I believe from the Lantern Group, Felix, I think his name is Felix, he always mimic my accent and make me

feel bad regarding the fact that I cannot pronounce Z. He would say "go Z" to mimic my accent.

Q. And on how many occasions did Felix mimic your accent?

A. Well, I remember two times that I really was furious but maybe other times or he was laughing, you know, and I know, I mean, the French accent is maybe laughable. He was laughing uncontrollably because I was so mad and, of course, I do understand that the French accent can make people laugh but to me is, again, regarding humiliation. What I'm trying to say is that he was not mean, he was, quote, unquote, he was just laughing, laughing at me or at my accent, to be fair. I'm trying to be fair.

Q. Is there any other way in which you allege that the Lantern Group treated you differently because of the fact that you are French?

A. Yes. You know, they would say, "Why don't you return to your own country," that I remember. I was humiliated,



specifically because I am an American citizen and it's not a reason because I am, I have an accent and I can't pronounce the T-H and I pronounce it Z that I should receive unsubtle remarks of "why don't you return to your own country." That, I don't accept that.

Q. I believe you testified last time that it was a security guard that said that to you; is that correct?

A. Yes, yes.

Q. Do you recall what the security guard who said that to you looked like?

A. No.

Q. On how many occasions did a security guard say to you, "Why don't you return to your own country?"

A. Once.

Q. Other than what you've testified to, is there any other way in which you believe that the Lantern Group discriminated against you because of the fact that you're French?

A. I would say, say it's the accent. This is only specific. I recall it would be



that in my memory.

Q. Is there any other way in which other than what you've already testified to, is there any other way in which you feel you were treated differently from the other tenants in the building?

A. Yes, I mean, you know, the fact that they make fun of my accent, nobody has the heavy accent that I have, so of course I felt totally treated differently because of that.

Q. On the next page in Paragraph 171 you say that as an approximate result of the discriminatory actions because of your national origin you suffered economic loss; what was the economic loss that you suffered?

A. This, maybe I use the wrong word but this is the, you know, the losses I spend this money in taxis that I would not spend if it were not in this situation. I would take the subway. I would never take a taxi.

Q. So it's the same that you already testified about, the same economic damages?

A. Yes. It's money coming out of my



pocket, I would say.

Q. Is the mental anguish the same mental anguish you already testified about?

A. Yes.

Q. What about the deprivation of civil rights, is there anything other than that you already testified that you believe was a deprivation of your civil rights?

A. Yes. I have my newspaper delivery, we did not talk about that but this is my right to have my newspaper delivered and especially it is the New York Law Journal. Now it is delivered, the New York Law Journal is delivered to me. I could not have it delivered. It was thrown on the street and finally, I ask my office to have permission to have it delivered into my office. But why I cannot have my newspaper delivered at my room or in the hallway, you know, why not? Why do I have to have delivery in my office?

And same thing goes also for Federal Express. I mean, let's say Federal Express, newspaper, the New York Law Journal, the cleaners, you know, I arrange all with my

Rolande Cutner 262

office except for the cleaners. I'm not going to deliver the cleaners at the office but the newspaper I arrange to have delivered at my office. The Federal Express I arrange to have delivered at my office except, for instance, I lost my Metro card so I went to Stone Street and I gave the MTA, a representative, the address in my office and the representative said to me, "no, no, no. We want your address in your home" so I gave the address 319 West 94th Street, Room 341 and every day I'm asking, "Did you receive this letter from the MTA, I need my card, it's very important." Because the MTA said, "We'll send the card to the residence, not to office." And I wait and wait and wait and wait and wait and wait. Never arrive.

So I had to go back to the MTA and I said, "send it again." So we send it a second time and every morning I would tell the security guard, "make sure," you know, "my card is going to arrive." And finally the card arrived and I was able to have it but, I mean, but why do you have to go



Rolande Cutner 263

through all this headache for a simple civil right that any New Yorker in all New York has a right to have the mail delivered normally and the newspaper delivered normally? This is my complaint.

Q. Now, with regard to the newspaper, was delivery of the newspaper rejected or was it that the newspaper was delivered to the building but at some point after it was delivered, the newspaper got lost or something along those lines?

A. I think the newspaper issue was rejected by the security guards.

Q. Why do you believe that it was rejected?

A. Because I called the New York Law Journal to complain and they said that they talked to the delivery services and that at the building they were always rejected or turned out, whatever so they say, "well, we tried, Ms. Cutner, we tried to deliver but our guy is rejected or the paper is thrown on the street," I mean, "so we stopped."

So they stop to deliver at this



Rolande Cutner 264

address because of that and then I said, "Don't worry, you can deliver at my office." It was that type of conversation.

Q. What do you mean when you say that it was thrown in the street?

A. Because I asked, "Where is my newspaper?" They say, "I don't know."

Q. Who threw it in the street?

A. I don't know, I don't know. I ask. I ask.

Q. How do you know that it was thrown in the street, did you see it in the street?

A. No. If it went in the street I would have picked it up.

Q. Was it that the delivery boy was told you cannot leave this paper there or was it that the delivery boy would leave it and then someone would throw it out?

A. I think, but again, I did not witness the incident, but I think the security guard would turn away the delivery boy for the newspaper. But I think because I was not a witness.

Q. Do you recall who you spoke to at



Rolande Cutner 265

the New York Law journal that told you?

A. No, no. I just spoke on the telephone and themselves say first, "wait, we are going to investigate." And they did investigate with their own system of delivery in this neighborhood that I told them to call me the next day or something like that because themselves, they did not know what's going on with the delivery.

Q. And where did you get the phone number to call New York Law Journal?

A. On the paper.

Q. Was there a specific department that you had to call, like description services or something like that?

A. I think I call the general number and they would dispatch you to whoever is in charge of delivery for the subscriber, I think.

Q. Did this continue after the package handling policy that is marked as Exhibit C?

A. Let me look at the date. September 10th. It was before because at that time on September 10th I arranged to

have my newspaper delivered to my office so it must have been between January to during that period of time probably because I remember I arranged to have it delivered.

I was so upset because, you know, the newspaper is so expensive and it's an important tool for my work, you see, and every day -- I have to read it every day so it's an expensive newspaper and I was very upset.

Q. I just want to clarify: At the time of the date listed on Exhibit C, September 10, 2007, you were already receiving your New York Law Journal at your office?

A. Yes, yes. I already because we had this business dispute before September 10th, yes.

Q. At the time of this package handling policy, September 10, 2007, were you already receiving your Fed Exes at your office as well?

A. No, at that particular time I know for sure that I already arrange my, my paper



to be delivered in my office.

Q. Do you recall whether you already arranged for your Fed Exes to be delivered to your office?

A. No, no, not that particular date.

Q. No, you don't recall or no, it happened after September 10th?

A. We are talking about what, now?

Q. The Fed Exes.

A. No, I don't recall.

Q. Were your Fed Exes rejected or were they just lost or damaged once they were delivered?

A. I think they were rejected and I had, yes, I remember not only FedEx but UPS and that I remember I had to go to the UPS to take my packages. That I remember. I went to the UPS center. That I remember specifically that, yes.

Q. On how many occasions were you FedEx or UPS packages rejected?

A. Well, let's take from the January 2007 until let's take until the September 10th, I went maybe two or three



times.

Q. Do you recall whether a signature was required for the packages?

A. Well, when I went to the center, I signed, yes, and I even had my passport. That I remember. I had my passport and I signed because I want -- because you understand that I don't drive because of my disease so I don't have driving license. However, I have a passport so I would present myself with a passport and say "yes, I am Rolande Cutner" and I sign and pick up my packages and my UPS boxes, whatever but now, I have everything at the office. I learned my lesson.

Q. When was the last time you had a UPS or FedEx package rejected?

A. Probably, let's say, maybe April 2007 or, I mean, I cannot pinpoint the exact date but it's between the period January to the Summer.

Q. January of 2007?

A. Yes.

Q. When was the first time you



remember having one of your packages rejected?

A. In April.

Q. April of '07?

A. 2007, yes; it was the UPS.

Q. When did the Metro card incident occur?

A. That was in November 2007 but not sure. I have to verify but probably November 2007.

Q. Did you ever learn why you didn't receive the first Metro card in the mail?

A. I went to complain to the MTA on Stone Street and they said no, no, no, it's not our fault. We have sent the Metro card to your residence address. This is the rule and they said they had sent it.

Q. Did they have any record of your Metro card being rejected or withdrawn?

A. Probably what we could do is to ask MTA when was it that I had it renewed because probably they know that through the MTA office they know that because I remember this discussion about whether or not I could have

Rolande Cutner 270

delivery to my office and they said "no, no, no. It has to be your residence," so maybe if you would ask MTA they probably have that in their archive. I mean, because I remember they told me, "we send it to your residence." It was adamant. The representative was adamant.

Q. Did the representative say whether the Metro card had actually been delivered to your residence or just that he sent it?

A. He said it sent it to my residence. That was a rule. That's what he said. I follow the rule because I said "send it to my office." He said "no, this is the rule. It's a residence." So what can you do?

Q. Other than what you've already testified to, is there any other way in which you believe your civil rights have been violated other than what you've already told me about?

A. I mean to me the delivery dispute is so important; it is the newspaper, packages, FedEx. It's my life so on that particular light I would say, say my civil



Rolande Cutner 271

right, the right to live in society and receive your mail at your residence has been violated.

Q. You also referenced the prospective loss of your room in the SRO hotel; in what way, other than what you've testified to last time, is there any other reason why you believe that you were faced with prospective loss of your room?

A. Yes.

Q. Why do you believe that you were faced with the loss of your room?

A. Because being a permanent tenant in the SRO I pay $500 every months and that amount of money I can pay. Now, I know the Lantern Group said "don't worry, we renovate the building and you will have a studio and you go under rent stabilization law so Ms. Cutner, don't worry."

That's the position of the Lantern Group and I said wait a minute, because if I have a lease with the Lantern Group, right now, I don't have a lease, I am a permanent tenant, if I have a lease, the lease will be



Rolande Cutner 272

one year and after one year, if the Lantern Group say out, we don't give you a lease after one year, I be thrown on the street because I cannot pay more than $500 a month and I am terrified of that because the lease will be contractual and if the Lantern Group say "Ms. Cutner, we don't renew your lease," how am I going to find a studio for $500. I don't know, I'm scared because if the Lantern Group give me a lease, it will be a one-year lease and then they can always decide you are out and I want to point out this because this scare me.

Let's look at Exhibit C: "Note, this policy is currently applicable and management reserves the right to revise or change it as appropriate upon the review."

This sentence is very scary to me. Let me explain to you why. Because the Lantern Group always renege, always has been my experience that they renege on the agreement and they always say, the Lantern Group say, "I reserve the right to change the policy" and if they give me a lease for one



Rolande Cutner 273

year, they would say "Ms. Cutner, you knew that, we reserve the right to change," "Whop, boom."

Q. This note is with regard to the package handling policy; is that correct?

A. Yes, yes but it is always the same thing with different instances and I have to look into my file but it's always the fact that the Lantern Group say yes and then they reserve the right to change and that is scary. It's a very scary.

Q. Who from the Lantern Group told you that after the renovation you would have a lease instead of being a permanent tenant?

A. I think the Lantern Group issue and again, I don't have my file in front of me, but the Lantern Group issue a policy and say "don't worry to the permanent tenants" not only me but I believe they say "don't worry. When the renovation will be completed you will have a lease." I believe and again, I have to look into my file but I think the Lantern Group at one point says that to everybody, "you will have a lease."

Page 274

Rolande Cutner 274

Q. Did anyone from the Lantern Group ever tell you that your lease might not be renewed at the end of the leased term?
A. You mean talking to?
Q. Yes.
A. No. I read it in, as I said, I read it in this policy and again, I don't have the paper in front of my eyes but according to my memory, I am looking at "we reserve the right to change the policy" and I immediately start to feel because of that sentence, you see.
Q. Do you still have a copy of this policy that was given out?
A. I have to look. I don't know. I have to look through my file.
Q. I'm going to ask for the production of the policy that you just referred to.
A. If I find it, I send it to you.
Q. Did anyone at the Lantern Group ever tell you that you might lose your room?
A. It was at one point if my memory is correct, I don't know if it is Felix or this lady Harriet Cohen, I don't remember, or

Page 275

Rolande Cutner 275

Felix or the other guy, this Mr. Chabab, C-H-A-B-A-B, I think is the one, either Felix or this Mr. Chabab one day said, "Well, you have to move to the Huntermoon building to be relocated." It's some kind of sentence like that to be relocated to the Huntermoon building which belong to the Lantern Group.
Q. The relocation of Huntermoon was for while the renovations were taking place; is that correct?
A. I understood that.
Q. Did they ever tell you that you wouldn't be moved back to St. Louis Hall after the renovations were completed?
A. That I have to look at this paper because I think they say then you go back to the St. Louis Hotel which is going to be a studio apartment. I think it says that in the policy but I don't recall exactly but I think it says that, "You move to the Huntermoon and then after you go back to the hotel."
MS. HOLTZER: I'm going to have this mark as Exhibit D.

Page 276

Rolande Cutner 276

(One-page document was marked Defendants' Exhibit E for identification, as of this date.)
Q. Ms. Cutner, I'm going to you what has been marked as Exhibit E (handing).
Have you ever seen this document before?
A. I don't recall but no, I don't recall.
Q. Is this the policy that you were just referring to?
A. No, it's not, no, because the one I recall it was a question that we would be moved to the Huntermoon building which also belonged to the Lantern Group and I don't see the it. I don't see it here but if I find the paper, I certainly show it to you.
Q. This document was provided to us along with your automatic disclosures so you had provided us with this document; do you see where it says what is there now?
A. Point 1, Section 1.
Q. Is says that 53 permanent tenants,

Page 277

Rolande Cutner 277

and 11 temporary tenants and 85 vacancies; do you see where it says that?
A. Fifty-three permanent tenants, is that where you are looking?
Q. Yes.
A. I see.
Q. There are more vacancies in the building than actual tenants; is that correct?
A. I don't know.
Q. It says there that there are 85 vacancies and there are 64 people living in the building?
A. Right.
Q. Isn't it correct that there are more vacancies than there were tenants in the building?
A. I don't know that because, as I said, there is a lot of the, on the elevator, of Mexicans going up and down, going up and down. My answer is I don't know if there are 85 vacancies.
Q. Do you have any reason to believe that there are less than 85 vacancies?

Rolande Cutner 278

A. I have no idea for the number because I see people up and down the elevator.

Q. Do you have any reason to believe that there are more than 11 temporary tenants?

A. Again, I don't know.

Q. Do you have any reason to believe that there are more than 53 permanent tenants?

A. That number I don't know because I talked to some tenants who said to me I am a permanent tenant so when I talk to them and they say I am a permanent tenant, I say okay but I cannot say I did not, you know, count 53. I don't know what my answer is. I don't know.

Q. Now, you testified previously at your first deposition that a representative from the Lantern Group had told you that the building had some financial difficulties; is that correct?

A. Yes.

Q. Wouldn't the fact that there are 85



Rolande Cutner 279

vacancies in the building contribute to some of their financial difficulties?

A. I have no idea.

Q. If an apartment is vacant, doesn't that mean they cannot collect rent for that apartment if no one is living there?

A. I don't know. I did not look at their balance sheet. I did not look at their accountings proceeding. I don't know. I don't know.

Q. Well, if a room is empty, you know, if no one is living in a particular room, doesn't that mean that there's nobody there to pay rent for the room?

A. Well, if they have a illegal Mexican immigrants living there and paying cash, they can say that we have a vacancy and it is not true so I don't know what the reasoning is. I don't know.

Q. Well, do you have any reason to believe that there were 85 vacancies in the building?

A. As I said, I don't know. I see a lot of the people go going up and down the



Rolande Cutner 280

elevator who are Mexican, who don't speak a word of English and if I talk to them in Spanish because I know two or three words, they would answer me in Spanish so the only thing I can say, they were up and down the elevator so they probably live there.

Q. And couldn't they be one of the 11 temporary tenants or one of the 53 permanent tenants?

A. I have no idea.

Q. But if a room is vacant and there's nobody living in the room, doesn't that mean that the Lantern Group isn't collecting rent for that room?

A. Yes, but I don't know. I have no way to know their accounting records but I know that I confront, what is his name, Rafal Markwat.

Q. Mr. Markwat?

A. M-A-R-K-W-A-T, that's his name, I confronted.

Q. What did you say to him when you confronted him?

A. That was because at one point he



Rolande Cutner 281

said, "Well, if you were paying your rent," -- no.

I confront him because of the terrible state of the building -- no repairs, C violation, whatever, and he said, Well, if you were paying your rent, we would not be in this terrible situation."

And I said, "What, I pay my rent every month." I mean, I pay every six months. I deliver $3,000. "Don't tell me that I don't pay my rent."

Q. You testified previously that you don't know whether the other tenants were paying their rent?

A. Yes, I don't know about that.

Q. Do you see under the bullet where it says all 53 existing tenants, do you understand that to mean all the 53 tenants above?

A. I understand.

Q. Does it indicate the Lantern Group intends for you to still live there after the renovation?

A. I say that it reflect that but for

one year.
Q. Where does it say for one year?
A. It will be a lease, this is what I understood. It will be a one-year lease.
Q. So it's your understanding that it was for a term?
A. Yes, it was my understanding that it was one-year lease, right. Let's say that. That is what I understood.
Q. Then do you see where it says Point 6, "how the renovation plan will impact current tenants?"
A. Point 6, "how the renovation plan will impact current tenants."
Q. And up the first bullet point it says that "tenants will be moved within the building and a minimum of seven tenants will be relocated to a nearby building."
Is that what you are referring to that you spoke with one of the tenants and you were told you would be relocated to Huntermoon?
A. Oui, oui. Yes, yes.
Q. I want to go back to Exhibit A, the



complaint.
Now, in Paragraph 173, you said that the Lantern Group knowingly and intentionally made false statements and admissions of material fact to you regarding the future development of the SRO; what false statement do you allege they made to you?
A. Because they say that they will renovate that at the beginning in 2000, in March 2006 they say we be renovating, you know, the rooms and the building and they did nothing. They said, "Don't worry, we will renovate," you know, "and everything will be beautiful." And nothing happened.
Q. Do you know whether they still plan to renovate the building?
A. I don't know that.
Q. Do you know whether the Lantern Group has taken any steps towards renovating the building?
A. Nothing that I see but I don't know.
Q. Do you know if they have looked for any contractors or anything along those



lines?
A. I don't know. I have no idea.
Q. Do you know if at the time that they first mentioned the renovation in March of 2006, do you know if at that time they believed that they would not actually be renovating the building?
A. I don't know.
Q. Do you know whether this was an intentionally false statement that they made in 2006?
A. Oh, yes, I believe. I believe it was not true. I believe it was false.
Q. Why do you believe that it was false?
A. Because they did nothing and they pack the building with those, quote, unquote, illegal Mexican immigrants, whatever; let's say Mexican because when I talk to them in the elevator in Spanish and I said from what country are you from and they say, "I am from Mexico."
Let me explain. It's why I felt it was misrepresentation because I am living in



this building so every day up and down the elevator I meet Mexicans and, to me, how is the Lantern Group pack this building with Mexicans, whether they are illegal or not, I don't know, but why they would pack people when at the same time they say we are going to renovate? Doesn't make sense so in that particular way I would say they tell lies, they tell anything. Who knows what, what's going on. I would say, you know, because they pack the building with those people.
Q. So your basis for believing that the Lantern Group did not intend to renovate the building is because they packed the building with the Mexican residents; is that correct?
A. That was one of my understanding or beliefs.
Q. Do you have any other reason to believe that the Lantern Group did not intend to renovate the building?
A. No, it was related to all this wave of Mexicans coming and with their lamp and their bed and the elevator was, you know,

Page 286

Rolande Cutner 286

with a lot of the those people coming in with their belongings. It was like a, we use the word "exodus," you know what I mean, exodus with their lamp and their luggage and, you know, like an exodus. I would use this word.

Q. Now, other than the statement in March of '06 that the Lantern Group was going to renovate the building, are there any other statements by the Lantern Group that you allege were false?

A. Well, I would say, you know, that that was the main statement that I understood was false.

Q. Can you recall any others, other than what you've already testified to?

A. I cannot recall.

Q. You also referenced omissions of material fact; are you also referring to the March '06 statement regarding the renovation here?

A. Yes, yes. It was all, I would say, a pattern. Let me use the word, it was a pattern to me. It was illogic that you tell "Oh, I am demolishing the building, I am

Page 287

Rolande Cutner 287

going to renovate" and then you see this wave, this exodus of people with their luggage and their lamp going into the building. To me, it did not make sense.

Q. In Paragraph 174 you say that you relied on the statements and omissions; in what way did you rely on their statement that they were going to renovate the building?

A. Because, you know, if were true that they would renovate quickly the building and that we would have a nicer environment to live, you know, if it were true, then it would have been all right but very quickly I was under the impression that they were telling lies so that was my feeling, my impression.

Q. You also alleged that you suffered damages as a result of your reliance on their statement; what damages did you suffer?

A. Yes, because, you know, if you are in this situation that you cannot, you believe you are going to live in a nice environment then you don't make, how would you say, program to look for another

Page 288

Rolande Cutner 288

apartment, for instance, or to decide, you know, where to go to live or whatever to make a plan for your immediate future because you believe what they say at the very beginning and then so then maybe, you know, you would lose an apartment at the same price and you know a thousand in Manhattan, how the price is going up and so you lose your apartment to maybe rent at 500 some place else and then it's increasing in the rent, in this neighborhood and then you lose your apartment so then it's lost. It's going to be closed I would say.

Q. Was there any point from March 2006 where you learned of another place where you could have rented for 500 a month?

A. At the beginning I did not look because I figure it's going to be a quick renovation and I can stay there so I did not look but maybe I should have at that time looked. I don't know. I did not. I did not look. I did not look.

Q. Did there come a time where you did start looking for another apartment?

Page 289

Rolande Cutner 289

A. Well, during the year 2007 the situation was so terrifying and upsetting to me that I was looking to find something at 500 in Manhattan because for two reasons:

Since I am disabled, I don't want to be in Harlem, in Washington Heights, in the Bronx, in Brooklyn, in Queens because of the fatigue. I have to be in Manhattan and I could not find for $500 in Manhattan.

Q. Do you have any reason to believe that had you looked in March 2006 you might have found something for 500 a month in Manhattan excluding Harlem and Washington Heights?

A. Maybe, maybe.

Q. Other than what you've already testified to, were there any other damages that you suffered as a result of your reliance on the Lantern Group's statements about renovation?

A. No. I am talking about finding another place to live for $500, you know.

Q. On page 58 you say that the Lantern Group made false and misleading statements

with regards to violations of New York City council local law and the New York City administrative code; who do you allege they made the false statements to?

A. Well, I would say I recall a conversation with this manager Rafal Markwat and again, you have to understand it's a confrontation situation and I probably, I don't remember the exact wording but the substance of the conversation is, if I may testify to that, substance of the conversation I was telling him "you are harassing me, you are, you do harassment. You harass people like me." And I don't remember exactly the words but the substance is, "you will never get a certificate of non harassment." I said that to him in a confrontation, "you will never get a certificate of non harassment" and he answer, "ha, I don't need to obtain" or he says owner. I mean, I could not say the exact words understand but the substance of that, "I don't need it" or the owner don't need it. "The owner is a non for profit corporation,



lady." So that cut me cold. I am telling you.

So what I did, I went and this is why I notice administrative code because you know, I said okay, maybe I am, I am going to look at the code. So I went to the New York law library, I look at the code and I see, you know, that the non for profit organizations there is a waiver they don't have to obtain a certificate of non harassment so the owner did not have to obtain a certificate of non harassment so in that particular sentence Rafal was right, he said, (impersonating), "we don't need to obtain a" -- meaning the owner doesn't need to obtain a certificate of non harassment. So at that particular point he was right and I said," This is incredible. It has a waiver. That's incredible."

And then I said to myself maybe he's telling me that to quiet me down but maybe the owner is not a non for profit corporation so it start from there that I start to question the legal status. It start



from this conversation.

Q. The false and misleading statement that you are referring to in Paragraph 178, is that the statement Rafal made to you that you're referring to?

A. I would say when he said to me, "I don't need to obtain a, obtain of certificate of non harassment," I understood because they were a non-for-profit organization, you see.

Q. What is the false and misleading statement that you're alleging that the Lantern Group made?

A. Because if they are not a non-for-profit organization then if they don't have the statutes, they don't have the waiver, you know, they have to obtain a certificate of non harassment.

Q. Then are you alleging that the false and misleading statement was made to the City, who are you saying that the false and misleading statement was made to?

A. New York City to me.

Q. And do you have any reason to believe that the Lantern Group is not a non



profit?

A. This is a tricky situation because the Clover Developing Corporation lost the status of non profit organization and they purchased the building and they lost their status.

Q. Do you know when they lost their status?

A. I think they lost it in 1996 but again, I don't have my file. Again, I have to look.

Q. Do you know whether the Lantern Group ever lost their non profit status?

A. I don't know. I don't know. I have to look at the file.

Q. As far as you know, is the Lantern Group recognized as a non profit organization?

A. I don't know.

Q. Do you have any reason to believe that the Lantern Group is not recognized as a non profit corporation?

A. Again, I don't know. I have to look at my file.

Rolande Cutner 294

Q. You say that you reasonably relied on the statement that the Lantern Group was a non profit organization; in what way did you rely on the statement?

A. Rafal told me that; Rafal Markwat.

Q. You also allege that you suffered damages; what damages did you suffer as a result your reliance on Rafal's statement?

A. Because as I said, if they were non profit organization -- no, let me put it -- they are non profit organization and they harass people.

Q. Are you alleging that the damage that you suffered was the harassment that you already testified about?

A. Yes, yes.

Q. Are you alleging that you suffered any financial damages as a result of your reliance on or filing a statement about being a non profit?

A. I would say that the damages is the one that I already testified to.

Q. Regarding the apartment search, which damages are you referring to, the taxi?



Rolande Cutner 295

A. The taxi whole thing. The fact that also you know, I am buying every week insect product to kill the bed bug that I buy but that you can see in my disclosure I gave the bill of insect product, I think you have it on my production document, I think to protect me against the bed bug.

MS. HOLTZER: Please mark.

(Disclosure statement was marked Defendants' Exhibit F for identification, as of this date.)

Q. Showing you what is marked as Exhibit F (handing).

Do you have to buy the insect products every week?

A. Yes, I do, I buy it. I mean I would say every two weeks. It depends, you see.

Q. Do you always buy the same brand of insect product?

A. Yes, I am satisfied with this insect killer.

Q. What is the name of the brand that



Rolande Cutner 296

you buy?

A. Well, you have it on your, you know, I don't have it in front of me. You have it. You have the --

Q. Interrogatories?

A. I think if you look into your file you'll find it.

Q. Other than the money that you spent to buy the insect products and the damages that you've already testified about, are there any other financial damages that you allege that you suffered because of Rafal's statement that the Lantern Group is a non profit?

A. No, I don't recall.

Q. I'm going to direct you to the next page, Page 59. You say that the Lantern group violated your rights to minimize the hardship of your relocation; what hardships have you suffered because of the relocation?

A. I don't understand the question.

Q. You say that you bring this action seeking injunctive relief damages and cost against the Lantern Group for violation of



Rolande Cutner 297

Cutner's rights to minimize the hardship of her relocation during the renovation of her room; what are you referring to in that statement?

A. The same thing. I mean, the same damages that I indicated before.

Q. So the hardships that you're referring are the hardships that you already testified about?

A. Yes, yes.

Q. When you say that the Lantern Group is in reality a private developer, what is your basis for this allegation?

A. I think somebody told me I was -- I repeat some of the statements from the other permanent tenants like for instance Mr. Chris Santee was one of the permanent tenants who would tell me things like that because he has been also very upset and looking into the Lantern Group, I believe.

Q. What exactly did Chris Santee tell you regarding the Lantern Group status as a private developer?

A. He told me that the Lantern Group

Rolande Cutner 298

had also a building that they bought, that they were in this business of buying other buildings and he told me about that, about buying other buildings.

Q. Did he tell you whether or not the buildings that they were buying were going to be used for non profit purpose?

A. Well, not exactly like that. He would say there is some kind of fraud going on, on the fact that they bought several buildings and they are under false pretense of helping the poor. I remember he said false pretense of helping the poor. That I remember in the conversation and that I think he mentioned at least four different buildings and that was a substance of the conversation.

Q. Did he tell you what those four buildings that you referred to were being used for instead of helping the poor?

A. No, he did not elaborate on that.

Q. Did he tell you where he got that information from?

A. No, he didn't say.



Rolande Cutner 299

Q. Other than the conversation you testified to with Mr. Santee, is there any other reason, basis for your belief that the Lantern Group is actually a private developer?

A. I also spoke with the lawyer of the SRO law project.

Q. Is that Mr. Islam?

A. M. Islam, yes; Shafaq Islam.

Q. What did you say to Mr. Islam?

A. Same thing about, you know, how upset I was, what was going on in the building and that the Lantern Group packs the illegal Mexicans, that we were suffering a lot and I explained the situation of the building to Mr. Shafaq Islam on the specific incident where he had participate in a memorandum of understanding with the Lantern Group and his signature was at the bottom of this piece of paper and this is why I want to talk to him because when I saw his signature down this memorandum of understanding, of course, I became very upset and I immediately request an appointment and I went to see him.



Rolande Cutner 300

Q. What did he say to you in response to your concerns?

A. He said that after October, I think October 27th but, again, I have to look at the date book, after October 27th when he sign this memorandum of understanding, let's call it that, memorandum of understanding, after October, I think October 27th, they were not anymore in negotiation with the Lantern Group regarding renovation of the building and protection of the permanent tenants and that negotiations were dead and that they were not anymore, negotiation, group of advisory people, that SRO Law project was not anywhere involved because the Lantern Group was not coming truthfully to the negotiation and that yes, after the 27th of October, there were not anymore negotiation with the Lantern Group and he said also that if I pursue it, he will come, and I said "would you testify to what you just said" and he said "sure, I have no problem with that."

Q. And did Mr. Islam tell you during



Rolande Cutner 301

this conversation that the Lantern Group is not a non profit organization?

A. No, we did not talk about this particular. He just said that the SRO law project kind of withdrew from the negotiation because they had the feeling that it was going nowhere.

Q. Other than what you've already testified to, is there any other way that you relied on these misstatements that you allege were misleading?

A. Tell me again.

Q. I'll rephrase.

Other than what you've already testified to, is there any way in which you relied on the statements that the Lantern Group was a charitable organization?

A. Other than what we discussed already?

Q. Right?

A. No, I don't recall. I don't recall.

Q. Other than what you've already testified to, are there any other damages

that you suffered?
A. I don't recall.
Q. I'm going to direct you to the last page of the complaint. You say that you're requesting an order that the management agreement between Capital Resources and 319 West Street, LLC be declared void and unenforceable; what agreement are you referring to?
A. Management agreement.
Q. Why do you believe that the Court should declare this agreement void and non enforceable?
A. Because of the fraud.
Q. Is that the fraud that you already testified to, that you just told me about?
A. Yes.
Q. In Section C you say you want to award accrual damages pursuant to the first and second cause of action in the amount of $100,000; what is your basis for seeking $100,000?
A. Related to the agreement I have from my office, I would say renewing the



office is $2,000 a month so that would come to $24,000 a year and then if I lose my office and if I have to find another office in Manhattan, it would be very, very expensive for me to find a new office so I came with this number comparing the price of offices in Manhattan.
And also which is important, I am 73 years old. I'm planning to work ten years ago until 83 and if I had to find another office and work ten years, you know, I would need the money to pay for the office for ten more years and if I lose this agreement with the KVB partners then I am really very, very in a difficult position to find office that was related to the losing the office space.
Q. Other than what you've testified to before regarding the fact that if you might not have clean clothes you may lose your office, is there any other reason why you believe you might lose your office?
A. Well, I mean, you know, the fact that I am so upset, I'll be totally upset and then I'll lose office and it will be terrible



hardship for me.
Q. You also in Section D you say award statutory damages pursuant to the first cause of action in the amount of $100,000; what is your basis?
A. Because I am a disabled person. I have disability and, you know.
Q. You also allege in Section E punitive damages pursuant to the first and second cause of action in the amount of $300,000; what is your basis for asking for $300,000 in punitive damages?
A. I understand that if you, if the Lantern Group is acting in such strategy way so that a jury can award punitive damages to others, as an example to other corporations who pretend to be non profit, pretend to help the poor and as a matter of fact not doing that, it would be an example for other corporations and then I understand that the $100,000 that I am asking for my own damage could be and again, that's up to the jury not me, the judge, the jury could decide it is three times the damages that this lady



suffered but that will be to frighten other corporations to do bad steps.
This is what I understood that the punitive damages is, to frighten other corporations to do something bad, not for me and it will be three times the damages. This is what I understood but I could be wrong and it's the nature of the jury.
MS. HOLTZER: Let's take a five-minute break.
(Whereupon, a recess was taken at this time.)
Q. Ms. Cutner, I'm going to refer to you Section F, the last page of the complaint, Exhibit A. You say you would like the Court to award you cost and expenses; what have your cost and expenses been so far?
A. That's a process server I understand and I don't have the file in front of me but I understand it's $395 an hour, something like that, process server; the taxi when I go to the court. So from either from my office or from my home, like, we went, I went there for the process fees -- let me

see, one for the process fees then I went there when I filed a default judgment then I went there in January when we had the hearing then I went there --
Q. Sorry to interrupt you. Hearing, meaning the initial conference?
A. Yes, initial conference, January 9th, I believe. And then we went there again lately. When was that?
Q. The status conference?
A. July, something like that. So for time back and forth with the taxi. I mean the big, big expenses was the process server, the taxi to go back and forth. What else? I don't think, I don't think because I'm a lawyer, I don't pay myself. David Cutner, my former husband, he's kind enough to say, "I'll do that as a gift," you know, when he came to help me so, no, no fee like that and viola.
Q. How much did you spend on taxis to and from the court?
A. Oh, generally from my office it's like about 12 or 15, depending on the



traffic.
Q. So about 12 to $15 each time?
A. But return so it would be 30.
Q. Round trip about $30 round trip each of the four times you would go to court?
A. Yes.
Q. I'm going to refer you now to what has been marked as Exhibit F, it's your disclosure; I just want to go through your list of potential witnesses.
On the second page you list Christopher Santee; is that the same Christopher Santee you mentioned several times throughout your testimony?
A. Yes, yes.
Q. What can Robert Atkins testify to, what was Robert Atkins a witness to?
A. It's a permanent tenant.
Q. As a permanent tenant, why did you put his name down regarding --
A. Because I think and I hope, I remember, I think one day he was sitting just on the stoop but again, you know, I have to recall but I think he was sitting on the



stoop and he was a witness to some of my confrontations with security guard. I think he can testify to that.
Q. Is there anything else that you think Robert Atkins could testify to?
A. Right now at this minute, no, but maybe.
Q. What about Christopher Ford?
A. Christopher Ford, I remember he was a guy, you remember he was the guy in the bathroom taking a poo and then the guy went banging on the door and he said, "How do you feel that you are in the bathroom," and the guy is -- I remember that, so he probably will testify about that, about the fact that the social worker had absolutely no respect for him and was banging on the bathroom door. I think he will testify about that.
Q. What about Nikolas Legrande?
A. Yes, he will testify to the verbal abuse from the security guard. I think also from, I would say, verbal abuse he would testify.
Q. Verbal abuse towards you or towards



other tenants as well?
A. Towards me because he was a witness.
Q. What about Almady Mamadou?
A. Well, this guy, I believe it's a guy who is from African country where he also would be a witness for me to testify about, you know, the fact that security guard would turn away my laundry. I believe that he was there one day when I had this confrontation. I believe. I believe.
Q. What about Ian Robertson?
A. Same thing, confrontation with the security guard.
Q. Monika Sandoval?
A. Yes. They are in the Room 344, you see, next to me, so they will testify also of what's going on, you know, in this building.
Q. You mean the conditions of the building?
A. Maybe, but the problem is that they are Spanish so I am not sure. But at one point she said yes. But, you know, questionable.

Rolande Cutner 310

Q. What about Shoshana Morgan?

A. Yes, she would. I think she will testify, I think so. She said yes but, you know, again, this list, when you go back, they might change their mind. I mean, you know what I say when I talk to them and I say to you, remember this, oh, yes, oh, yes, I testify, but you know, it's not, you understand that.

Q. I understand. I'm not asking whether or not they're going to testify, I'm asking what you believe that they witnessed.

A. Yes, yes. So this lady Shoshana, same thing, verbal abuse and this.

Q. James Wood is the gentleman you testified about last time that moved to Huntermoon Hall?

A. Yes, and he came back and when he came back, he complained to me and he said that he did not like Huntermoon but again, you know, I don't know if he will testify.

Q. What about Mimi Yon?

A. She complained to me because she had an understanding with the Lantern Group



Rolande Cutner 311

lawyer and then she complained to me that the Lantern Group reneged on her understanding, what she had negotiated and she said, "I can testify to that, that they say yes, yes, yes and then after the next day it's not yes." I think she will testify to that particular fact, I think that she said.

Q. What was William Ashby a witness to?

A. He will testify to the terrible condition of the building.

Q. And Fernando Colon?

A. Also the condition of the building.

Q. What about Shelly Rosner?

A. Well, she said, "You will have to subpoena me" because she's very, very afraid of the Lantern Group and she said, you know, "I wish I could testify." Because if you remember in my complaint, you remember the story about people coming from the roof and you remember she said she lived on the 6th floor and she was terrified, you remember the whole story?

Q. Yes.



Rolande Cutner 312

A. So this is this lady, Shelly Rosner, but she's terrified, and with reason, because she said, you know, "If they evict me, I be a whole mess. I be on the streets so you can't ask me voluntarily." She's terrified, terrified.

Q. What about Alexis Chavis, what did Alexis Chavis witness?

A. Terrible condition of the building, you see.

Q. And Cynthia Edwards?

A. Said she will come and testify about the, you know, the security guard, the verbal abuse against me. She will testify because she was a witness there when that happened so if she accept to testify, if she accept, you know.

Q. What was Jorge Ruiz a witness to?

A. Terrible condition of the building.

Q. And Florence Baylor?

A. This lady, this lady has two, she can testify about two things: The verbal abuse because she was witness that the security guard really talk badly to me. And



Rolande Cutner 313

you remember the lady she went outside with a little dog and she was in her evening nightgown and it's the guard closed the door and she couldn't get into the apartment, you remember this story?

Q. I remember that testimony.

A. So this is Florence and she said she will testify.

Q. What is Thierry Poe a witness to?

A. Terrible condition of the building.

Q. What about Rosalba Rodriguez a witness to?

A. Well, she could testify to the fact that we tried with the minimum of understanding to negotiate with the Lantern Group, you know, at least we try and she suddenly confirm we make an effort to arrive to a better understanding, you know. I am pretty sure she will remember that.

Q. What was Michael Meade a witness to?

A. Well, I think he was there when we had -- you remember this big visit of the building with the elected officials came, it

was like, you know, August in 2007 and you remember the story, there was all this violation and they went through the whole building and they look at the violation so this guy Michael Meade was there, he was there.

Q. And what was David Weinberg a witness to?

A. I think he was aware also of the visit. I am not sure if he was actually at the visit because it was this huge group of people and, you know, there were a lot of the elected officials at that particular visit in the months of August so I think it was one of the people at this group but I am not sure.

Q. What was Aaron Biller a witness to?

A. Aaron Biller is the president of this group of neighbors who are very upset with renovation project because they are owner of apartment, co-op or condo. I don't know if it is co-op or if it is condo but I know for sure they own the apartment and they are afraid that not only the adjacent wall will be cocked because the building being in





the middle of being renovated, demolished and each building on each side will suffer of the renovation.

I believe that that is one of his concerns and the second concern is because the, what we call, quote, unquote, NY3 population will be, 60 percent will be put into the building, they are former drug addicts, former psychiatrists patients released from New York Hospital, people suffering from AIDS, people publicly homeless, they are going to be put in our building and this Aaron Biller is afraid because the Lantern Group explain to us that they are going to have a social worker from 9:00 to 5:00 and nothing from 5:00 to the next day, to the next day 9 o'clock. So 9 o'clock in the morning, so that it will mean that we are totally at the mercy of somebody doing something bad to us so this Aaron Biller is very much concerned about the NY3 population.

And Maxene Cleaners is the lady who is the, she's not the owner but she's the





manager of the -- you remember the story about the cleaners?

Q. Yes.

And Richard Bekins?

A. He help me because one day I fell practically in front of him and he helped me to go into my building.

Q. Other than what you've already testified to today and at your deposition on July 10th, are there any other facts that you haven't already testified about that you belive support your claims against the Lantern group?

A. You mean fact?

Q. Other than what you've already told me about, is there anything else that you haven't told me about that you believe supports your claims against the Lantern Group?

A. I think I'll have to look into my calendar, you know, or whatever when there is a, for instance, verbal abuse. I'll maybe write it down, maybe, but I would say it's pretty, we did a pretty good testimony about





what really happened to me since March 2006 until now.

I think it's pretty complete, see, but I don't want to close the door because if somebody comes to my mind, of course, I would like to tell you because you have to be aware of what's happened, so right now let me say that we cover pretty well the incident.

Q. As far as you can recall, just sitting here today, you believe --

A. We cover the incident.

Q. Other than what you've already testified to today and on July 10th, are there any other damages that you allege that you've suffered that you didn't already testify about?

A. Not that I recall but you know, I don't want to close the door completely. If I find, I have more or a number, whatever, immediately I let you know. Absolutely.

Q. But as you sit here today, as far as you know and as far as you recall, we've covered everything with regard to your incident?

Rolande Cutner 318

A. Everything with regard to the incident I would say.

MS. HOLTZER: We're done.

-o0o-

(Whereupon, the examination of Rolande Cutner was concluded at 12:50 p.m.)

ROLANDE CUTNER

Subscribed and sworn to before me this day of , 2008.

NOTARY PUBLIC



319

INDEX

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| Rolande Cutner | Ms. Holtzer | 217 |

EXHIBITS

| DEFENDANTS' | | PAGE |
|---|---|---|
| C | Interim Package Handling Policy | 217 |
| D | Document | 222 |
| E | One-page document | 275 |
| F | Disclosure statement | 295 |



320

CERTIFICATE

I, MARY E. SANTIAGO, a Notary Public within and for the State of New York, do hereby certify:

That the witness(es) whose testimony is hereinbefore set forth was duly sworn by me, and the foregoing transcript is a true record of the testimony given by such witness(es).

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

MARY E. SANTIAGO