SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - x

In the Matter of the Application of:

NEIGHBORHOOD IN THE NINETIES,
INC., AARON BILLER, ROLANDE CUTNER,
LAWRENCE LIBERSTEIN, CATHERINE
BINDMAN, ARMIN KUNZ, KATHY
PASSERO, SHARON GAFFNEY, MICHAEL
DiSTASIO, DAVID HENDRICKS, JOHN
HUGILL, JACQUELINE HOWELL, RICHARD
SCHWARTZ, ROBERT REMIEN, JUDITH
AMORY, EDWARD GRIMM, MARINA
HIGGINS, JOAN MORGAN, JUANITA
STREULI, and JAMES and MONA CANNING,

                     Petitioners,

For a Judgment Pursuant to Article 78 of the
Civil Practice Law and Rules,

      - against -

CITY OF NEW YORK, BOARD OF
STANDARDS AND APPEALS OF THE
CITY OF NEW YORK, DEPARTMENT OF
HOUSING PRESERVATION AND
DEVELOPMENT, NEW YORK CITY
HOUSING DEVELOPMENT
CORPORATION, LANTERN GROUP
FOUNDATION, INC., LANTERN
INVESTMENT GROUP, LLC, LANTERN
GROUP, 319 REALTY SERVICES L.P., 319
WEST LLC, ST. LOUIS L.P., AUDUBON
HOUSING DEVELOPMENT FUND
CORPORATION, FRIENDS IN THE CITY,
INC., MiCASA HDFC, MEL-AP HOTEL
CORP., IRENE SHREYBERG, CITY
PLANNING COMMISSION, "JOHN AND
JANE DOES" 1-10, and XYZ
Corp./LLC/LLP 1-10

                     Respondents.

- - - - - - - - - - - - - - - - - - - - - - - - x

Index No.:

**VERIFIED PETITION**

**PETITIONERS**, as and for their Verified Petition, allege as follows:

## INTRODUCTION

1.    By this proceeding ("Proceeding"), petitioners Neighborhood in the Nineties, Inc., Aaron Biller, Rolande Cutner, Lawrence Liberstein, Catherine Bindman, Armin Kunz, Kathy Passero, Sharon Gaffney, Michael DiStasio, David Hendricks, John Hugill, Jacqueline Howell, Richard Schwartz, Robert Remien, Judith Amory, Edward Grimm, Marina Higgins, Joan Morgan, and Juanita Streuli (collectively, "Petitioners") seek to vacate and annul, or in the alternative remand, a variance ("Variance") issued by the Board of Standards and Appeals of the City of New York ("BSA") on October 26, 2007.  A copy of the Resolution granting the Variance ("Resolution") is annexed as Exhibit 1.

2.    In granting the Variance, the BSA gave authorization to substantially demolish the building and premises located at 319 West 94th Street, New York, New York, known as Saint Louis Hall (the "Building"), and to reconfigure it for use as a minimally supervised facility that would house chronically homeless single adults who suffer from, among other conditions, severe mental disturbances, psychiatric illnesses, and chemical and substance abuse.

3.    As demonstrated below, the Building is located in close proximity to two schools ("Schools"), one of which has a non-contiguous playground that renders it virtually impossible to monitor.  The grant of the Variance places surrounding residents and the children attending the Schools in serious danger.

2

4.    The Variance also poses a hazard to current residents of the Building who, as discussed further below, will continue to occupy their apartments in the Building as the demolition is performed.  Approximately 80% of the Building will be demolished, without any study whatsoever over the environmental and other adverse impacts that will occasion the Building's existing residents and those living in the vicinity.

5.    Most of the residents in the area were not notified of the Variance because the BSA failed to follow its own rules which require such notice.  Worse, those who did receive some notice of the Variance, received, at best from respondents' perspective, inaccurate (at worst false) information concerning the Variance and, in particular, the planned residents of the reconfigured Building.

6.    Aside from the lack of adequate notice, the grant of the Variance violates ZR 72-21, the Fair Share Guidelines ("FSG"), Uniform Land Use Review Procedure ("ULURP"), the State Environmental Quality Review Act ("SEQRA") and the City Environmental Quality Review ("CEQR").

## PARTIES

7.    Petitioner Neighborhood in the Nineties, Inc. (the "Coalition") is, and at all relevant times has been, a not-for-profit corporation, organized and existing under the laws of the State of New York, with a principal address in New York, New York.

8.    The Coalition is registered as a 501(c)(3) organization under the statutes and regulations governing the Internal Revenue Service.

9. The Coalition is comprised of more than 900 residents, occupying more than 80 buildings, and other interested parties located in the zoning district at or about West 94th Street between Riverside and West End Avenues (the "Zoning District").

10. Petitioner Aaron Biller ("Aaron") is, and at all relevant times has been, a citizen of the State and City of New York, residing at 310 West 94th Street, New York, New York.

11. Aaron lives in, and is an owner of, a residential co-operative corporation apartment ("residential co-op") across the street from the Building.

12. Petitioner Rolande Cutner ("Rolande") is, and at all relevant times has been, a citizen of the State and City of New York, residing in the Building, 319 West 94th Street, New York, New York.

13. Rolande is over the age of 70 and suffers from multiple sclerosis and the affects of a serious car accident that occurred several years ago.

14. Petitioner Lawrence Liberstein ("Larry") is, and at all relevant times has been, a citizen of the State and City of New York, residing at 214 Riverside Drive, New York, New York.

15. Larry lives in, and is an owner of, a residential co-op located within 400 feet of the Building.

16. Petitioner Catherine Bindman ("Catherine") is, and at all relevant times has been, a citizen of the State and City of New York, residing at 224 Riverside Drive, New York, New York.

17.    Catherine lives in, and is an owner of, a residential co-op located within 400 feet of the Building.

18.    Petitioner Armin Kunz ("Armin") is, and at all relevant times has been, a citizen of the State and City of New York, residing at 224 Riverside Drive, New York, New York.

19.    Armin lives in, and is an owner of, a residential co-op located within 400 feet of the Building.

20.    Petitioner Kathy Passero ("Kathy") is, and at all relevant times has been, a citizen of the State and City of New York, residing at 224 Riverside Drive, New York, New York.

21.    Kathy lives in, and is an owner of, a residential co-op located within 400 feet of the Building.

22.    Petitioner Sharon Gaffney ("Sharon") is, and at all relevant times has been, a citizen of the State and City of New York, residing at 227 Riverside Drive, New York, New York.

23.    Sharon lives in, and is an owner of, a residential co-op located within 400 feet of the Building.

24.    Petitioner Michael DiStasio ("Michael") is, and at all relevant times has been, a citizen of the State and City of New York, residing at 314 West 94th Street, New York, New York.

25.    Michael lives in, and is a tenant in a building located within 400 feet of the Building.

26.    Petitioner David Hendricks ("David") is, and at all relevant times has been, a citizen of the State and City of New York, residing at 314 West 94th Street, New York, New York.

27.    David lives in, and is an owner of a condominium located within 400 feet of the Building.

28.    Petitioner John Hugill ("John") is, and at all relevant times has been, a citizen of the State and City of New York, residing at 310 West 94th Street, New York, New York.

29.    John lives in, and is an owner of a residential co-op located across the street from the Building.

30.    Petitioner Jacqueline Howell ("Jacqueline") is, and at all relevant times has been, a citizen of the State and City of New York, residing at 250 West 94th Street.

31.    Jacqueline lives in, and is an owner of a residential co-op located across the street from the Building.

32.    Petitioner Richard Schwartz ("Richard") is, and at all relevant times has been, a citizen of the State and City of New York, residing at 711 Westend Avenue, New York, New York.

33.    Richard lives in, and is a tenant in a building located within 400 feet of the Building.

6

34.     Petitioner Robert Remien ("Remien") is, and at all relevant times has been, a citizen of the State and City of New York, residing at 314 West 94th Street, New York, New York.

35.     Remien lives in, and is an owner of a condominium located within 400 feet of the Building.

36.     Petitioner Judith Amory ("Judith") is, and at all relevant times has been, a citizen of the State and City of New York, residing at 222 Riverside Drive, New York, New York.

37.     Judith lives in, and is an owner of a condominium located within 400 feet of the Building.

38.     Petitioner Edward Grimm ("Ed") is, and at all relevant times has been, a citizen of the State and City of New York, residing at 697 West End Avenue, New York, New York.

39.     Ed lives in, and is a tenant in a building located within 400 feet of the Building.

40.     Petitioner Marina Higgins ("Marina") is, and at all relevant times has been, a citizen of the State and City of New York, residing at 697 West End Avenue, New York, New York.

41.     Marina lives in, and is a tenant in a building located within 400 feet of the Building.

42.     Petitioner Joan Morgan ("Joan") is, and at all relevant times has been, a citizen of the City and State of New York, residing at 677 West End Avenue, New York, New York.

7

43.    Joan lives in, and is an owner of, a residential co-op located within 400 feet of the Building.

44.    Petitioner Juanita Streuli ("Juanita") is, and at all relevant times has been, a citizen of the City and State of New York, residing at 670 West End Avenue, New York, New York.

45.    Juanita lives in, and is an owner of , a residential co-op located within 400 feet of the Building.

46.    Petitioners James and Mona Canning (the "Cannings") are, and at all relevant times have been, citizens of the City and State of New York, residing at 224 Riverside Drive, New York, New York.

47.    The Cannings send their child to PS 75 Elementary School which is within 400 feet of the Building.

48.    Respondent City of New York (the "City") is a governmental body, charged with the responsibility of, inter alia, overseeing and administering the public affairs and public lands of the five boroughs of New York City, including all governmental and public administration and oversight.

49.    Respondent BSA is, and at all relevant times has been, an agency of the City of New York and is a "body" or "officer" within the meaning of Article 78 of the CPLR.

50.    Respondent Department of Housing Preservation and Development ("DHPD") is, and at all relevant times has been, a department of the City of New York and is a "body"

8

or "officer" within the meaning of Article 78 of the CPLR.

51.    Upon information and belief, the DHPD has taken action supportive of the Variance and re-configuration of the Building.

52.    Respondent Housing Development Corporation ("HDC") is, and at all relevant times has been, a Department of the City of New York and is a "body" or "officer" within the meaning of Article 78 of the CPLR.

53.    Upon information and belief, the HDC has taken action supportive of the Variance and re-configuration of the Building.

54.    Upon information and belief, Lantern Group Foundation, Inc. ("Developer") is, and at all relevant times has been, a corporation organized and existing under the laws of the State of New York, with offices located in New York, New York.

55.    Upon information and belief, the Developer was the applicant before the BSA in support of the reconfiguration of the Building.

56.    Upon information and belief, the Developer is, and at all relevant times has been, a net lessee of the Building.

57.    Upon information and belief, Respondent Lantern Investment Group, LLC ("LIG") is, and at all relevant times has been, a limited liability company organized and existing under the laws of the State of New York, with offices located in New York, New York.

58.    Upon information and belief, LIG is an investment arm of the Developer.

59.    Respondent Lantern Group ("LG") was listed as the applicant before the BSA, but, according to the records of the Secretary of State of the New York State, LG has no existence separate and apart from the Developer. In an excess of caution, LG is separately named as a party respondent to this Proceeding.

60.    Upon information and belief, respondent 319 Realty Services L.P. ("319 LP") is, and at all relevant times has been, a limited partnership organized and existing under the laws of the State of New York, with a principal place of business in the City and State of New York.

61.    Upon information and belief, 319 LP is an affiliate of the Developer and may have an interest in this litigation.

62.    Upon information and belief, respondent 319 West LLC ("319 LLC") is, and at all relevant times has been, a limited liability company organized and existing under the laws of the State of New York, with a principal place of business in the City and State of New York.

63.    Upon information and belief, 319 LLC is an affiliate of the Developer and may have an interest in this litigation.

64.    Upon information and belief, respondent St. Louis L.P. ("St. Louis") is a limited partnership organized and existing under the laws of the State of New York, with a principal place of business in the City and State of New York.

65.    Upon information and belief, St. Louis an affiliate of the Developer and may

10

have an interest in this litigation.

66.    Upon information and belief, respondent Audubon Housing Development Fund Corporation ("Audubon") is, and at all relevant times has been, a corporation organized and existing under the laws of the State of New York, with offices in the City and State of New York.

67.    Audubon is mentioned in the Developer's Second Revised Statement (discussed infra) as an affiliate of the Developer and a potentially interested party.

68.    Upon information and belief, respondent Friends in the City, Inc. ("FICI") is, and at all relevant times has been, a corporation organized and existing under the laws of the State of New York, with offices in the City and State of New York.

69.    FICI is mentioned in the Developer's Second Revised Statement (discussed infra) as an affiliate of the Developer and a potentially interested party.

70.    Upon information and belief, respondent MiCasa HDFC ("MCA") is, and at all relevant times has been, a corporation organized and existing under the laws of the State of New York, with offices in the City and State of New York.

71.    MCA is mentioned in the Developer's Second Revised Statement (discussed infra) as an affiliate of the Developer and a potentially interested party.

72.    Upon information and belief MEL-AP Hotel Corp. ("Mel") is, and at all relevant times has been, a corporation organized and existing under the laws of the State of New York, with offices located in New York, New York.

11

73.    New York City Property records reflect that Mel is an owner in fee of the Building.[1]

74.    Upon information and belief, Irene Shreyberg ("Shreyberg") is, and at all relevant times has been, a citizen of the City and State of New York, residing in New York, New York.

75.    New York City Property records reflect that Shreyberg is an owner in fee of the Building.[2]

76.    City Planning Commission ("CPC") is, and at all relevant times has been, an agency of the City of New York and is a "body" or "officer" within the meaning of Article 78 of the CPLR.

77.    Respondents "John and Jane Does" 1-10 are fictitious names representing persons, currently unknown to Petitioners, but who may have an interest in this Proceeding.[3]

78.    Respondents XYZ Corp./LLC/LLP 1-10 are fictitious names representing business organizations, currently unknown to Petitioners, but which may have an interest in

---

[1]Petitioners' review of the Administrative Record ("Record") of the BSA reveals that the name of the owner of the Building was not disclosed to the BSA. All references to the "Record" pertain only to those documents made available to Petitioners and their counsel by the BSA. Such does not constitute a representation that the Record provided to Petitioners by the BSA is complete.

[2]See n. 1.

[3]Because Petitioners were deprived of an opportunity to participate before the BSA, and given the shortened period of limitation within which this Proceeding must be commenced, they simply cannot be certain of, and have not been afforded the opportunity to ascertain, the identities of all of the parties.

this Proceeding.[4]

## FACTS

### The Building

79.    The Building is located in the Zoning District which is classified as R8 (Resolution, Exh. 1); it is a six story (plus cellar), tenement Class A structure built in or about 1949 (Resolution at 1); Certificate of Occupancy, Exh. 2; Developer's Second Revised Statement at 2, Exh. 3). The Building measures approximately 31,600 square feet in floor area and is currently occupied by 54 elderly, low-income residents (Developer's Second Revised Statement at 2).

80.    According to the Developer's application before the BSA ("Application"), the Developer is the lessee/operator of the Building and indicated to the BSA that it intended to purchase it in October 2007 (Developer's Second Revised Statement at 2, Exh. 3).[5]

81.    The Developer desires to enlarge and dramatically reconfigure the Building. Specifically, the Developer seeks to:

- increase the number of stories of the Building from six to nine;

- add nearly 14,000 square feet of new space; and

- increase the number of current occupants from 54 to 149[6]

---

[4] See n. 3.

[5] New York City property records do not currently reflect any such purchase.

[6] BSA Record reflects that this figure may have been reduced to 141 (Resolution at 2, Exh. 1).

13

(collectively, "Development Objectives") (Developer's Second Revised Statement at 2-3, Exh. 3).

**The Developer's Proposed Occupants of the Building**

82.    The intended new occupants of the Building do not fall into the same general description of those currently residing there; rather, 49% of the new occupants would consist of adults who meet the eligibility standards of the November 3, 2005 New York/New York III Supportive Housing Agreement between the City and State ("NY3 Residents") (10/19/07 Motion to Reopen at 1-2, Exh. 4). NY3 Residents consist of individuals who meet the following criteria:

- chronically homeless individuals who suffer from a "serious and persistent mental illness" or who are "diagnosed as mentally ill and chemically addicted";

- single adults who are "presently living in New York State-operated psychiatric centers" or State-operated transitional residences;

- young adults, age 18-24, who have "serious mental illness";

- chronically homeless individuals "who have a substance abuse disorder" or are recovering from one;

- chronically homeless individuals who are living with HIV/AIDS and who "suffer from a serious and persistent mental illness or substance abuse disorder" (Id.).

83.    The facility envisioned by the Developer would provide for only limited supervision of the NY3 Residents -- Monday through Friday from 9 AM to 5 PM; during the remainder of the week and on weekends, the NY3 Residents would be totally unsupervised and unmonitored (Developer's Second Revised Statement of Facts at 3, Exh. 3). Thus, the

14

Building and its new NY3 Residents, comprised of mentally-ill, chemically-dependent, substance-abusive, chronically homeless single adults would be unsupervised and unmonitored 128 out of 168 hours a week, including nights and weekends.

**The Building is Nearby an Elementary School and Non-Contiguous Playground**

84.     Public School 75, the Emily Dickinson School, is a public elementary school located one block north of the Building, bounded by 95th and 96th Streets, West End Avenue and Riverside Drive ("PS 75 Elementary School"). The school building ("Elementary School Building") and schoolyard of PS 75 Elementary School are located on the east end of the block, while a large affiliated playground ("Non-Contiguous School Playground") is located at the west end of the block. PS 75 Elementary School serves more than 800 young school children in grades K through 5 (10/19/07 Motion at 2, Exh. 4). Another approximately 200 middle school students enrolled in West Side Academy also occupy the PS 75 School Building (10/17/07 Letter from PTA President Barbara Mellor, Exh. 5). Thus, the Non-Contiguous School Playground cannot be seen, and more than 1,000 school children cannot be observed, from the Elementary School Building.

85.     Juxtaposing a largely unmonitored and unsupervised facility of mentally-ill, chemically-dependent, substance-abusive, chronically homeless single adults with an Elementary School and unmonitorable Non-Contiguous School Playground creates a substantial and unacceptable danger to young school children and the public welfare generally, not to mention the elderly tenants currently living in the Building.

15

**Developer's Plan for the Building Would Violate the Zoning Resolution**

86.    The Developer contended before the BSA that, in order to meet its Development Objectives, the Developer needed a variance from the following applicable zoning restrictions:

- ZR §24-522 (wall height, setback and sky exposure plane);

- ZR §24-36 (rear yard)

- ZR §54-41 (permitted reconstruction)

(Developer's Second Revised Statement at 1, Exh. 3).

87.    As reflected in the BSA's Resolution, the reconfiguration of the Building sought by the Developer:

> exceeds the street wall height, does not provide the required setbacks, encroaches into the setback and sky exposure plane, does not provide the required rear yard, and demolishes more than 75 percent of the interior floor area of an existing non-complying building, contrary to ZR §24-522, 24-36, and 54-41 (Resolution at 1, Exh. 1).

88.    With respect to wall height and setback, the Zoning Resolution permits the building to rise to a height of 85 feet or nine (9) stories, "whichever is less," whereupon it must set back from the street a minimum distance of 20 feet. ZR 24-522. Here, the Developer's plan ("Developer's Plan") seeks to violate the height and setback regulations by building straight up to a height of 88 feet with no setback (Resolution at 2, Exh. 1).

89.    With respect to the sky exposure plane, the Zoning Resolution requires that, beginning at the height of the lesser of 85 feet or nine (9) stories, the building must set back

16

behind an imaginary plane of 2.7 feet vertical to one (1) foot horizontal (the sky exposure plane). Here, the Developer seeks to encroach into the sky exposure plan by not setting back above the 85 foot elevation.

90.    The Resolution indicates that a Variance is granted with respect to the setback requirements, but does not indicate the extent of the Variance. In other words, the Resolution permits the front wall height to rise to 88 feet without a setback and further allows the Building's height to rise another 11 feet to 99 feet, <u>but there is no indication in the Resolution how much of a setback is going to be required of the Developer above 88 feet</u>. Thus, the Resolution is entirely unclear and provides no guidance to the Developer or the community at large.

91.    With respect to the rear yard requirements, the Zoning Resolution requires the Building to have a 30-foot rear yard. ZR §24-36. The purpose of the rear-yard requirements is to fulfill and ensure compliance with legal light and air requirements to: (i) the Building's occupants (who have "living" rooms facing the back of the Building) and (ii) occupants of adjacent buildings whose light and air is impacted by the depth of the Building and its rear yard. The Developer's Plan, however, ignores these requirements and consequences and would result in only a 13'1" rear yard (less than half that required) (Resolution at 2, Exh. 1), drastically affecting light air to the Building's current occupants and those living in the adjacent buildings.

92.    With respect to demolition, the Zoning Resolution does not permit the

17

demolition of more than 75% of a building that fails to comply with the Zoning Resolution. ZR §54-41. The Developer's Plan would require demolition of at least 80% ("80% Demolition") of the Building (Id. at 4). Upon information and belief, the Record does not set forth that the BSA ever considered the adverse impact that the 80% Demolition would have on current residents, including Petitioner Rolande, other than the fact that the Developer's Plan requires that they all move from the front of the Building to the back and then again from the back to the front (Developer's Second Revised Statement at 7, Exh. 3).[7]

**Standard for Granting a Variance**

93.    Zoning Resolution §72-21 states in pertinent part:

[T]he Board of Standards and Appeals may, in accordance with the requirements set forth in this Section, vary or modify a provision [of the Zoning Resolution] so that the spirit of the law shall be observed, public safety secured, and substantial justice done.

94.    Zoning Resolution §72-21 further sets forth five specific findings (the "Five Required Findings") that "the Board shall make" prior to the grant of any hardship variance in New York City. Id. As will be reflected in the Memorandum of Law to follow, any hardship variance granted in the absence of the Five Required Findings must be vacated, annulled or remanded to the BSA.[8] The Five Required Findings are set forth below.

---

[7]Hardly the virtuous do-gooder, the Developer has been at loggerheads with its tenants in the Building for some time. In fact, as will be shown during the course of this Proceeding, one such tenant, Rolande, has been forced to bring a federal civil rights action against the Developer and its affiliates for harassment and abuse.

[8]Given the 30-day period of limitation within which to commence a proceeding to challenge a determination by the BSA, Petitioners did not have the opportunity to organize and hire counsel sufficiently in advance of the expiring deadline to arrange for the preparation of a Memorandum of Law

**Finding (a)**

95.    Subsection (a) of ZR §72-21 requires, as a precondition to granting the Variance, that the Developer prove, and the BSA find:

> (a)    that there are unique physical conditions, including irregularity, narrowness or shallowness of lot size or shape, or exceptional topographical or other physical conditions peculiar to and inherent in the particular zoning lot ...

(ZR §72-21(a)).  This provision further requires the Developer to demonstrate that the alleged hardship is "not due to circumstances created generally by the strict application of such provisions in the neighborhood or district in which the lot is located." Id.

96.    By law, Finding (a) requires that the Building be, not only unique, but also obsolete in the absence of the grant of a hardship variance ("Unique Obsolescence Requirement"). See Memorandum of Law.  As explained by the Court of Appeals:

> There must at least be proof that a particular property suffers a singular disadvantage through the operation of a zoning regulation before a variance thereof can be allowed on the ground of 'unnecessary hardship' . . . .

(Memorandum of Law).

97.    The Court of Appeals has further explained:

> [B]efore the board may vote a variance, there must be shown, among other things, that the plight of the owner is due to unique circumstances and not to the general conditions in the neighborhood which may reflect the unreasonableness of the zoning ordinance itself (Memorandum of Law).

98.    To determine whether a building is truly unique within a zoning district and

---

contemporaneously with the filing of this petition. However, Petitioners intend to file a separate Memorandum of Law prior to the time within which a response is required by respondents.

suffers from a "singular disadvantage," the Developer is required to submit, among other evidence, a survey of the other buildings in the Zoning District (Memorandum of Law).

99.    The BSA Record reflects that the Developer did not submit a survey or other evidence in support of the (a) finding. Indeed, the sole "evidence" of supposed uniqueness was a conclusory statement by the Developer in its Application, stating through counsel simply that the Building is "oddly-shaped and resembles a dumbbell" or "I-shape[]" (Developer's Second Revised Statement at 5, Exh. 3). In fact, as reflected in the annexed photographs, the dumbbell or "I" shaped building is an entirely common design in New York City. See Photographs (Exh. 6).

100.    The BSA failed to insist upon a survey from the Developer and failed to conduct its own survey of surrounding buildings in the area, instead relying upon the Developer's conclusory statements concerning the shape of the Building, and concluding that the shape "results in an irregular shape and inefficient floorplate" (Resolution at 3, Exh. 1).

101.    Instead of obtaining substantial evidence with respect to the Unique Obsolescence Requirement, or conducting an analysis with respect to the same, the BSA relied upon the Developer's assertions with respect to its "programmatic space needs" for the Building (Resolution at 3). As shown infra and in the Memorandum of Law, an allegation with respect to "programmatic needs" cannot be substituted for the Unique Obsolescence Requirement and may be used only to supplant the (b) finding.

**Finding (b)**

20

102.   Subsection (b) of ZR §72-21 ordinarily requires, as a precondition to granting the Variance, that a developer prove, and the BSA find:

> (b)    that because of such physical conditions, there is no reasonable possibility that the development of the zoning lot in strict conformity with the provisions of the [Zoning] Resolution will bring a reasonable return ...

(ZR §72-21(b)).  However, as will be reflected in the Memorandum of Law, where the Developer is a non-profit, the (b) finding is replaced with a requirement that the Developer demonstrate a "programmatic need" for the variance ("Programmatic Need Finding").[9]

### Finding (c)

103.   Subsection (c) of ZR §72-21 requires, as a precondition to granting the Variance, that the Developer prove, and the BSA find:

> (c)    that the variance, if granted, will not alter the essential character of the neighborhood or district in which the zoning lot is located; will not substantially impair the appropriate use or development of adjacent property; and will not be detrimental to the public welfare (ZR §72-21(c)) ("Adverse Impact Finding").

104.   As will be shown infra and in the Memorandum of Law, the BSA, with respect to Finding (c): (i) committed errors of law by refusing to consider, not only the specific terms of the Variance requested, by the overall effect, environmental and otherwise, of its being granted; and (ii) was arbitrary and capricious, failed to rely on substantial evidence and

---

[9]As discussed infra, the Developer relied upon, and the BSA wrongfully accepted, a "programmatic needs" showing to substitute for three of the Five Required Findings.  In any event, as further shown infra, the Developer did not meet its burden of showing that its programmatic needs could not be satisfied in the absence of a variance.  Moreover, it was entirely unproven before the BSA that the Developer was a legitimate non-profit.

otherwise acted in derogation of New York law.

### Finding (d)

105.    Subsection (d) of ZR §72-21 requires, as a precondition to granting the

Variance, that the Developer prove, and the BSA find, that the hardship was not "created by

the owner or by a predecessor in title" ("Self Created Hardship").  As the Courts have ruled:

> A hardship is self-created, for zoning purposes, where the applicant for a
> variance acquired the property subject to the restriction from which he or she
> seeks relief.[10]

106.    As the Courts have further stated:

> Even if a prospective purchaser of property does not have the actual
> knowledge of the applicable provisions of an ordinance, he [or she] is bound
> by them and by the facts and circumstances concerning the use of the property
> which he [or she] may learn by exercising reasonable diligence.

107.    As will be shown infra and in the Memorandum of Law, the BSA, with respect

to Finding (d): failed to make any reasoned inquiry with respect to Self-Created Hardship,

did not rely on substantial (or really any) evidence, acted arbitrarily and capriciously and

otherwise in violation of New York law.

### Finding (e)

108.    Subsection (e) of ZR §72-21 requires, as a precondition to granting the

Variance, that the Developer prove, and the BSA find:

> that within the intent and purposes of this [Zoning] Resolution[,] the variance,
> if granted, is the minimum variance necessary to afford relief; and to this end,

---

[10]Section (d) is not applied under circumstances in which all of the other Five Required Findings
are present.  ZR §72-21(d).  As demonstrated infra, such was not the case here.

22

the Board may permit a lesser variance than that applied for ("Minimum Variance Necessary Finding"). ZR §72-21(e).

109.   As will be shown _infra_ and in the Memorandum of Law, the BSA, with respect to Finding (e): failed to make any reasoned inquiry with respect to this provision, did not rely on substantial (or really any) evidence, acted arbitrarily and capriciously and otherwise in violation of New York law.

110.   Each of the Required Five Findings must be specified in the BSA's decision to grant or deny a variance. ZR §72-21.

111.   The evidence submitted in support of the Required Five Findings must be "substantial," non-conclusory, well-reasoned and in compliance with New York law (Memorandum of Law). Any variance granted in the absence of substantial evidence, in violation of the law, or based upon conclusory or arbitrary decision-making is void and shall be vacated, annulled or remanded.

## FIRST CLAIM: VIOLATION OF ZR §72-21

112.   Petitioners repeat and reallege each and every allegation set forth in the preceding paragraphs 1 through 111, inclusive, as if set forth fully herein.

113.   Zoning Resolution §72-21 requires the BSA to make the Five Required Findings prior to granting a variance.

114.   The Five Required Findings when the applicant is a non-profit are that: (i) the subject building suffers from Unique Obsolescence; (ii) programmatic needs of the applicant require the variance; (iii) the grant of a variance will have no Adverse Impact on the

23

neighborhood and community; (iv) the hardship of which the applicant complains was not Self-Created; and (v) the variance sought is the Minimum Variance Necessary to avert the hardship. See Discussion at ¶¶91-109, supra.

115.    Zoning Resolution §72-21 requires the BSA to rely upon substantial evidence rather than the conclusory submissions of the applicant in the context of the Five Required Findings.

116.    The BSA's resolution to grant or deny a variance cannot be arbitrary or capricious, lacking in rationality, or violative of New York law.

117.    With respect to Finding (a), the BSA failed to rely upon substantial evidence with respect to the Unique Obsolescence Requirement; failed to insist upon a survey and conduct a survey of its own; relied upon conclusory assertions of the Developer's counsel; and mistakenly and in violation of New York law, relied upon the Developer's "programmatic needs" to satisfy the Unique Obsolescence Requirement when, in fact, "programmatic needs" may only be used to supplant Finding (b); and otherwise acted arbitrarily and capriciously and without rationality with respect to Finding (a).

118.    With respect to Finding (b), the BSA Record, the Developer's Application and the Resolution:

- are all devoid of any evidence that alternate proposals were considered in order to meet the programmatic needs of the Developer;

- do not explain why the Building could not be functional if its front wall were limited to the height prescribed by the Zoning Resolution (85 feet) as opposed to the height specified in the Developer's Plan (88 feet);

24

- are devoid of any evidence that alternate proposals were considered with respect to the rear yard;

- were otherwise lacking in substantial evidence to support the Resolution.

119. Furthermore with respect to Finding (b), the Record copied by the BSA on Petitioner's behalf makes numerous references to, but does not actually contain, a letter from the Internal Revenue Service purporting to establish that Developer is a non-profit organization ("IRS Letter"), thereby excusing it from demonstrating that there is no possibility of generating a reasonable return on its investment in the Building. In the absence of the IRS Letter, the Developer was required to, and thus failed to, prove the facts supporting Finding (b), namely that the Building is unable to generate a reasonable return to the Developer.

120. With respect to Factor (c), the Record confirms that the Developer did not submit evidence in connection with, and, independent of the Developer's failure to submit such evidence, the BSA did not evaluate or consider the Adverse Impact caused by, among other things: (i) the effect that reconfiguration of the Building would have on the community; or (ii) using the Building as housing for NY3 Residents.

121. As regards reconfiguration, the Record does not indicate that the Developer submitted any evidence with respect to, and the BSA, in fact, did not evaluate or consider, among other things:

- the extent to which raising the front wall of the Building to a height of 88 feet, with a total building height of 99 feet, would cast shadows across other buildings, and the Non-Contiguous School Playground; and the neighborhood

25

trees and other areas in the neighborhood;

- the extent to which reducing the size of the rear yard by nearly 57%, in violation of the Zoning Resolution, would impact both occupants of the Building and those of adjoining properties;

- the overall environmental and aesthetic impact of violating the height and setback regulations; and

- the adverse impact the 80% Demolition will cause with respect to the elderly residents of the Building (who will remain in the Building during this massive construction project), including, but not limited to, exposure to lead dust, asbestos, construction debris, excess noise, release of airborne particulates and other environmental hazards, and other Adverse Impacts on current residents of the Building (and others in the neighborhood).

122.    As to the change in use from housing 54 elderly persons to more than 140 residents, half of whom will be NY3 Residents, the Record confirms that the Developer did not submit evidence in connection with, and, independent of the Developer's failure to submit evidence, the BSA did not evaluate or consider, among other things, the following:

- the consequences of introducing a substantial population of NY3 Residents into this particular community which is, as shown infra, already overloaded with community facility residents;

- introducing NY3 Residents into the Building housing vulnerable residents;

- the proximity of the Building, with its NY3 Residents, to the PS 75 Elementary School and its Non-Contiguous Playground which cannot be monitored or supervised from the School Building; and

- the potential hazard of combining NY3 Residents, with chemical dependency, substance abuse, psychiatric disorders and who suffer from chronic homelessness into an area in which a nearby school uses a playground that cannot be seen from the School Building.

123.    The BSA ruled that the Adverse Impact of the change in use is irrelevant

26

(Resolution, Exh 1 at 6).

124.    The BSA's contrived determination that the change of use is irrelevant to the consideration of the Variance Application constitutes an error of law, inasmuch as the BSA, in order to have granted the Variance, was required first to find, among other things, that granting the Variance "will not be detrimental to the public welfare" (ZR §72-21(c)).

125.    Upon information and belief, the BSA's grant of the Variance will be detrimental to the public welfare.

126.    The BSA's failure to consider whether granting the Variance will be "detrimental to the public welfare" constitutes an error of law.

### Finding (d)

127.    With respect to Finding (d), upon information and belief, the Developer's entire submission to support the proposition that the hardship was not Self-Created consists of the following unsworn statement:

> The unnecessary hardship created by a strict application of the zoning regulations ... is not caused by the owner of the site or a predecessor in interest but is inherent in the site and in the uniqueness posed by the applicant's programmatic needs. Without the grant of the requested variance, the applicant would be, in effect, penalized for a situation due to circumstances beyond its control. Absent relief from this board, nothing can reasonably be done to alleviate this problem (Second Revised Statement of Developer at 11-12).[11]

128.    The aforesaid statement by the Developer is conclusory and does not constitute evidence.

---

[11]The same statement appears in the earlier iterations of statements submitted by the Developer.

129.    Despite the Developer's conclusory and non-substantive submission with respect to its assertion that the hardship was not Self-Created, the BSA ruled in pertinent part:

> the Board finds that the hardship herein was not created by the owner or a predecessor in title (Resolution at 5).

130.    Upon information and belief, the Developer did not identify to the BSA the owner or predecessor in title of the Building.

131.    Upon information and belief, the Developer did not set forth any information concerning the actions taken (or inactions) by the owner or any predecessor thereto to maintain the Building in proper condition such that the reconfiguration proposed by the Developer might have been rendered unnecessary (assuming arguendo it were necessary at all).

132.    Upon information and belief, the only reference in the Record to actual "evidence" relating to Self-Created Hardship is a single statement that the Developer, owner or a predecessor apparently allowed the Building to fall into a state of disrepair (Developer's Second Revised Statement, Exh. 3 at 11) which, in fact, actually controverts the Developer's prior assertion and the BSA's "finding."

133.    Except the aforementioned reference that the Developer, owner and/or predecessor allowed the Building to fall into a state of disrepair, upon information and belief, the Record confirms that the Developer did not submit evidence in connection with, and, independent of the Developer's failure to submit evidence, the BSA did not evaluate or

28

consider the extent to which Self-Created Hardship required denial of the Variance, warranting a finding that the BSA's grant of the Variance with respect to this ground is not supported by substantial evidence, defies rationality, is arbitrary and capricious and was granted in violation of New York law.

### Finding (e)

134. As to Finding (e), the Developer asserted that, in view of its "programmatic needs," only a facility that would house 140 people would attract the funding necessary to construct, and generate the rent roll necessary to sustain, the Building and the services the Developer desires to provide (Developer's Second Revised Statement, Exh. 3 at 12).

135. The BSA ruled that the Variance it granted was the Minimum Variance Necessary "to allow the applicant [Developer] to fulfill its programmatic needs" (Resolution, Exh. 1 at 5).

136. Relying upon the Developer's programmatic needs to meet the Minimum Variance Necessary Finding constitutes an error of law, inasmuch as it may be used only to supplant Finding (b).

137. Upon information and belief, the Record confirms that the Developer did not submit evidence in connection with, and, independent of the Developer's failure to submit evidence, the BSA did not evaluate or consider, among other things, the following:

- whether other uses could be made of the Building consistent with existing zoning, including, among other things, market rate and affordable housing; and

- whether the Building could have been constructed with a wall height of 85 feet

29

instead of 88 feet and otherwise in compliance with height and setback regulations.

138.   In the absence of any evidence on these issues or the BSA's consideration of the same, the BSA's determination fails to meet Finding (e), inasmuch as it is unsupported by substantial evidence, is arbitrary and capricious, and violates New York law.

139.   Petitioners have no remedy at law.

140.   By reason of the foregoing, Developer's failure to meet any of the Five Required Findings and the BSA's failure to consider or evaluate the same, Petitioners are entitled to an order vacating and annulling the Variance and Resolution or, in the alternative, an order of remand thereof, together with an injunction, enjoining any further actions by Respondents in furtherance of the Developer's Plan, Variance, and Resolution.

## SECOND CLAIM:
### BREACH OF THE BSA'S RULES REQUIRING NOTICE

141.   Petitioners repeat and reallege each and every allegation set forth in the preceding paragraphs 1 through 140, inclusive, as if set forth fully herein.

142.   Section 1-06(g) of the BSA's Rules of Practice and Procedure ("BSA's Rules") states in pertinent part:

> After the examiner(s) [of the BSA] have determined the application [for a variance] to be substantially complete, the applicant shall be notified by the Executive Director [of the BSA] ... of the date set forth the public hearing, which shall be at least thirty (30) days after the mailing of said notice. With this notice, the applicant shall be supplied with an official copy of the appropriate forms, which he or she is required to send not less than twenty (20) days prior to the date of such hearing to:

30

... e.    Affected property owners.

Section 1-06(g).

143.    Affected property owners are defined by the BSA's Rules as, among others, "all

... residential ... tenants of record in the building or premises which is the subject of the

application as well as all owners of property within a radius of 400 feet from the center of

the lot which is the subject matter of the application" (Id.)

144.    A copy of the listing of individuals to whom the Developer provided notice

does not include any of the 54 tenants of the Building (Service List, Exh. 7).

145.    Petitioner Rolande Cutner, who resides in the Building, did not receive any

notice of the Developer's Application or any hearing in this matter.

146.    By reason of the foregoing, the BSA's grant of the Variance was in violation

of Rule 1-06(g).

147.    The BSA's Rules further provide that, where affected property owners hold

their property in a residential cooperative corporation or as members of a condominium

association:

> notice of the public hearing shall be posted in the common areas of the
> building and given to the business office of the cooperative or the
> condominium which should then be requested to notify its residents in its
> customary manner.

Id. (emphasis added).[12]

_____

[12]As demonstrated infra, the Developer did not post notices, and the BSA's records do not reflect
that the Developer ever alleged that it posted notices, in the common areas of the condominium
associations in the area. Furthermore, as also shown infra, although perfunctory notices may have been

31

148.    Upon information and belief, the Developer's submissions to the BSA do not reflect that the Developer either: (i) directed the business offices to notify residents of -- or (ii) posted notices or arranged for the posting of notices in the common areas of -- the following residential co-operative corporations and condominium associations, each of which is occupied by at least one of the Petitioners:

- 214 River Owners Corp. (occupied by Larry);

- 222 Riverside Drive Condominium Association (occupied by Judith);

- 224 Riverside Drive Owners Corp. (occupied by Catherine, Armin and Kathy);

- 227 River Arms Realty Association LLC (occupied by Sharon);

- Norson Realty Corp. (occupied by Aaron and John)

- The Vancouver Condominium Association (occupied by Michael, David and Remien);

- 677 Tenants Corp. (occupied by Joan);

- 670 Apartments Corp. (occupied by Juanita)

(collectively, the "Condos").

149.    None of the Petitioners received proper notice of the public hearings or the Application by the Developer.

150.    The Developer sent several notices to managing agents for some of the Condos,

---

sent to the business offices of the condominiums in the area, none contained the additional language requesting that it be circulated to owners of apartments in the condominiums. Aside from the condominium associations, no notice was sent to the Department of Education (as owner) until after the first public hearing was held.

but, upon information and belief, did not specify within the notice, <u>which of the managing agents' many buildings were affected by the notice</u>, thereby rendering it impracticable, if not impossible, for the managing agents to ascertain the parties to notify.

151.    Even those individuals who might have received some notice of the public hearings or the Application by the Developer were not informed by the aforesaid notice that the new occupants of the Building were going to be NY3 Residents -- a material fact in the context of, <u>inter alia</u>, the Developer's Plan, Application, SEQRA and FSG.

152.    In other circumstances, the BSA has strictly applied its Rules to the extent that doing so is harmful to those opposing the Variance,[13] but waived the Rules (<u>e.g.</u>, governing notice) here where doing so was favorable to the Developer.

153.    The BSA's failure to comply with its notice requirements constitutes arbitrary and capricious conduct, and the BSA's failure to require the Developer to comply with its notice requirements constitutes arbitrary and capricious conduct, a violation of New York law, and actions taken without jurisdiction, rendering the Resolution and Variance <u>ultra vires</u>, null and void and/or requiring vacatur and annulment of the Variance and Resolution or, in the alternative, an order of remand thereof, together with an injunction, enjoining any further actions by Respondents in furtherance of the Developer's Plan, Variance, and Resolution.

154.    Petitioners have no remedy at law.

---

[13]For example, on October 23, 2007, Howard Goldman appeared before the BSA to oppose the Application; however, he arrived a few minutes after the BSA had begun its proceedings. Although "second calls" are regularly and informally permitted before the BSA, the BSA refused to do so on this occasion, citing its Rules.

### THIRD CLAIM:
### VIOLATION OF DUE PROCESS IN REGARDS TO NOTICE

155.   Petitioners repeat and reallege each and every allegation set forth in the preceding paragraphs 1 through 154, inclusive, as if set forth fully herein.

156.   The Fourteenth Amendment to the Constitution of the United States requires that no person shall be "deprived of ... property without due process of law." U.S. Const. amend. XIV(1).

157.   Due process requires, at a minimum, notice and an opportunity to be heard (Memorandum of Law).

158.   Notice requires, at a minimum, that the recipient be apprised in such a manner that is reasonably calculated to inform the recipient of the pendency of a hearing or such other proceeding at which property rights and entitlements may be affected (Memorandum of Law).

159.   The BSA rendered determinations affecting the rights of the following petitioners without providing them with any notice that the Application for the Variance was pending or that a hearing was scheduled to proceed:

- Rolande

- Larry

- Judith

- Catherine, Armin and Kathy

- Sharon

- Aaron and John

- Michael, David and Remien

- Joan and

- Juanita

160. The BSA's failure to require the Developer to comply with due process constitutes arbitrary and capricious conduct and is a violation of the Constitution of the United States, requiring vacatur and annulment of the Variance and Resolution or, in the alternative, an order of remand thereof.

161. Petitioners have no remedy at law.

**FOURTH CLAIM: RESPONDENTS' FAILURE TO COMPLY WITH
FAIR SHARE REGULATIONS**

162. Petitioners repeat and reallege each and every allegation set forth in the preceding paragraphs 1 through 161, inclusive, as if set forth fully herein.

163. Upon information and belief, the Building is a "city facility," i.e., "a facility used or occupied or to be used or occupied to meet City needs that is located on real property ... operated by the City or pursuant to a written agreement on behalf of the City." Charter §203.

164. The New York City Charter promulgates guidelines ("Fair Share Criteria") for City agencies to consider while siting and/or significantly expanding City facilities including that the City agencies are required to, inter alia:

(1) site facilities equitably by balancing the considerations of community needs

35

for services, efficient and cost effective service delivery, and the social, economic, and environmental impacts of City facilities upon surrounding areas;

(2) base its siting and service allocation proposals on the City's long-range policies and strategies, sound planning, zoning, budgetary principles, and local and citywide land use and service delivery plans;

(3) expand public participation by creating an open and systematic planning process;

(4) foster consensus building;

(5) plan for the fair distribution among communities of facilities providing local or neighborhood services in accordance with relative needs among communities for those services;

(6) lessen disparities among communities in the level of responsibility each bears for facilities serving citywide or regional needs;

(7) preserve the social fabric of the City's diverse neighborhoods by avoiding undue concentrations of institutional uses in residential areas; and

(8) promote government accountability by fully considering all potential negative effects, mitigating them as much as possible, and monitoring neighborhood impacts of facilities once they are built.

See Memorandum of Law.

165.    The New York City Charter provides additional criteria for City agencies to consider when evaluating, inter alia, the "significant expansion" of facilities other than administrative offices and data processing facilities, including:

(a) compatibility of the facility with existing facilities and programs, both City and non-City, in the immediate vicinity of the site;

(b) extent to which neighborhood character would be adversely affected by a concentration of City and/or non-City facilities;

36

(c) suitability of the site to provide cost-effective delivery of the intended services. Consideration of sites shall include properties not under City ownership, unless the agency provides a written explanation of why it is not reasonable to do so in this instance;

(d) consistency with the locational and other specific criteria for the facility identified in the Statement of Needs or, if the facility is not listed in the Statement, in a subsequent submission to a Borough President; and

(e) consistency with any plan adopted pursuant to Section 197-a.

N.Y. Rules, Tit. 62, §A TO TITLE 62.

166.    The Fair Share Criteria are "designed to further the fair distribution among communities of the burdens and benefits associated with City facilities, consistent with community needs for services and efficient and cost effective delivery of services and with due regard for the social and economic impacts of such facilities upon the areas surrounding the sites." New York City Charter §203(a).

167.    City agencies must conduct a "meaningful" analysis of the Fair Share Criteria, in order to determine whether the community chosen is indeed harboring its "fair share" of City facilities or whether it has become a de facto dumping ground for City facilities. See Memorandum of Law.

168.    The record does not show that respondents ever considered, much less conducted, a meaningful (or really, any) analysis of the Fair Share Criteria.

169.    Respondents were required to refer the Developer's Application and Plan to the CPC prior to consideration of the Variance by the BSA.

170.    Respondents' failure to refer the Developer's Application and Plan to the CPC

37

requires that the BSA's subsequent grant of the Variance be rendered null and void.[14]

171.   Any analysis of the Fair Share Criteria would yield the conclusion that the Zoning District already accommodates more than its fair share of City facilities, and such Development Objectives, if carried out, would impermissibly "overburden" the area with such facilities.  For example, any review of the Fair Share Criteria would have revealed, inter alia, that the Record is devoid of credible evidence indicating that:

- Developer considered any alternative sites to the Building, including privately owned as well as City-owned potential site locations, as the Fair Share Criteria require;

- Developer's Plan would satisfy the requirement for fair distribution, given that the Upper West Side already accommodates a grossly disproportionate share of City facilities and is already home to eleven housing projects, as compared to the Upper East Side's mere two;[15] and

- Developer considered whether the project would be compatible with and/or adversely affect the surrounding neighborhood, particularly with respect to the Building's proximity to Schools and the potential danger to the surrounding residents and children attending the Schools.

Accordingly, even were the BSA to have conducted an analysis of the Fair Share Criteria, such would have required the conclusion that the Developer's Plan and Variance failed to meet the City's obligation to equitably apportion the burdens of its City facilities.

---

[14]Unless the Court permits Petitioners to proceed on the merits of a mandamus claim based upon the existing Record, Petitioners intend to serve an appropriate demand letter to Respondents and the CPC shortly to direct them to conduct an analysis under the FSG, and, assuming Respondents and/or the CPC refuse to act in accordance with their obligations, Petitioners will file a separate mandamus to compel proceeding.

[15]See, e.g., Benjamin Sarlin, New Housing For Homeless Proves Divisive, The New York Sun, Nov. 16, 2007, available at http://www.nysun.com/article/66569.

172.    By reason of the foregoing, Petitioners are entitled to a declaration that the Variance and Resolution are null and void, together with an injunction, enjoining any further actions by Respondents in furtherance of the Developer's Plan, Variance, and Resolution.

173.    Petitioners have no remedy at law.

## FIFTH CLAIM:
## RESPONDENTS VIOLATED SEQRA

174.    Petitioners repeat and reallege each and every allegation contained in the preceding paragraphs 1 through 173, inclusive as if set forth fully herein.

175.    "No agency involved in an action may undertake, fund or approve the action until it has complied with the provisions of the State Environmental Quality Review Act ("SEQRA")." 6 N.Y.C.R.R. §617.3(a).

176.    The purpose of SEQRA is to:

> encourage productive and enjoyable harmony between man [and woman] and his [and her] environment; to promote efforts which will prevent or eliminate damage to the environment and enhance human and community resources; and to enrich the understanding of the ecological systems, natural, human and community resources important to the people of the state.

ECL §8-0101 (McKinney's 2005).

177.    The "environment" that SEQRA is designed to protect is broadly defined to include:

> the physical conditions which will be affected by proposed action, including land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic

39

significance, existing patterns of population concentration, distribution or growth and existing community or neighborhood character.

ECL §8-0105(6).

178.    SEQRA accomplishes its beneficial purposes by requiring that, "[a]s early as possible in the formulation of a proposal for an <u>action</u>, the responsible [body] shall make an initial determination whether an environmental impact statement need be prepared for the <u>action</u>." <u>Id</u>. §8-0109(4) (emphasis added).

179.    Under SEQRA, "actions" include:

(1) projects or physical activities, such as construction or other activities that may affect the environment by changing the use, appearance or condition of any natural resource or structure, that:

(i) are directly undertaken by an agency; or

(ii) involve funding by an agency; or

(iii) require one or more new or modified approvals from an agency or agencies;

(2) agency planning and policy making activities that may affect the environment and commit the agency to a definite course of future decisions;

6 N.Y.C.R.R. §617.2.

180.    The Resolution granting the Variance and approving reconfiguration of the Building and its conversion into a facility to accommodate NY3 Residents, constitutes an Unlisted Action under SEQRA (Resolution at 7).

181.    SEQRA further provides in pertinent part:

An application for agency funding or approval of a Type I or Unlisted action

40

will not be complete until:

    (1) a negative declaration has been issued; or

    (2) until a draft EIS has been accepted by the lead agency as satisfactory with respect to scope, content and adequacy. When the draft EIS is accepted, the SEQR process will run concurrently with other procedures relating to the review and approval of the action, if reasonable time is provided for preparation, review and public hearings with respect to the draft EIS.

6 N.Y.C.R.R. §617.3(a).

182.    Where an agency is considering whether to approve an Unlisted Action, the agency must first determine whether it "may include the potential for at least one significant adverse environmental impact." 6 N.Y.C.R.R. §617.7. If so, an environmental impact statement must be prepared. Id.

183.    For all Type I and Unlisted actions the lead agency making a determination of significance must:

    (1) consider the action as defined in sections 617.2(b) and 617.3(g) of this Part;

    (2) review the EAF [Environmental Assessment Form] for the criteria contained in subdivision (c) of this section and any other supporting information to identify the relevant areas of environmental concern;

    (3) thoroughly analyze the identified relevant areas of environmental concern to determine if the action may have a significant adverse impact on the environment; and

    (4) set forth its determination of significance in a written form containing a reasoned elaboration and providing reference to any supporting documentation.

6 N.Y.C.R.R. §617.7(b).

184.   Under SEQRA:

> To determine whether a proposed ... Unlisted action may have a significant adverse impact on the environment, the impacts that <u>may be reasonably expected to result from the proposed action</u> must be compared against the criteria in this subdivision. 6 N.Y.C.R.R. §617.7(c) (emphasis added).

185.   The BSA, in granting the Variance, issued a conditional negative declaration (Resolution at 7-8). A conditioned negative declaration is defined under SEQRA as follows:

> Conditioned negative declaration (CND) means a negative declaration issued by a lead agency for an Unlisted action, involving an applicant, in which the action as initially proposed may result in one or more significant adverse environmental impacts; however, mitigation measures identified and required by the lead agency, pursuant to the procedures in section 617.7(d) of this Part, will modify the proposed action so that no significant adverse environmental impacts will result.[16]

186.   The BSA violated SEQRA in that, <u>inter alia</u>:

- the BSA failed to "thoroughly analyze the identified relevant areas of environmental concern to determine if the action may have a significant adverse impact on the environment" (6 N.Y.C.R.R. §617.7(b));

- the BSA failed to "set forth its determination of significance in a written form containing a reasoned elaboration and providing reference to any supporting documentation" (<u>Id</u>.);

- the BSA failed to consider the full environmental impact of the grant of the Variance (<u>Id</u>.);

- the BSA failed to "identify the relevant areas of environmental concern" (<u>Id</u>.); and

- the BSA limited its SEQRA inquiry to a narrow discussion of the "wall height,

---

[16]The conditions that the BSA imposed relate exclusively to the Developer's adherence to drawings and the parameters of the Variance; there are no environmental specific mitigation formulae set forth in the CND, rendering it effectively a nullity (Resolution 7-8).

sky exposure plane, and rear yard requirements" of the Zoning Resolution, rather than a broader "analysis" of the "impacts that <u>may be reasonably expected to result from the proposed action</u>," in violation of 6 N.Y.C.R.R. §617.7(c) (emphasis added).

187.    As a direct, proximate and substantial result of the foregoing, the BSA never considered the following criteria specifically enumerated in SEQRA's regulations, <u>inter alia</u>:

(i) a substantial adverse change in existing air quality ... noise levels [caused by the Developer's Plan, particularly to the Building's current tenants including Petitioner Rolande Cutner]; ...

(iv) the creation of a material conflict with a community's current plans or goals as officially approved or adopted;

(v) the impairment of the character or quality of ... or aesthetic resources or of existing community or neighborhood character; ...

(vii) the creation of a hazard to human health;

(viii) a substantial change in the use, or intensity of use, of land including ... recreational resources, or in its capacity to support existing uses; ...

(ix) the encouraging or attracting of a large number of people to a place or places for more than a few days, compared to the number of people who would come to such place absent the action;

(x) the creation of a material demand for other actions that would result in one of the above consequences; ...

(xi) changes in two or more elements of the environment, no one of which has a significant impact on the environment, but when considered together result in a substantial adverse impact on the environment; ... [and]

(xii) two or more related actions undertaken, funded or approved by an agency, none of which has or would have a significant impact on the environment, but when considered cumulatively would meet one or more of the criteria in this subdivision (6 N.Y.C.R.R. §617.7(c)).

188.    Had the BSA considered the required criteria under SEQRA, it would have had no choice but to have determined that the issuance of the Resolution granting the Variance and approving reconfiguration of the Building and its conversion into a facility to accommodate NY3 Residents would have substantial and adverse impacts on the environment within the meaning of SEQRA, requiring preparation of an Environmental Impact Statement.

189.    By reason of the foregoing, Petitioners are entitled to an order, vacating and annulling the Variance and Resolution or, in the alternative, an order of remand thereof, together with an injunction, enjoining any further actions by Respondents in furtherance of the Developer's Plan, Variance, and Resolution.

190.    Petitioners have no remedy at law.

## SIXTH CLAIM:
## RESPONDENTS VIOLATED ULURP

191.    Petitioners repeat and reallege each and every allegation set forth in the preceding paragraphs 1 through 190, inclusive, as if set forth fully herein.

192.    Pursuant to the provisions of ULURP for certain specified categories of actions ("Categories"), any "applications by any person or agency, for changes, approvals, contracts, consents, permits or authorization thereof, representing the use, development or improvement of real property subject to City regulation shall be reviewed pursuant to a uniform review procedure" (Charter, Ch. 8, §197-c).

193.    The Categories requiring ULURP review include "site selection for capital

44

projects pursuant to sections two hundred eighteen" (Id. at §197-c(5)) ("Site Selection for Capital Projects").

194.    Pursuant to Charter, Chapter 9, §210(1), a "Capital Project" means, inter alia:

(a) a project which provides for the construction, reconstruction, acquisition or installation of a physical public betterment or improvement which would be classified as a capital asset under generally accepted accounting principles for municipalities or any preliminary studies and surveys relative thereto or any underwriting or other costs incurred in connection with the financing thereof.

195.    Upon information and belief, the Developer's Plan is a Capital Project within the meaning of the City Charter.

196.    The BSA, in issuing the Resolution granting the Variance, failed to conduct any ULURP analysis.

197.    The BSA violated ULURP and the City Charter.

198.    By reason of the foregoing, Petitioners are entitled to an order, vacating and annulling the Variance and Resolution or, in the alternative, an order of remand thereof, together with an injunction, enjoining any further actions by Respondents in furtherance of the Developer's Plan, Variance, and Resolution.

199.    Petitioners have no remedy at law.

**SEVENTH CLAIM:    THE BSA LACKED JURISDICTION AND ACTED IN VIOLATION OF ITS RULES BY PERMITTING THE DEVELOPER TO PURSUE THE VARIANCE WITH AN OWNER'S CONSENT**

200.    Petitioners repeat and reallege each and every allegation set forth in the preceding paragraphs 1 through 199, inclusive, as if set forth fully herein.

201.   Under Rule 1-03(g) of the BSA's Rules, the applicant seeking a variance files through counsel, "a signed and notarized statement or other proof must be submitted with the application showing that the applicant is authorized by the owner to make the application." 1-03(g).

202.   Here, the Developer submitted an application through counsel, but filed only a blank consent, with no executed authorization (Blank, Unexecuted Consent, Exh. 8).

203.   Where an agency's commitment to adhering to its own rules changes depending upon whose side is favored thereby, such constitutes arbitrary and capricious decision-making and a violation of due process, requiring vacatur and annulment of the action taken.

204.   By reason of the foregoing, Petitioners are entitled to an order, vacating and annulling the Variance and Resolution or, in the alternative, an order of remand thereof, together with an injunction, enjoining any further actions by Respondents in furtherance of the Developer's Plan, Variance, and Resolution.

**WHEREFORE**, for the reasons stated, Petitioners demand judgment over and against Respondents, vacating and annulling the Resolution and Variance, or in the alternative remand thereof; an injunction, enjoining any further actions by Respondents in furtherance of the Developer's Plan, Variance, and Resolution; together with costs, disbursements, attorneys' fees, and any and all other relief this Court deems just, proper and appropriate.

Dated:    New York, New York
          November 21, 2007

                              **WEISS & HILLER, PC**
                              Attorneys for Petitioners
                              600 Madison Avenue
                              New York, NY 10022
                              (212) 319-4000

                    By: _____
                              Michael S. Hiller

47