SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - x

In the Matter of the Application of:                          :

NEIGHBORHOOD IN THE NINETIES,                                 :
INC., AARON BILLER, ROLANDE CUTNER,                           :
LAWRENCE LIBERSTEIN, CATHERINE                                :
BINDMAN, ARMIN KUNZ, KATHY                                    :        Index No.:
PASSERO, SHARON GAFFNEY, MICHAEL                              :
DiSTASIO, DAVID HENDRICKS, JOHN                               :
HUGILL, JACQUELINE HOWELL, RICHARD                            :
SCHWARTZ, ROBERT REMIEN, JUDITH                               :
AMORY, EDWARD GRIMM, MARINA                                   :
HIGGINS, JOAN MORGAN, JUANITA                                 :
STREULI, and JAMES and MONA CANNING,                          :        **VERIFIED PETITION**

                        Petitioners,                          :

For a Judgment Pursuant to Article 78 of the                  :
Civil Practice Law and Rules,                                 :

        - against -                                           :

CITY OF NEW YORK, BOARD OF                                    :
STANDARDS AND APPEALS OF THE                                  :
CITY OF NEW YORK, DEPARTMENT OF                               :
HOUSING PRESERVATION AND                                      :
DEVELOPMENT, NEW YORK CITY                                    :
HOUSING DEVELOPMENT                                           :
CORPORATION, LANTERN GROUP                                    :
FOUNDATION, INC., LANTERN                                     :
INVESTMENT GROUP, LLC, LANTERN                                :
GROUP, 319 REALTY SERVICES L.P., 319                          :
WEST LLC, ST. LOUIS L.P., AUDUBON                             :
HOUSING DEVELOPMENT FUND                                      :
CORPORATION, FRIENDS IN THE CITY,                             :
INC., MiCASA HDFC, MEL-AP HOTEL                               :
CORP., IRENE SHREYBERG, CITY                                  :
PLANNING COMMISSION, "JOHN AND                                :
JANE DOES" 1-10, and XYZ                                      :
Corp./LLC/LLP 1-10                                            :

                        Respondents.                          :

- - - - - - - - - - - - - - - - - - - - - - - - - x

**PETITIONERS**, as and for their Verified Petition, allege as follows:

## INTRODUCTION

1.    By this proceeding ("Proceeding"), petitioners Neighborhood in the Nineties, Inc., Aaron Biller, Rolande Cutner, Lawrence Liberstein, Catherine Bindman, Armin Kunz, Kathy Passero, Sharon Gaffney, Michael DiStasio, David Hendricks, John Hugill, Jacqueline Howell, Richard Schwartz, Robert Remien, Judith Amory, Edward Grimm, Marina Higgins, Joan Morgan, and Juanita Streuli (collectively, "Petitioners") seek to vacate and annul, or in the alternative remand, a variance ("Variance") issued by the Board of Standards and Appeals of the City of New York ("BSA") on October 26, 2007.  A copy of the Resolution granting the Variance ("Resolution") is annexed as Exhibit 1.

2.    In granting the Variance, the BSA gave authorization to substantially demolish the building and premises located at 319 West 94th Street, New York, New York, known as Saint Louis Hall (the "Building"), and to reconfigure it for use as a minimally supervised facility that would house chronically homeless single adults who suffer from, among other conditions, severe mental disturbances, psychiatric illnesses, and chemical and substance abuse.

3.    As demonstrated below, the Building is located in close proximity to two schools ("Schools"), one of which has a non-contiguous playground that renders it virtually impossible to monitor.  The grant of the Variance places surrounding residents and the children attending the Schools in serious danger.

2

4.    The Variance also poses a hazard to current residents of the Building who, as discussed further below, will continue to occupy their apartments in the Building as the demolition is performed.  Approximately 80% of the Building will be demolished, without any study whatsoever over the environmental and other adverse impacts that will occasion the Building's existing residents and those living in the vicinity.

5.    Most of the residents in the area were not notified of the Variance because the BSA failed to follow its own rules which require such notice.  Worse, those who did receive some notice of the Variance, received, at best from respondents' perspective, inaccurate (at worst false) information concerning the Variance and, in particular, the planned residents of the reconfigured Building.

6.    Aside from the lack of adequate notice, the grant of the Variance violates ZR 72-21, the Fair Share Guidelines ("FSG"), Uniform Land Use Review Procedure ("ULURP"), the State Environmental Quality Review Act ("SEQRA") and the City Environmental Quality Review ("CEQR").

## PARTIES

7.    Petitioner Neighborhood in the Nineties, Inc. (the "Coalition") is, and at all relevant times has been, a not-for-profit corporation, organized and existing under the laws of the State of New York, with a principal address in New York, New York.

8.    The Coalition is registered as a 501(c)(3) organization under the statutes and regulations governing the Internal Revenue Service.

9. The Coalition is comprised of more than 900 residents, occupying more than 80 buildings, and other interested parties located in the zoning district at or about West 94th Street between Riverside and West End Avenues (the "Zoning District").

10. Petitioner Aaron Biller ("Aaron") is, and at all relevant times has been, a citizen of the State and City of New York, residing at 310 West 94th Street, New York, New York.

11. Aaron lives in, and is an owner of, a residential co-operative corporation apartment ("residential co-op") across the street from the Building.

12. Petitioner Rolande Cutner ("Rolande") is, and at all relevant times has been, a citizen of the State and City of New York, residing in the Building, 319 West 94th Street, New York, New York.

13. Rolande is over the age of 70 and suffers from multiple sclerosis and the affects of a serious car accident that occurred several years ago.

14. Petitioner Lawrence Liberstein ("Larry") is, and at all relevant times has been, a citizen of the State and City of New York, residing at 214 Riverside Drive, New York, New York.

15. Larry lives in, and is an owner of, a residential co-op located within 400 feet of the Building.

16. Petitioner Catherine Bindman ("Catherine") is, and at all relevant times has been, a citizen of the State and City of New York, residing at 224 Riverside Drive, New York, New York.

4

17.    Catherine lives in, and is an owner of, a residential co-op located within 400 feet of the Building.

18.    Petitioner Armin Kunz ("Armin") is, and at all relevant times has been, a citizen of the State and City of New York, residing at 224 Riverside Drive, New York, New York.

19.    Armin lives in, and is an owner of, a residential co-op located within 400 feet of the Building.

20.    Petitioner Kathy Passero ("Kathy") is, and at all relevant times has been, a citizen of the State and City of New York, residing at 224 Riverside Drive, New York, New York.

21.    Kathy lives in, and is an owner of, a residential co-op located within 400 feet of the Building.

22.    Petitioner Sharon Gaffney ("Sharon") is, and at all relevant times has been, a citizen of the State and City of New York, residing at 227 Riverside Drive, New York, New York.

23.    Sharon lives in, and is an owner of, a residential co-op located within 400 feet of the Building.

24.    Petitioner Michael DiStasio ("Michael") is, and at all relevant times has been, a citizen of the State and City of New York, residing at 314 West 94th Street, New York, New York.

5

25.    Michael lives in, and is a tenant in a building located within 400 feet of the Building.

26.    Petitioner David Hendricks ("David") is, and at all relevant times has been, a citizen of the State and City of New York, residing at 314 West 94th Street, New York, New York.

27.    David lives in, and is an owner of a condominium located within 400 feet of the Building.

28.    Petitioner John Hugill ("John") is, and at all relevant times has been, a citizen of the State and City of New York, residing at 310 West 94th Street, New York, New York.

29.    John lives in, and is an owner of a residential co-op located across the street from the Building.

30.    Petitioner Jacqueline Howell ("Jacqueline") is, and at all relevant times has been, a citizen of the State and City of New York, residing at 250 West 94th Street.

31.    Jacqueline lives in, and is an owner of a residential co-op located across the street from the Building.

32.    Petitioner Richard Schwartz ("Richard") is, and at all relevant times has been, a citizen of the State and City of New York, residing at 711 Westend Avenue, New York, New York.

33.    Richard lives in, and is a tenant in a building located within 400 feet of the Building.

6

34.   Petitioner Robert Remien ("Remien") is, and at all relevant times has been, a citizen of the State and City of New York, residing at 314 West 94th Street, New York, New York.

35.   Remien lives in, and is an owner of a condominium located within 400 feet of the Building.

36.   Petitioner Judith Amory ("Judith") is, and at all relevant times has been, a citizen of the State and City of New York, residing at 222 Riverside Drive, New York, New York.

37.   Judith lives in, and is an owner of a condominium located within 400 feet of the Building.

38.   Petitioner Edward Grimm ("Ed") is, and at all relevant times has been, a citizen of the State and City of New York, residing at 697 West End Avenue, New York, New York.

39.   Ed lives in, and is a tenant in a building located within 400 feet of the Building.

40.   Petitioner Marina Higgins ("Marina") is, and at all relevant times has been, a citizen of the State and City of New York, residing at 697 West End Avenue, New York, New York.

41.   Marina lives in, and is a tenant in a building located within 400 feet of the Building.

42.   Petitioner Joan Morgan ("Joan") is, and at all relevant times has been, a citizen of the City and State of New York, residing at 677 West End Avenue, New York, New York.

7

43.     Joan lives in, and is an owner of, a residential co-op located within 400 feet of the Building.

44.     Petitioner Juanita Streuli ("Juanita") is, and at all relevant times has been, a citizen of the City and State of New York, residing at 670 West End Avenue, New York, New York.

45.     Juanita lives in, and is an owner of , a residential co-op located within 400 feet of the Building.

46.     Petitioners James and Mona Canning (the "Cannings") are, and at all relevant times have been, citizens of the City and State of New York, residing at 224 Riverside Drive, New York, New York.

47.     The Cannings send their child to PS 75 Elementary School which is within 400 feet of the Building.

48.     Respondent City of New York (the "City") is a governmental body, charged with the responsibility of, inter alia, overseeing and administering the public affairs and public lands of the five boroughs of New York City, including all governmental and public administration and oversight.

49.     Respondent BSA is, and at all relevant times has been, an agency of the City of New York and is a "body" or "officer" within the meaning of Article 78 of the CPLR.

50.     Respondent Department of Housing Preservation and Development ("DHPD") is, and at all relevant times has been, a department of the City of New York and is a "body"

8

or "officer" within the meaning of Article 78 of the CPLR.

51.    Upon information and belief, the DHPD has taken action supportive of the Variance and re-configuration of the Building.

52.    Respondent Housing Development Corporation ("HDC") is, and at all relevant times has been, a Department of the City of New York and is a "body" or "officer" within the meaning of Article 78 of the CPLR.

53.    Upon information and belief, the HDC has taken action supportive of the Variance and re-configuration of the Building.

54.    Upon information and belief, Lantern Group Foundation, Inc. ("Developer") is, and at all relevant times has been, a corporation organized and existing under the laws of the State of New York, with offices located in New York, New York.

55.    Upon information and belief, the Developer was the applicant before the BSA in support of the reconfiguration of the Building.

56.    Upon information and belief, the Developer is, and at all relevant times has been, a net lessee of the Building.

57.    Upon information and belief, Respondent Lantern Investment Group, LLC ("LIG") is, and at all relevant times has been, a limited liability company organized and existing under the laws of the State of New York, with offices located in New York, New York.

58.    Upon information and belief, LIG is an investment arm of the Developer.

9

59.    Respondent Lantern Group ("LG") was listed as the applicant before the BSA, but, according to the records of the Secretary of State of the New York State, LG has no existence separate and apart from the Developer. In an excess of caution, LG is separately named as a party respondent to this Proceeding.

60.    Upon information and belief, respondent 319 Realty Services L.P. ("319 LP") is, and at all relevant times has been, a limited partnership organized and existing under the laws of the State of New York, with a principal place of business in the City and State of New York.

61.    Upon information and belief, 319 LP is an affiliate of the Developer and may have an interest in this litigation.

62.    Upon information and belief, respondent 319 West LLC ("319 LLC") is, and at all relevant times has been, a limited liability company organized and existing under the laws of the State of New York, with a principal place of business in the City and State of New York.

63.    Upon information and belief, 319 LLC is an affiliate of the Developer and may have an interest in this litigation.

64.    Upon information and belief, respondent St. Louis L.P. ("St. Louis") is a limited partnership organized and existing under the laws of the State of New York, with a principal place of business in the City and State of New York.

65.    Upon information and belief, St. Louis an affiliate of the Developer and may

10

have an interest in this litigation.

66.    Upon information and belief, respondent Audubon Housing Development Fund Corporation ("Audubon") is, and at all relevant times has been, a corporation organized and existing under the laws of the State of New York, with offices in the City and State of New York.

67.    Audubon is mentioned in the Developer's Second Revised Statement (discussed infra) as an affiliate of the Developer and a potentially interested party.

68.    Upon information and belief, respondent Friends in the City, Inc. ("FICI") is, and at all relevant times has been, a corporation organized and existing under the laws of the State of New York, with offices in the City and State of New York.

69.    FICI is mentioned in the Developer's Second Revised Statement (discussed infra) as an affiliate of the Developer and a potentially interested party.

70.    Upon information and belief, respondent MiCasa HDFC ("MCA") is, and at all relevant times has been, a corporation organized and existing under the laws of the State of New York, with offices in the City and State of New York.

71.    MCA is mentioned in the Developer's Second Revised Statement (discussed infra) as an affiliate of the Developer and a potentially interested party.

72.    Upon information and belief MEL-AP Hotel Corp. ("Mel") is, and at all relevant times has been, a corporation organized and existing under the laws of the State of New York, with offices located in New York, New York.

73.    New York City Property records reflect that Mel is an owner in fee of the Building.[1]

74.    Upon information and belief, Irene Shreyberg ("Shreyberg") is, and at all relevant times has been, a citizen of the City and State of New York, residing in New York, New York.

75.    New York City Property records reflect that Shreyberg is an owner in fee of the Building.[2]

76.    City Planning Commission ("CPC") is, and at all relevant times has been, an agency of the City of New York and is a "body" or "officer" within the meaning of Article 78 of the CPLR.

77.    Respondents "John and Jane Does" 1-10 are fictitious names representing persons, currently unknown to Petitioners, but who may have an interest in this Proceeding.[3]

78.    Respondents XYZ Corp./LLC/LLP 1-10 are fictitious names representing business organizations, currently unknown to Petitioners, but which may have an interest in

---

[1]Petitioners' review of the Administrative Record ("Record") of the BSA reveals that the name of the owner of the Building was not disclosed to the BSA. All references to the "Record" pertain only to those documents made available to Petitioners and their counsel by the BSA. Such does not constitute a representation that the Record provided to Petitioners by the BSA is complete.

[2]See n. 1.

[3]Because Petitioners were deprived of an opportunity to participate before the BSA, and given the shortened period of limitation within which this Proceeding must be commenced, they simply cannot be certain of, and have not been afforded the opportunity to ascertain, the identities of all of the parties.

this Proceeding.[4]

## FACTS

### The Building

79.    The Building is located in the Zoning District which is classified as R8 (Resolution, Exh. 1); it is a six story (plus cellar), tenement Class A structure built in or about 1949 (Resolution at 1); Certificate of Occupancy, Exh. 2; Developer's Second Revised Statement at 2, Exh. 3). The Building measures approximately 31,600 square feet in floor area and is currently occupied by 54 elderly, low-income residents (Developer's Second Revised Statement at 2).

80.    According to the Developer's application before the BSA ("Application"), the Developer is the lessee/operator of the Building and indicated to the BSA that it intended to purchase it in October 2007 (Developer's Second Revised Statement at 2, Exh. 3).[5]

81.    The Developer desires to enlarge and dramatically reconfigure the Building. Specifically, the Developer seeks to:

- increase the number of stories of the Building from six to nine;

- add nearly 14,000 square feet of new space; and

- increase the number of current occupants from 54 to 149[6]

---

[4] See n. 3.

[5] New York City property records do not currently reflect any such purchase.

[6] BSA Record reflects that this figure may have been reduced to 141 (Resolution at 2, Exh. 1).

13

(collectively, "Development Objectives") (Developer's Second Revised Statement at 2-3, Exh. 3).

## The Developer's Proposed Occupants of the Building

82.    The intended new occupants of the Building do not fall into the same general description of those currently residing there; rather, 49% of the new occupants would consist of adults who meet the eligibility standards of the November 3, 2005 New York/New York III Supportive Housing Agreement between the City and State ("NY3 Residents") (10/19/07 Motion to Reopen at 1-2, Exh. 4). NY3 Residents consist of individuals who meet the following criteria:

- chronically homeless individuals who suffer from a "serious and persistent mental illness" or who are "diagnosed as mentally ill and chemically addicted";

- single adults who are "presently living in New York State-operated psychiatric centers" or State-operated transitional residences;

- young adults, age 18-24, who have "serious mental illness";

- chronically homeless individuals "who have a substance abuse disorder" or are recovering from one;

- chronically homeless individuals who are living with HIV/AIDS and who "suffer from a serious and persistent mental illness or substance abuse disorder" (Id.).

83.    The facility envisioned by the Developer would provide for only limited supervision of the NY3 Residents -- Monday through Friday from 9 AM to 5 PM; during the remainder of the week and on weekends, the NY3 Residents would be totally unsupervised and unmonitored (Developer's Second Revised Statement of Facts at 3, Exh. 3). Thus, the

14

Building and its new NY3 Residents, comprised of mentally-ill, chemically-dependent, substance-abusive, chronically homeless single adults would be unsupervised and unmonitored 128 out of 168 hours a week, including nights and weekends.

**The Building is Nearby an Elementary School and Non-Contiguous Playground**

84.    Public School 75, the Emily Dickinson School, is a public elementary school located one block north of the Building, bounded by 95th and 96th Streets, West End Avenue and Riverside Drive ("PS 75 Elementary School"). The school building ("Elementary School Building") and schoolyard of PS 75 Elementary School are located on the east end of the block, while a large affiliated playground ("Non-Contiguous School Playground") is located at the west end of the block. PS 75 Elementary School serves more than 800 young school children in grades K through 5 (10/19/07 Motion at 2, Exh. 4). Another approximately 200 middle school students enrolled in West Side Academy also occupy the PS 75 School Building (10/17/07 Letter from PTA President Barbara Mellor, Exh. 5). Thus, the Non-Contiguous School Playground cannot be seen, and more than 1,000 school children cannot be observed, from the Elementary School Building.

85.    Juxtaposing a largely unmonitored and unsupervised facility of mentally-ill, chemically-dependent, substance-abusive, chronically homeless single adults with an Elementary School and unmonitorable Non-Contiguous School Playground creates a substantial and unacceptable danger to young school children and the public welfare generally, not to mention the elderly tenants currently living in the Building.

15

**Developer's Plan for the Building Would Violate the Zoning Resolution**

86.    The Developer contended before the BSA that, in order to meet its Development Objectives, the Developer needed a variance from the following applicable zoning restrictions:

- ZR §24-522 (wall height, setback and sky exposure plane);

- ZR §24-36 (rear yard)

- ZR §54-41 (permitted reconstruction)

(Developer's Second Revised Statement at 1, Exh. 3).

87.    As reflected in the BSA's Resolution, the reconfiguration of the Building sought by the Developer:

> exceeds the street wall height, does not provide the required setbacks, encroaches into the setback and sky exposure plane, does not provide the required rear yard, and demolishes more than 75 percent of the interior floor area of an existing non-complying building, contrary to ZR §24-522, 24-36, and 54-41 (Resolution at 1, Exh. 1).

88.    With respect to wall height and setback, the Zoning Resolution permits the building to rise to a height of 85 feet or nine (9) stories, "whichever is less," whereupon it must set back from the street a minimum distance of 20 feet. ZR 24-522. Here, the Developer's plan ("Developer's Plan") seeks to violate the height and setback regulations by building straight up to a height of 88 feet with no setback (Resolution at 2, Exh. 1).

89.    With respect to the sky exposure plane, the Zoning Resolution requires that, beginning at the height of the lesser of 85 feet or nine (9) stories, the building must set back

16

behind an imaginary plane of 2.7 feet vertical to one (1) foot horizontal (the sky exposure plane). Here, the Developer seeks to encroach into the sky exposure plan by not setting back above the 85 foot elevation.

90.     The Resolution indicates that a Variance is granted with respect to the setback requirements, but does not indicate the extent of the Variance. In other words, the Resolution permits the front wall height to rise to 88 feet without a setback and further allows the Building's height to rise another 11 feet to 99 feet, <u>but there is no indication in the Resolution how much of a setback is going to be required of the Developer above 88 feet</u>. Thus, the Resolution is entirely unclear and provides no guidance to the Developer or the community at large.

91.     With respect to the rear yard requirements, the Zoning Resolution requires the Building to have a 30-foot rear yard. ZR §24-36. The purpose of the rear-yard requirements is to fulfill and ensure compliance with legal light and air requirements to: (i) the Building's occupants (who have "living" rooms facing the back of the Building) and (ii) occupants of adjacent buildings whose light and air is impacted by the depth of the Building and its rear yard. The Developer's Plan, however, ignores these requirements and consequences and would result in only a 13'1" rear yard (less than half that required) (Resolution at 2, Exh. 1), drastically affecting light air to the Building's current occupants and those living in the adjacent buildings.

92.     With respect to demolition, the Zoning Resolution does not permit the

17

demolition of more than 75% of a building that fails to comply with the Zoning Resolution. ZR §54-41. The Developer's Plan would require demolition of at least 80% ("80% Demolition") of the Building (Id. at 4). Upon information and belief, the Record does not set forth that the BSA ever considered the adverse impact that the 80% Demolition would have on current residents, including Petitioner Rolande, other than the fact that the Developer's Plan requires that they all move from the front of the Building to the back and then again from the back to the front (Developer's Second Revised Statement at 7, Exh. 3).[7]

**Standard for Granting a Variance**

93.   Zoning Resolution §72-21 states in pertinent part:

[T]he Board of Standards and Appeals may, in accordance with the requirements set forth in this Section, vary or modify a provision [of the Zoning Resolution] so that the spirit of the law shall be observed, public safety secured, and substantial justice done.

94.   Zoning Resolution §72-21 further sets forth five specific findings (the "Five Required Findings") that "the Board shall make" prior to the grant of any hardship variance in New York City. Id. As will be reflected in the Memorandum of Law to follow, any hardship variance granted in the absence of the Five Required Findings must be vacated, annulled or remanded to the BSA.[8] The Five Required Findings are set forth below.

---

[7]Hardly the virtuous do-gooder, the Developer has been at loggerheads with its tenants in the Building for some time. In fact, as will be shown during the course of this Proceeding, one such tenant, Rolande, has been forced to bring a federal civil rights action against the Developer and its affiliates for harassment and abuse.

[8]Given the 30-day period of limitation within which to commence a proceeding to challenge a determination by the BSA, Petitioners did not have the opportunity to organize and hire counsel sufficiently in advance of the expiring deadline to arrange for the preparation of a Memorandum of Law

## Finding (a)

95.     Subsection (a) of ZR §72-21 requires, as a precondition to granting the Variance, that the Developer prove, and the BSA find:

(a)     that there are unique physical conditions, including irregularity, narrowness or shallowness of lot size or shape, or exceptional topographical or other physical conditions peculiar to and inherent in the particular zoning lot ...

(ZR §72-21(a)).  This provision further requires the Developer to demonstrate that the alleged hardship is "not due to circumstances created generally by the strict application of such provisions in the neighborhood or district in which the lot is located." Id.

96.     By law, Finding (a) requires that the Building be, not only unique, but also obsolete in the absence of the grant of a hardship variance ("Unique Obsolescence Requirement").  See Memorandum of Law.  As explained by the Court of Appeals:

There must at least be proof that a particular property suffers a singular disadvantage through the operation of a zoning regulation before a variance thereof can be allowed on the ground of 'unnecessary hardship' . . . .

(Memorandum of Law).

97.     The Court of Appeals has further explained:

[B]efore the board may vote a variance, there must be shown, among other things, that the plight of the owner is due to unique circumstances and not to the general conditions in the neighborhood which may reflect the unreasonableness of the zoning ordinance itself (Memorandum of Law).

98.     To determine whether a building is truly unique within a zoning district and

contemporaneously with the filing of this petition. However, Petitioners intend to file a separate Memorandum of Law prior to the time within which a response is required by respondents.

19

suffers from a "singular disadvantage," the Developer is required to submit, among other evidence, a survey of the other buildings in the Zoning District (Memorandum of Law).

99.    The BSA Record reflects that the Developer did not submit a survey or other evidence in support of the (a) finding. Indeed, the sole "evidence" of supposed uniqueness was a conclusory statement by the Developer in its Application, stating through counsel simply that the Building is "oddly-shaped and resembles a dumbbell" or "I-shape[]" (Developer's Second Revised Statement at 5, Exh. 3). In fact, as reflected in the annexed photographs, the dumbbell or "I" shaped building is an entirely common design in New York City. See Photographs (Exh. 6).

100.    The BSA failed to insist upon a survey from the Developer and failed to conduct its own survey of surrounding buildings in the area, instead relying upon the Developer's conclusory statements concerning the shape of the Building, and concluding that the shape "results in an irregular shape and inefficient floorplate" (Resolution at 3, Exh. 1).

101.    Instead of obtaining substantial evidence with respect to the Unique Obsolescence Requirement, or conducting an analysis with respect to the same, the BSA relied upon the Developer's assertions with respect to its "programmatic space needs" for the Building (Resolution at 3). As shown infra and in the Memorandum of Law, an allegation with respect to "programmatic needs" cannot be substituted for the Unique Obsolescence Requirement and may be used only to supplant the (b) finding.

**Finding (b)**

20

102.   Subsection (b) of ZR §72-21 ordinarily requires, as a precondition to granting

the Variance, that a developer prove, and the BSA find:

> (b)   that because of such physical conditions, there is no reasonable
> possibility that the development of the zoning lot in strict conformity with the
> provisions of the [Zoning] Resolution will bring a reasonable return ...

(ZR §72-21(b)).  However, as will be reflected in the Memorandum of Law, where the

Developer is a non-profit, the (b) finding is replaced with a requirement that the Developer

demonstrate a "programmatic need" for the variance ("Programmatic Need Finding").[9]

**Finding (c)**

103.   Subsection (c) of ZR §72-21 requires, as a precondition to granting the

Variance, that the Developer prove, and the BSA find:

> (c)   that the variance, if granted, will not alter the essential character of the
> neighborhood or district in which the zoning lot is located; will not
> substantially impair the appropriate use or development of adjacent property;
> and will not be detrimental to the public welfare (ZR §72-21(c)) ("Adverse
> Impact Finding").

104.   As will be shown infra and in the Memorandum of Law, the BSA, with respect

to Finding (c): (i) committed errors of law by refusing to consider, not only the specific terms

of the Variance requested, by the overall effect, environmental and otherwise, of its being

granted; and (ii) was arbitrary and capricious, failed to rely on substantial evidence and

---

[9] As discussed infra, the Developer relied upon, and the BSA wrongfully accepted, a
"programmatic needs" showing to substitute for three of the Five Required Findings.  In any event, as
further shown infra, the Developer did not meet its burden of showing that its programmatic needs could
not be satisfied in the absence of a variance.  Moreover, it was entirely unproven before the BSA that the
Developer was a legitimate non-profit.

otherwise acted in derogation of New York law.

**Finding (d)**

105.   Subsection (d) of ZR §72-21 requires, as a precondition to granting the

Variance, that the Developer prove, and the BSA find, that the hardship was not "created by

the owner or by a predecessor in title" ("Self Created Hardship").  As the Courts have ruled:

> A hardship is self-created, for zoning purposes, where the applicant for a
> variance acquired the property subject to the restriction from which he or she
> seeks relief.[10]

106.   As the Courts have further stated:

> Even if a prospective purchaser of property does not have the actual
> knowledge of the applicable provisions of an ordinance, he [or she] is bound
> by them and by the facts and circumstances concerning the use of the property
> which he [or she] may learn by exercising reasonable diligence.

107.   As will be shown _infra_ and in the Memorandum of Law, the BSA, with respect

to Finding (d): failed to make any reasoned inquiry with respect to Self-Created Hardship,

did not rely on substantial (or really any) evidence, acted arbitrarily and capriciously and

otherwise in violation of New York law.

**Finding (e)**

108.   Subsection (e) of ZR §72-21 requires, as a precondition to granting the

Variance, that the Developer prove, and the BSA find:

> that within the intent and purposes of this [Zoning] Resolution[,] the variance,
> if granted, is the minimum variance necessary to afford relief; and to this end,

---

[10]Section (d) is not applied under circumstances in which all of the other Five Required Findings
are present.  ZR §72-21(d).  As demonstrated _infra_, such was not the case here.

22

the Board may permit a lesser variance than that applied for ("Minimum Variance Necessary Finding"). ZR §72-21(e).

109.    As will be shown _infra_ and in the Memorandum of Law, the BSA, with respect to Finding (e): failed to make any reasoned inquiry with respect to this provision, did not rely on substantial (or really any) evidence, acted arbitrarily and capriciously and otherwise in violation of New York law.

110.    Each of the Required Five Findings must be specified in the BSA's decision to grant or deny a variance. ZR §72-21.

111.    The evidence submitted in support of the Required Five Findings must be "substantial," non-conclusory, well-reasoned and in compliance with New York law (Memorandum of Law). Any variance granted in the absence of substantial evidence, in violation of the law, or based upon conclusory or arbitrary decision-making is void and shall be vacated, annulled or remanded.

### FIRST CLAIM: VIOLATION OF ZR §72-21

112.    Petitioners repeat and reallege each and every allegation set forth in the preceding paragraphs 1 through 111, inclusive, as if set forth fully herein.

113.    Zoning Resolution §72-21 requires the BSA to make the Five Required Findings prior to granting a variance.

114.    The Five Required Findings when the applicant is a non-profit are that: (i) the subject building suffers from Unique Obsolescence; (ii) programmatic needs of the applicant require the variance; (iii) the grant of a variance will have no Adverse Impact on the

23

neighborhood and community; (iv) the hardship of which the applicant complains was not Self-Created; and (v) the variance sought is the Minimum Variance Necessary to avert the hardship. See Discussion at ¶¶91-109, supra.

115.    Zoning Resolution §72-21 requires the BSA to rely upon substantial evidence rather than the conclusory submissions of the applicant in the context of the Five Required Findings.

116.    The BSA's resolution to grant or deny a variance cannot be arbitrary or capricious, lacking in rationality, or violative of New York law.

117.    With respect to Finding (a), the BSA failed to rely upon substantial evidence with respect to the Unique Obsolescence Requirement; failed to insist upon a survey and conduct a survey of its own; relied upon conclusory assertions of the Developer's counsel; and mistakenly and in violation of New York law, relied upon the Developer's "programmatic needs" to satisfy the Unique Obsolescence Requirement when, in fact, "programmatic needs" may only be used to supplant Finding (b); and otherwise acted arbitrarily and capriciously and without rationality with respect to Finding (a).

118.    With respect to Finding (b), the BSA Record, the Developer's Application and the Resolution:

- are all devoid of any evidence that alternate proposals were considered in order to meet the programmatic needs of the Developer;

- do not explain why the Building could not be functional if its front wall were limited to the height prescribed by the Zoning Resolution (85 feet) as opposed to the height specified in the Developer's Plan (88 feet);

24

- are devoid of any evidence that alternate proposals were considered with respect to the rear yard;

- were otherwise lacking in substantial evidence to support the Resolution.

119.    Furthermore with respect to Finding (b), the Record copied by the BSA on Petitioner's behalf makes numerous references to, but does not actually contain, a letter from the Internal Revenue Service purporting to establish that Developer is a non-profit organization ("IRS Letter"), thereby excusing it from demonstrating that there is no possibility of generating a reasonable return on its investment in the Building. In the absence of the IRS Letter, the Developer was required to, and thus failed to, prove the facts supporting Finding (b), namely that the Building is unable to generate a reasonable return to the Developer.

120.    With respect to Factor (c), the Record confirms that the Developer did not submit evidence in connection with, and, independent of the Developer's failure to submit such evidence, the BSA did not evaluate or consider the Adverse Impact caused by, among other things: (i) the effect that reconfiguration of the Building would have on the community; or (ii) using the Building as housing for NY3 Residents.

121.    As regards reconfiguration, the Record does not indicate that the Developer submitted any evidence with respect to, and the BSA, in fact, did not evaluate or consider, among other things:

- the extent to which raising the front wall of the Building to a height of 88 feet, with a total building height of 99 feet, would cast shadows across other buildings, and the Non-Contiguous School Playground; and the neighborhood

25