UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

ROLANDE CUTNER,

               Plaintiff,

    -against-


THE LANTERN GROUP, ST. LOUIS HALL L.P.,
SRO HOTEL THE ST. LOUIS a/k/a THE ST. LOUIS
HALL, 319 REALTY SERVICES, LLP, and 319
WEST LLC and XYZ CORPORATION (said name
being fictitious, it being the intention of CUTNER to
designate any corporation having a legal interest in the
SRO HOTEL THE ST. LOUIS,



               Defendants.
-----------------------------------------------------------------X

Docket No.: CV-07-8649
           (LAK)(WM)


**DEFENDANTS'
STATEMENT OF
UNDISPUTED MATERIAL
FACTS PURSUANT TO
LOCAL RULE 56.1**

        Defendants THE LANTERN GROUP, ST. LOUIS L.P. s/h/a ST. LOUIS HALL L.P.,

and 319 REALTY SERVICES L.P., s/h/a 319 REALTY SERVICES, LLP, by its attorneys,

MIRANDA SOKOLOFF SAMBURSKY SLONE VERVENIOTIS LLP, submit this Statement

of Undisputed Material Facts, pursuant to Local Civil Rule 56.1, in support of their motion for an

order:

        a)      pursuant to Fed. R. Civ. P. 56(b) awarding summary
                 judgment to defendant; and

        b)      such other and further relief as this Court may deem just,
                 equitable, and proper.

**A.    TRANSFER OF OWNERSHIP OF PLAINTIFF'S RESIDENCE**

    1.      Plaintiff has resided in the single room occupancy ("SRO") building located at

319 West 94th Street, Room 341, New York, NY since September of 1994. *See*

Exh. E at p. 16.[1]

2.    When plaintiff moved to 319 West 94th Street, also known as St. Louis Hall, the building was owned by the Margules family. *See* Exh. E at p. 17.

3.    The Lantern Group, Inc., is a not-for-profit organization that owns and operates buildings within New York that serve as housing for persons who have been homeless or have other special needs. *See* Exh. D at ¶2.

4.    The Lantern Group, Inc. has been involved in a proposed conversion of St. Louis Hall that ultimately seeks to create affordable housing units.

5.    In March 2006, the Lantern Group notified 319 West 94th Street's tenants that it had taken ownership of the building. *See* Exh. E at p. 17.[2]

6.    319 Realty Services, L.P. (a related entity of The Lantern Group, Inc.) became the lessee and manager of St. Louis Hall. *See* Exh. D at ¶6

7.    St. Louis L.P. (another related entity of The Lantern Group, Inc.) is a not-for-profit entity that signed an agreement to purchase the building located at 314 W. 94th Street, New York, NY in order to create the affordable housing units. The Lantern Group, Inc. would be the sponsor of the conversion project. *See* Exh. D at ¶5.

8.    Plaintiff admits that the Lantern Group is a non-profit entity. *See* Exh. E at p. 39.

9.    In or about March 2006, the Lantern Group advised the 319 West 94th Street tenants of its status as a non-profit organization that provides affordable housing and on-site social services to tenants. *See* Exh. G.

---

1 Copies of all exhibits are attached to the accompanying Declaration of Melissa Holtzer, submitted in support of defendant's motion.
2 Plaintiff does not distinguish between the corporate defendants, referring to them as "the Lantern Group."

10.    The Lantern Group advised the 53 existing 319 West 94th Street tenants that the planned renovation would not result in eviction of any existing tenants and that there would not be any rent increase to them. *See* Exh. G.

11.    The Lantern Group also notified the existing 319 West 94th Street's tenants that the building would be redeveloped so that it could also provide housing to 60 formerly homeless adults with special needs, and 27 formerly homeless and employed single adults without special needs. *See* Exh. E at p.35, Exh. G.

12.    Plaintiff believes that the Lantern Group's goal was to have the building become inhabited with 60 "ex-convict[s], people having AIDS, ex-drug addicts, ex-pornographers, [and] pedophiles." *See* Exh. E at p.35.

13.    Plaintiff took issue with the renovations believing they would be aesthetically unappealing. *See* Exh. E at p. 41.

14.    Plaintiff admits that a non-profit corporation need not obtain a certificate of non-harassment from New York City. *See* Exh. F at pp. 292-93.

**B.    THE LANTERN GROUP'S POLICY REGARDING DELIVERIES TO THE BUILDING**

15.    In or about September of 2007, the Lantern Group implemented a policy that prohibited the building's security guards from accepting the delivery of any packages to residents. *See* Exh. E at p. 32.

16.    The rationale for the enactment of the policy was that the Lantern Group did not want to accept responsibility for packages and other items which could potentially be stolen. *See* Exh. E at pp. 33-34.

17.    In this regard, the security guards in the building were not employees of the Lantern Group. Rather, a corporation called St. Louis Service Corp. employed

Resident Coordinators on weekdays during the 8 a.m. to 4 p.m. and 4 p.m. to midnight shifts.    *See* Exh. D ¶7.    The Lantern Group contracts with FJC Securities for the provision of security guard services weekdays from midnight to 8 a.m. and weekends. *See* Exh. D ¶7. *See also* Exh. E at p. 56.

18.    Prior to the enactment of this new rule, tenants who had laundry delivered to the building would find their clothes placed on a hook located by a lobby window. *See* Exh. E at p. 34.

19.    Plaintiff subsequently advised Harriet Cohen, a Director of the Lantern Group, that she is disabled and cannot carry her laundry home by herself.  As such, she needed the security guards to accept delivery of her laundry. *See* Exh. E at p. 37, 51, 54-55.

20.    Plaintiff has been diagnosed with Multiple Sclerosis. *See* Exh. E at p. 42.

21.    In response to plaintiff's concerns, the Lantern Group amended its policy to allow the security guards to accept personal deliveries (i.e. laundry, dry cleaning) on behalf of tenants with physical disabilities. *See* Exh. E at p. 72, Exh. I.

22.    In order to avail themselves of the exception to the package handling policy, interested tenants were required to complete a Package Delivery Assistance Form. *See* Exh. F at p. 218, Exh. I.

23.    The Package Delivery Assistance Form states that the tenant has authorized the reception desk to accept packages, and there are signature lines for both the tenant and the property manager. *See* Exh. I.

24.    Plaintiff did not complete a Package Delivery Assistance Form as she "did not feel that it was necessary to fill out the form." *See* Exh. F at p. 218.

4

25.     Since its enactment of its amended Package Delivery policy, the Lantern Group
        has accepted deliveries on plaintiff's behalf. _See_ Exh. D at ¶7.

### C.  PLAINTIFF'S REQUESTS FOR REPAIRS TO THE BUILDING

26.     The Lantern Group required all tenants to submit any requests for repairs in
        writing on a designated Work Order Form. _See_ Exh. E at pp. 106, 114.

27.     When plaintiff submitted repair requests, it would generally take no more than
        two days for the repairs to be made. _See_ Exh. E at pp. 112-13.

28.     On two occasions, plaintiff notified an individual named Felix DeJesus that there
        was vomit and/or urine in the elevator. _See_ Exh. E at pp. 128-29.

29.     In both instances, the elevator had been cleaned by the next time plaintiff entered
        the elevator. _See_ Exh. E at pp. 129-30.

30.     Plaintiff concedes that the physical condition of the building is something that
        would apply to all tenants, not just plaintiff. _See_ Exh. E at p. 182.

31.     The tenants of St. Louis Hall are people of varying races, ages, and disabilities.
        _See_ Exh. D at ¶9.

32.     Plaintiff compares the Lantern Group to the Nazis stating that, "they treat the
        people as bad as they treat the people in the Second World War." _See_ Exh. E at p.
        203.

### D.  PLAINTIFF'S SECURITY DEPOSIT

33.     Plaintiff claims that, when she moved into the building in September of 1994, she
        gave a $100 security deposit to the Margules family. _See_ Exh. E at pp. 139, 141.

34.     After the Lantern Group took ownership of the building in or about March of
        2006, plaintiff received a receipt reflecting her most recent rent payment. _See_

5

Exh. E at pp. 139-40.

35.    Plaintiff complained to the Lantern Group about the fact that her receipt did not reflect the $100 security deposit allegedly paid to the prior owner. *See* Exh. E at p. 141.

36.    The Lantern Group investigated the complaint, confirmed the $100 security deposit to the previous owner, and subsequently sent correspondence to plaintiff recognizing her payment of $100 to the previous owner of the building. *See* Exh. E at p. 141.

37.    Several other tenants had the same issue arise relating to security deposits issued to the prior owner. *See* Exh. E at p. 143.

**E.    PLAINTIFF'S TRIPS TO FRANCE FOR MEDICAL TREATMENT**

38.    Plaintiff travels to Paris, France every 4 to 6 weeks in order to obtain medical treatment relating to her Multiple Sclerosis. *See* Exh. E at p. 47.

39.    Each time plaintiff travels to Paris for medical treatment, she travels for approximately one week. *See* Exh. E at p. 172.

40.    In order to maintain her status as a Permanent Tenant, plaintiff is required to maintain 319 West 94th Street as her primary residence. *See* Exh. E at p. 169.

41.    Despite the primary residence rule, no one at the Lantern Group required plaintiff to write a letter or otherwise provide an explanation of her reasons for traveling to Paris. *See* Exh. E at p. 169.

**F.    PLAINTIFF'S CLAIM OF NATIONAL ORIGIN DISCRIMINATION**

42.    Plaintiff believes that a porter named Jose and a security guard named Felix DeJesus were making fun of her when they laughed at her pronunciation of the

6

word "rest room," which she claims to have difficulty pronouncing due to her French accent. _See_ Exh. E at pp. 80-82.

43.    Plaintiff complained to Rafal Markwat of the Lantern Group about the matter and Markwat responded that he would take care of the situation. _See_ Exh. E at p. 83.

44.    No one else from the Lantern Group ever made fun of her accent or ever referenced her French heritage. _See_ Exh. E at pp. 159, 161.

## G.    PLAINTIFF'S CLAIM OF AGE DISCRIMINATION

45.    Plaintiff alleges that unknown security guards told her she was cheap and should live in a nursing home. _See_ Exh. F at pp. 233-34.

## H.    PLAINTIFF'S STATE COURT LAWSUIT

46.    About 25 neighborhood residents, including plaintiff, have commenced an Article 78 proceeding in the Supreme Court for the State of New York, captioned Neighborhood in the Nineties Inc. et al v. City of New York et al., Index No., seeking to stop the building's renovation/conversion. _See_ Exh. E at pp. 7-9, _see also_ Exh. J.

47.    In this proceeding, petitioners seek to invalidate the grant of a zoning variance to the Lantern Group which would have enabled it to complete it renovation of St. Louis Hall. _See_ Exh. J.

48.    This case is still pending. _See_ Exh. J.

Dated:  Mineola, New York
        September 5, 2008                  MIRANDA SOKOLOFF SAMBURSKY
                                           SLONE VERVENIOTIS LLP
                                           Attorneys for Defendants
                                           THE LANTERN GROUP, ST. LOUIS L.P. s/h/a
                                           ST. LOUIS HALL L.P., 319 WEST REALTY

SERVICES L.P. s/h/a 319 WEST REALTY
SERVICES L.L.P.

Adam I. Kleinberg (AIK-0468)
Melissa Holtzer (MH 6636)
The Esposito Building
240 Mineola Boulevard
Mineola, New York 11501
(516) 741-7676
Our File No.: 07-636